Mark S. Lichtenstein
AKERMAN LLP
1251 Avenue of the Americas, 37th Floor
New York, New York 10020
Tel. No. (212) 880-3800
Fax No. (212) 880-8965

John H. Thompson
AKERMAN LLP
750 Ninth Street, N.W., Suite 750
Washington D.C. 20001
Tel.: (202) 393-6222
Fax: (202) 393-5959

*Proposed Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BUYK CORP.[1] | ) | Case No. 22-10328 (MEW) |
| | ) | |
| Debtor. | ) | |
| | ) | |

### DECLARATION OF JAMES WALKER PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS

1.      I am the Chief Executive Officer of BUYK Corp. ("BUYK" or the "Debtor"), and I am familiar with the business and affairs of the Debtor.  I submit this declaration in accordance with Local Bankruptcy Rule 1007-2 in support of the Debtor's voluntary petition under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and the relief, in the form of motions and applications, that the Debtor has requested of the Court (the "First Day Motions").  I believe the relief sought in each of the First Day Motions is (i) necessary to enable the Debtor to maximize the value of its assets in Chapter 11, (ii) critical to the Debtor achieving a successful liquidation in Chapter 11, and (iii) in the best interests of the Debtor's estate, creditors and all parties in interest.

2.      Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, upon information supplied to me by the Debtor's employees, and from my review of relevant documents, or otherwise upon my opinion based upon my experience, my

---

[1] The Debtor in this case, along with the last four digits of its federal tax identification number is Buyk Corp. (1477). The principal place of business for the Debtor is 360 West 31st Street, Floor 6, New York, NY 10001.

discussions with the Debtor's advisors and my knowledge of the Debtor's business and financial condition.

## INTRODUCTION

3.     The Debtor intends to proceed as expeditiously as permitted through its Chapter 11 case for the purposes of effecting a sale of substantially all of its assets subject to higher and better offers in an auction process approved by the Court.

4.     Prior to this bankruptcy filing, the Debtor operated an ultra-high speed grocery business with 39 locations, 31 in the New York metropolitan area and 8 in the Chicago metropolitan area.  The Debtor commenced operations in April of 2021.  After an initial seed round of investment by Russian-based investors in the amount of approximately $63.5 million in convertible notes and $11 million in unsecured loans, in or about January 2022, the Debtor was in the process of a seeking additional equity investment of approximately $250,000,000.  Due to the mounting indicia of a potential Russian dispute with Ukraine, the Debtor determined in January 2022 to pivot to a United States-based equity raise and actively sought series A funding from numerous institutional investors.  The United States fund raising was going reasonably well when Russia commenced its invasion of Ukraine.  At that juncture, the Debtor was confronted with an existential and, ultimately, fatal crisis.  First, any chance of obtaining equity or debt investment from the prominent institutional investors which had been interested in funding the Debtor was now lost.  Second, although the Debtor was operating and earning revenue, it was in the beginning stages of its growth and was relying, in part, on cash infusions by the founders to continue its operations and expansion.  Unfortunately, although the founders were not, and are not, subject to any sanctions, restrictions on the ability to transfer any funds out of Russia made it impossible for the founders to provide any further funding to the Debtor.

5.      Since February 28, 2022, working together with the management team, I have tried to pursue, on behalf of the Debtor, an asset or stock sale to a variety of entities in a similar or adjacent business as the Debtor or a rescue loan /equity investment.  In light of the monthly deficiency between income and expenses, an impending payroll due on March 11, 2022, and other pressing obligations to creditors, plus the negative impact of the Russia/Ukraine crisis on investor interest, the Debtor began seeking a loan from several potential debtor-in-possession ("DIP") lenders in order to fund final payroll to Debtor's employees and independent contractors in the amount of approximately 800 and an orderly liquidation in the context of bankruptcy.  In the exercise of its fiduciary duties to all stakeholders it became apparent that the only viable and realistic strategic alternative for the Debtor was to obtain a short term bridge loan secured by all of the Debtor's assets, including unencumbered brand new (and almost new) refrigeration and other food storage equipment with a book value of approximately $11 million, grocery items (including 20% perishable items) with a book value of $1.7 million, and cash of approximately $700,000, in a sufficient amount to fund all outstanding payroll expense and an expedited sale process in bankruptcy.  The goal, of course, is to maximize the value of these assets in bankruptcy in order to repay the DIP Lender, administrative and priority claims and to, if possible, provide some level of distribution to unsecured creditors.

6.      After having discussions with over thirty (30) potential funding sources, including multiple potential DIP lenders, on March 10, 2022, the Debtor entered into a Term Sheet with Legalist for a debtor-in-possession loan commitment of $6.5 million (the "DIP Loan").

7.      On March 4, 2022, the Debtor furloughed approximately 98% of all employees. On March 11, 2022, the Debtor terminated the employment of all of its employees, except for six staff members, who the Debtor proposes to continue to employ post-petition to assist in the

orderly wind down in this liquidating Chapter 11.[2]  On March 11, 2022, Legalist and the Debtor executed that certain Pre-Petition Term Loan Credit Agreement in the maximum amount of $6.5 million (the "Credit Agreement")[3] which provided for two separate draws:  (i) $4 million on March 11, 2022 for the sole purpose of satisfying all payroll obligations for the Debtor's terminated employees and, (ii) up to $2.5 million to be drawn post-petition pursuant to a budget approved by the Court as part of Court approval of the DIP Loan and the funds borrowed both pre and post-petition.  As more fully detailed below, and in the Debtor's motion for approval of the DIP Loan and for use of cash collateral (the "DIP Motion"), the Debtor seeks entry of an order providing Legalist with a senior secured lien under section 364(d) of the Bankruptcy Code and a super priority administrative claim pursuant to Section 507 of the Bankruptcy Code (subject only to expenditures permitted under the Budget and a Carveout as set forth in the proposed DIP Financing Order) on any of the Debtor's assets, both pre and post-petition, in the amount of the entire indebtedness.

8.    The purpose of the post-petition availability under the DIP Loan is to fund an expedited and efficient sale process of the Debtor's assets.   In light of the existence of perishable inventory and the desperate need to avoid administrative rents starting in April 2022[4], the Debtor retained certain auctioneers pre-petition with the intent to seek Court approval of the retention of such auctioneers and the sale process.

9.    The Debtor's goal is to complete the sale process within sixty (60) days of the Petition Date and to then seek confirmation of a plan of liquidation to distribute the remaining sale proceeds after satisfaction of the DIP Loan.  The Debtor has sufficient funds and anticipated

---

[2] On March 11, 2022, the Debtor provided WARN Notices to all terminated employees.

[3] Pre-Petition Term Loan Credit Agreement was superseded by the Amended and Restated DIP Agreement.

[4]  Many of the Debtor's leases are current through March 2022.

revenues from prospective asset sales to operate in liquidation mode through, at least, the first 13 weeks of these Chapter 11 case, as reflected in the six month weekly budget (the "Budget") prepared by the Debtor and annexed hereto as **Exhibit A**.

10.    The Debtor's entry into the DIP Loan and the sale of all assets is the best result for all stakeholders under incredibly difficult and unforeseeable circumstances.  For the Debtor's former employees, the DIP Loan allowed them to be paid their wages in full.  For the rest of the Debtor's stakeholders, the DIP Loan, commencement of this case, and the contemplated sale process will enable the Debtor to maximize the value of its assets in the hope of satisfying creditor claims in order of priority.

## BUSINESS OF THE DEBTOR

11.    In April 2021, the Debtor made its debut with the launch of a 15-minute grocery delivery service in New York City. In November 2021, the Debtor expanded into the Chicago market.

12.    The Debtor offered grocery items, along with household essentials, personal care and pet supplies, relying on couriers on bicycles to deliver the orders.

13.    The Debtor, which was backed by $46 million in seed funding, was the latest entrant to the competitive field of ultrafast delivery firms cropping up in major metropolitan areas including New York.  One of the Debtor's differentiating factors from its competitors was its real-time, in-house technology.  For example, the Debtor, which had an order weight maximum of 26 pounds for each courier, had the ability to split larger orders up between multiple couriers if needed. Its technology allowed the Debtor to fulfill orders within two minutes and then deliver them in between five and 10 minutes.

14.    The Debtor relied on a mix of contractors and its own workforce and had more than 600 couriers and over 100 office workers.  In addition to leveraging efficiencies from its

technologies, the Debtor attempted to earn revenue from the margins on its products and used the money saved by renting small locations not needed to be in prime spots for foot traffic to invest in employee costs. The Debtor's business plan also included an initiative to launch private label offerings with more than 100 SKUs in categories, such as meat and pasta.

15.     As of February 24, 2022, the Debtor had 39 stores that serve the New York and the Chicago metropolitan areas (31 in New York and 8 in Chicago), each with 2,000 to 3,000 SKUs.

16.     As noted above, the Debtor had been relying upon cash infusions by its original investors to continue to operate and expand while simultaneously seeking a new round of equity financing.  Prior to closing its business, the Debtor's plan was to open another 100 stores in 2022.  Due to the invasion of Ukraine, the Debtor was unable to execute on its planned equity raise, despite its intensive efforts to raise rescue capital.  With relatively little cash on hand in February 2022 and payroll coming due, the Debtor's Board of Directors, in consultation with its managers and retained advisors, determined to ultimately terminate virtually all of its employees and obtain a relatively small DIP Loan to fund a liquidating Chapter 11 case.

17.     On March 11, 2022, the Debtor enter into the Credit Agreement to borrow up to $6.5 million from Legalist with $4 million of such commitment already distributed by the Debtor on account of the wages due to all employees[5] whose employment was terminated on March 11, 2022.

18.     As previously stated, Legalist and the Debtor agreed in the Credit Agreement that the Debtor was required to file a bankruptcy case on March 15, 2022 (with a two-business day grace period).

---

[5] Note the exception of 6 employees retained to assist with the bankruptcy.

## CHAPTER 11

19.     On March 17, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  As a result of the Ukrainian crisis and the Debtor's attendant inability to receive funding from its initial investors and/or any other parties in a sufficient amount to continue to operate as a going concern while seeking a comprehensive capital raise or a merger or sale transaction, the Debtor's fiduciaries determined to cause the Debtor to commence this Chapter 11 case in order to effectuate an orderly sale of its assets.

## CORPORATE STRUCTURE

20.     Annexed hereto as **Exhibit B** is the Debtor's organizational chart.  As set forth therein, Rodion Shishkov and Viacheslav Bocharov, each own 46.55% of the Debtor.  The remaining 6.9% of the Debtor is owned by Kirill Shishkov.  Prior to the financial distress described above, the Debtor formed a German wholly-owned subsidiary named BUYK GmBH.  That entity has no assets, liabilities and operations and has little if any value.  In the Debtor's estimation it is highly unlikely that any part of the funds realized from the sales of the Debtor's assets will be distributed to equity holders under a liquidating plan or otherwise.

## CAPITAL STRUCTURE AND PREPETITION INDEBTEDNESS

21.     The Debtor's principal pre-petition secured lender is Legalist whose secured debt against the Debtor is in the amount of $4,000,000 as of the Petition Date.  Legalist has a blanket lien on all of the Debtor's assets.  Legalist has committed to funding up to an additional $2.5 million to fund the Chapter 11 case.  The Debtor has no other secured creditors.

22.     The Debtor is also a borrower under certain unsecured convertible notes in the aggregate amount of $63.5 million during the period from June-December 2021 (the "Convertible Notes").  In addition to the secured debt to Legalist and the Convertible Note debt,

the Debtor has approximately $18 million in unsecured debt.  Finally, the Debtor anticipates

significant claims arising from the rejection of its leases (although as part of the sale process).

### SUMMARY OF FIRST-DAY MOTIONS AND APPLICATIONS

23.     To minimize the adverse effects of the commencement of the Chapter 11 case on

the Debtor's business and employees, the Debtor has requested various types of relief in its First

Day Motions, all of which are either being filed concurrently with this Affidavit, or will be filed

shortly after the Petition Date.  I believe that the relief requested in each of the First Day Motions

is necessary, appropriate, and is in the best interests of the Debtor's estates, creditors, and other

parties in interest.

24.     I have reviewed each of the First Day Motions (described below), including any

exhibits and schedules thereto, and, to the best of my knowledge, I believe that the facts set forth

in the First Day Motions are true and correct.  If I were called upon to testify, I could and would,

based on the foregoing, testify competently to the facts set forth in each of the First Day Motion.

25.     Furthermore, as a result of my personal knowledge, information supplied to me by

other members of the Debtor's management and employees, from my review of relevant

documents, or upon my opinion based upon my experience, discussions with the Debtor's

advisors and knowledge of the Debtor's operations and financial condition, I believe the relief

sought in the First Day Motions is necessary for the Debtor to effectuate a smooth transition into

Chapter 11 bankruptcy, to maximize the value of its assets in the context of an expedited and

orderly sale process, and is in the best interests of the Debtor's creditors, estates, and other

stakeholders.

26.     Accordingly, for the reasons stated herein and in each of the First Day Motions

filed concurrently or in connection with the commencement of the Chapter 11 Case, I believe the

relief sought in the First Day Motions should be granted by the Court, together with such other and further relief the Court deems just and proper, in the most expeditious manner possible.

A.      **DIP LOAN/ Cash Collateral Motion:**

Debtor's Motion for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. 105, 361, 362, 363, 364, 503, 506, 507, and 552, (I) Authorizing the Debtor to Obtain Senior Secured Superpriority Post-Petition Financing, (II) Granting Liens and Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing and (VII) Granting Related Relief (the "DIP Motion")

27.     Pursuant to the DIP Motion, the Debtor seeks an order from the Court (a) authorizing the Debtor to obtain senior secured superiority postpetition financing, (b) granting liens and administrative expense claims, (c) authorizing the use of cash collateral, (d) granting adequate protection, (e) modifying the automatic stay, (f) scheduling a final hearing and (g) granting related relief.

28.     The Debtor needs to obtain credit pursuant to postpetition financing is immediate and critical in order to enable the Debtor to fund this bankruptcy filing, the payment of the salaries/wages of its employees, the legal fees of Akerman, and the operating/wind-down expenses in order to maximize the value of the Debtor's collateral on behalf of creditors.

29.     The Debtor does not have sufficient available sources of working capital and financing to orderly wind-down its affairs and fund this Chapter 11 filing without debtor-in-possession financing and the authorized use of "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code ("Cash Collateral").

30.     The DIP Lender (as defined in the DIP Motion) is willing to provide liquidity on the terms provided in the DIP Loan Documents (as defined in the DIP Motion) and the Interim Order and the Final Order (each as defined in the DIP Motion). I understand the terms of the DIP Loans (as defined in the DIP Motion) to be reasonable and customary in the context of debtor-in-

possession financings of this type.  And I believe that the liquidity to be provided by the DIP

Loans, together with the use of Cash Collateral, will enable the Debtor to orderly wind-down its

operations quickly and efficiently throughout the course of this Chapter 11 Case.

31.     The ability of the Debtor to finance its wind-down operations, pay its employees,

protect the value of its assets and pursue a strategy to maximize value for their creditors requires

the availability of working capital from the DIP Loans and the ability to use Cash Collateral. I

believe the absence of such would immediately and irreparably harm the Debtor, its estate and its

creditors and the possibility for successful administration of these Chapter 11 Case.  Without the

proceeds of the DIP Loan and the ability to use Cash Collateral, the Debtor would be unable to

fund payments that are essential to the Debtor's orderly winddown of its business.

**B.      KERP/KEIP Motion:**

Debtor's Motion for an Order (I) Approving Terms and Authorizing Implementation of
Key Employee Retention Program and Key Employee Incentive Plan; and (II) Granting
Related Relief (the "Key Employee Motion")

32.     As is typical in Chapter 11 cases, the Debtor requests an order from the Court

approving terms and authorizing implementation of key employee retention program and key

employee incentive plan and granting related relief.

33.     Preservation and maximization of the value of the Debtor's business for its

orderly liquidation depends on the performance and productivity of the Debtor's key employees

to oversee and handle the liquidation of its assets.  The Debtor has already terminated, on a pre-

petition basis, all but six (6) key employees who each have critically important and distinct skill

sets and responsibilities.  I view these 6 employees as critical to the winddown process, and I

believe that replacing these employees would be difficult, time-consuming and expensive, if they

could be replaced at all. Losing these employees at this early and critical stage of the Chapter 11

Case will be highly disruptive to the Debtor's orderly liquidation process, prejudicing the Debtor's bankruptcy estate and creditors.

34.    **Description of the KERP:**  To reduce the risk of potential departures of certain key employees as a consequence of the liquidation process, the Debtor has developed a key employee retention program (the "KERP") and a key employee incentive program (the "KEIP") to motivate six  of the Debtor's employees representing approximately .075 of the Debtor's total pre-petition employee headcount (the "KERP/KEIP Participants"), to remain employed with the Debtor and to maximize the value of the Debtor's remaining assets during Chapter 11.

35.    The KERP is designed to ensure that six (6) key employees remain with the Debtor during this Chapter 11 Case and the liquidation of the Debtor's assets. The total aggregate KERP payments is $153,203.10 per month including benefits (the "KERP Payments") consistent with the chart below:

|  | Current Salary per Year | Discount | New Salary per Year |
|---|---|---|---|
| James Walker | $      750,000 | 35% | $      487,500 |
| Alexandre Agaian | $      222,000 | 0.0% | $      222,000 |
| Olga Beliakova | $      178,500 | 0.0% | $      178,500 |
| Dmitry Vilbaum | $      300,000 | 10.0% | $      270,000 |
| Ramon Guzman | $      120,000 | 0.0% | $      120,000 |
| Oleg Lungu | $      180,000 | 0.0% | $      180,000 |

36.    **Description of the KEIP:**  The Debtor's KEIP covers all six employees, with an aggregate total payout of approximately $300,000 (the "KEIP Payments").  The KEIP is based on the following metrics being met: (i) a sale of assets for an aggregate net value of $8 million or more; or (ii) a distribution to unsecured creditors of 10% or more, through the confirmation of a plan of liquidation. The distribution of the KEIP Payments among the KERP/KEIP Participants shall be based on and proportionate to the amount of salary received by each KERP/KEIP

Participant while the Debtor is in bankruptcy. Upon the completion of the required metrics, each KERP/KEIP Participant shall receive a percentage of the $300,000 equal to the percentage amount of the salary received by that KERP/KEIP Participant, after all salary to all of the KERP/KEIP Participants has been calculated.

37.     The ability of the Debtor to wind-down its operations, protect the value of its assets and pursue a strategy to maximize value for its creditors requires employees familiar with the Debtor's assets and operations in order for those assets to be liquidated as quickly and efficiently as possible. I believe the absence of the KERP/KEIP Participants in the liquidation/winddown process would immediately and irreparably harm the Debtor, its estate and its creditors and the possibility for successful administration of this Chapter 11 Case.  Without employees knowledgeable of the Debtor, there would be no one to actually execute the winddown tasks envisioned and required under this Chapter 11 Case.

**C.     Cash Management Motion:**

Debtor's Emergency Motion for Entry of Interim and Final Order (I) Authorizing Debtor to, in the Ordinary Course, Use Cash Management System and Bank Accounts; and (II) Authorizing Banks and Financial Institutions to Honor and Process All Related Checks and Electronic Payment Requests (the "Cash Management Motion")

38.     In the Cash Management Motion, the Debtor is seeking interim and final orders: (i) authorizing the Debtor to, in the ordinary course of business, use  existing cash management system, and pre-petition bank accounts; (ii) authorizing the Debtor's banks and financial institutions to: (a) maintain, service, and administer the Debtor's bank accounts, and (b) honor and process all related checks and electronic payment requests consistent with the relief requested herein; and (iii) granting such other and further relief as requested herein or as the Court otherwise deems necessary or appropriate.

39.     The Debtor has an established cash management system it utilizes to collect, manage, and disburse funds used in the Debtor's operations in the ordinary course of business (the "Cash Management System").   The Cash Management System enables the Debtor to facilitate its cash forecasting and reporting, monitor the collection and disbursement of funds, and maintain control over the administration of its bank accounts.

40.     In connection with the Cash Management System, the Debtor maintains two (2) bank accounts with Citibank and one (1) bank account with JP Morgan Chase (the "Bank Accounts").   In the ordinary course of business, the Debtor routinely transfers money between the Bank Accounts.  As of the Petition Date, the Debtor's CitiBank account ending in 4388 is an operating account.   Payments to landlords, payroll and vendors are made directly from this account.  The Debtor also has a JP Morgan Chase account, which account number ends in 6907. The Debtor's operating and purchases are paid from this account.   Next, the CitiBank account ending in number 4396 is the account the Debtor received and maintained monies from investors.  In the ordinary course, the Debtor's Cash Management Bank charges, and the Debtor pays, honors, or allows the deduction from the appropriate account, certain service and other fees, costs, charges, and expenses (collectively, the "Bank Fees"). In the six (6) months preceding the Petition Date, the Bank Fees averaged approximately $1,000.00 per month.

41.     The Debtor's inability to continue using the Cash Management System, including existing bank accounts, would severely disrupt their operations.  The Debtor's corporate and financial structure make it difficult and unduly burdensome to establish an entirely new system of accounts and a new cash management system for the Debtor in an orderly liquidation of its business.   Accordingly, under the circumstances, I believe that maintenance of the Cash Management System is in the best interests of the Debtor's estate and its creditors.  Additionally, preserving as close to "business as usual" conditions under the circumstances and avoiding the

substantial difficulties that would be created by a major disruption of the Cash Management System will facilitate the Debtor's orderly winddown and liquidation of the company. I understand that the Debtor will continue to maintain accurate and current records with respect to all transactions so that all transactions can be readily ascertained, tracked and properly recorded.

D.    **The Insurance Motion :**

Debtor's Emergency Motion for Entry of Order (I) Authorizing, But Not Directing, Debtor to (A) Maintain Existing Insurance Programs and Existing Premium Financing Agreement, and (B) Fund all Obligations in Respect Thereof, and (III) Granting Related Relief (the "Insurance Motion")

42.    In connection with the operation of the Debtor's business, the Debtor maintains comprehensive insurance programs (collectively, the "Insurance Programs") that include a variety of policies through several different insurance carriers (collectively, the "Insurance Carriers"). A detailed list of the Insurance Programs is annexed as Exhibit B to the Insurance Motion. In general the policies include general liability and property policies, workers compensation policies, a management liability policy, a policy to insure against crime, an employment and practices liability policy, a policy to insure against cyber-attacks, and a policy to insure against terrorist attacks.

43.    The premiums with respect to certain of the Insurance Programs are financed pursuant to a premium financing agreement between First Insurance Funding and the Debtor (the "Premium Financing Agreement"), a true and correct copy of which is attached as Exhibit C to the Insurance Motion. The Debtor is obligated to make monthly payments to First Insurance Funding in the amount of $28,370.67 under the Premium Financing Agreement. The Debtor previously funded $49,452.56 toward the down payment of the Premium Financing Agreement.

44.    The relief requested in this Motion is necessary for the Debtor to continue its operations during the pendency of the Chapter 11 Case. If the Insurance Programs lapse, the

Debtor will be required to obtain replacement insurance, likely at a cost greater than the cost of the current Insurance Programs. Furthermore, replacing the Insurance Programs would divert the time and resources of the Debtor's officers and/or managers away from the liquidation process. Based upon my experience and business judgment, I believe that it is necessary for the Insurance Programs to be paid for during the pendency of the this until the Debtor is able to liquidate of all its assets and reject the leases at issue in this case. In addition I believe the loss of the Management Liability Insurance policy could prompt officers to resign. Further, I am concerned that if the Insurance Programs are not kept in place, an accident could expose the Debtor to substantial administrative claims.

**E.    The Extension of Time Motion**

Debtor's Motion for Entry of an Order Granting an Extension of Time to File Schedules and Statements (the "Extension of Time Motion")

45.    The Debtor has begun compiling the information required to complete its Schedules and Statements. Nevertheless, in order to prepare the Schedules and Statements, the Debtor must review and compile information from its books and records and from other documents relating to, among other things, accounts payable and receivables, real estate leases, employee wages and benefits, and vendor and supplier agreements. Collecting the necessary information to prepare the Schedules requires an enormous expenditure of time and effort from the Debtor, its employees and professionals.

46.     Given the numerous critical operational matters that the Debtor's employees, in a substantially reduced capacity, and legal personnel must address in the early days of this Chapter 11 Case, and the volume of information that must be reviewed, prepared, and included in its Schedules and Statements, the Debtor anticipates that it will be unable to complete its Schedules and Statements within the time required under Bankruptcy Rule 1007.

47.     It is my belief that focusing the attention of the remaining employees on maximizing value through this liquidation process during the critical first weeks after filing this Chapter 11 Case, rather than on preparing its Schedules and Statements, will facilitate the Debtor's smooth transition into Chapter 11 and maximize the value of the Debtor's estate for the benefit of creditors and all parties in interest.  It is my belief that seeking an additional thirty (30) days by which to file its Schedules and Statements with the Court will not prejudice the creditors and other interested parties in this case and provide the Debtor with sufficient time to marshal its assets for a successful liquidation process.

**E.**     **The Tax Motion**

Debtor's Motion for Entry of an Order Authorizing Payment of Sales. Franchise, and Annual Reporting Taxes and Fees (the "Extension of Time Motion")

48.     In connection with its business the Debtor incurred certain taxes (collectively, the "Taxes") and fees and other similar charges and assessments (collectively, the "Fees" and, together with Taxes, the "Taxes and Fees") to various taxing, licensing, regulatory, and other governmental authorities (the "Taxing Authorities").  The Taxes and Fees incurred by the Debtor generally consist of sales, franchise, and annual reporting Taxes and Fees.  As of the Petition Date, the Debtor owes approximately $40,000 in outstanding Taxes and Fees, for which the Debtor is seeking from the Court authorization, but not direction, to pay or to fund**.**

49.     There are multiple sound business justifications for payment of the Debtor's Taxes and Fees. First, absent payment, I believe Taxing Authorities may initiate audits of the Debtor, which would unnecessarily divert the Debtor's focus and attention from the tasks required at this critical time.  Second, I have been advised that the Taxing Authorities may attempt to file liens, seek to lift the automatic stay, and/or pursue other remedies that would be administratively burdensome and adverse to the Debtor's estate. Third, I believe the Debtor's failure to pay such Taxes and Fees to the Taxing Authorities could cause the Debtor to incur late fees, penalties, and other charges. Finally to the extent Taxes and Fees of the Debtor remain unpaid, the Debtor's officers and directors, including myself, may be subject to claims during the pendency of this Chapter 11 Case which would prove extremely distracting for myself and the other officers and directors who instead need to focus their attention to the Debtor's bankruptcy case to ensure a maximum distribution to creditors.

## F.     **The Utilities Motion**

Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Determining That Utility Providers Have Been Provided with Adequate Assurance of Payment, (II) Approving Proposed Adequate Assurance Procedures, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (IV) Determining that Debtor is not Required to Provide Any Additional Assurance, (V) Scheduling a Hearing to Consider Entry of a Final Order, and (VI) Granting Related Relief (the "Utilities Motion")

50.     The Debtor incurs utility expenses for electricity, telephone, water, waste disposal, internet, and other essential services (collectively "Utility Services") in the ordinary course of its business. Prior to the Petition Date, the Debtor placed amounts on deposit with many of the Utility Providers as security for the Debtor's respective obligations (the "Pre-petition Security Deposits").

51.     I believe that preserving the Utility Services on an uninterrupted basis to the Debtor's office, locations and warehouses is essential to the Debtor's ability to maximize the value of assets for the estate and creditors. I fear that an unplanned interruption of utility services for even a brief period of time will negatively impact the goods located at these locations and thus seriously jeopardize their value to the estate. Thus, I believe it is imperative that the Utility Providers continue to provide their  Utility Services without interruption.

52.     In general, I understand that the Debtor has established satisfactory payment histories with the Utility Providers and have made payments on a regular and timely basis. The Debtor intends to pay any postpetition obligations to the Utility Providers in a timely fashion and in the ordinary course. The Debtor has budgeted for the payments and believe, and I agree, that cash on hand, the DIP financing, cash generated through the liquidation, and cash otherwise available to the Debtor will be sufficient to satisfy obligations for the Utility Services in the ordinary course on a postpetition basis in a manner consistent with the Debtor's prepetition practice.

53.     Further the Debtor submits, and I agree, that it has made a good faith effort to identify all of its Utility Providers to provide them with the right to evaluate the Proposed Adequate Assurance and to seek additional adequate assurance. Further the Debtor submits, and I agree, that the proposed Adequate Assurance Procedures provide the Utility Providers with fair and orderly procedures for demanding adequate assurance.

G.     **The Reclamation Procedures Motion**

        The Debtor's Motion for Order Under 11 U.S.C. §§ 105 and 546 Approving Reclamation Procedures (the "Reclamation Procedures Motion")

54.     In the ordinary course of business the Debtor received daily shipments of food, materials, supplies, goods, products and related items (the "Goods"). Therefore, the Debtor believes that many of the Debtor's suppliers and vendors (together, the "Suppliers") will attempt, pursuant to section 546(c) of the Bankruptcy Code, to assert their right to reclaim Goods delivered to the Debtor shortly before the Petition Date. On or about March 4, 2022, the Debtor began to refuse delivery of unpaid Goods from vendors.

55.     The Debtor proposes to handle reclamation demands as follows: Within 10 business days following the Debtor's receipt of a reclamation demand, the Debtor will provide the Supplier with a written response (the "Response") advising the Supplier whether or not the Debtor has any Segregated Reclamation Goods and, if so, that such Goods shall be available for pick-up for 10 days following the date of the Response. In the event the Supplier does not reclaim the Segregated Reclamation Goods within that 10-day period, the Supplier shall be deemed to have waived and be forever barred from pursuing its reclamation demand. In the event that (i) the Debtor provides no Response or (ii) the Segregated Reclamation Goods do not include all Goods subject to a valid reclamation demand, then the Supplier shall have an administrative expense claim for any Goods covered by a valid reclamation demand other than the Segregated Reclamation Goods (the "Nonsegregated Reclamation Goods"), subject to the claimant's right to seek a lien or request other relief with respect to the Nonsegregated Reclamation Goods (without the need to commence an adversary proceeding) and the Debtor's and other parties' right to oppose such relief or contest the extent, validity or enforceability of the administrative expense claim.

56.     I believe the proposed reclamation procedures are justified by the Debtor's current goals of expeditiously liquidating the business. The Debtor believes the expeditious return of Segregated Reclamation Goods subject to reclamation demands to Vendors is in the best interests of the estate. I further believe that the return of the reclaimed Goods will reduce potential administrative claims on a dollar-for-dollar basis. It is my fear that if the Goods are not returned, the Debtor may be forced to liquidate such Goods at a fraction of the invoice price, thus resulting in a net increase in total administrative claims to the potential detriment of general unsecured creditors. It is my belief that under these procedures the Debtor will be able to minimize the delays, costs, and drain on resources that will occur if the Debtor is not authorized to streamline the reclamation and return-of-goods process in the manner described herein, and to eliminate, as much as possible, the expenditure of resources necessary to resolving reclamation claims.

**H.      The Sale Motion and Auctioneer Retention Motions**

57.     As part of the Debtor's liquidation of its assets, the Debtor will be seeking court authority to sell substantially all of its assets during this case. Because the Debtor is located in two different cities, New York City and Chicago, the Debtor is further going to need to hire at least two auctioneers, one in each city, in order to carry out its liquidation of its assets.

58.     Due to the urgency of the events triggering the filing of this case, these motions will be not be filed contemporaneously with this Declaration and the other First Day Pleadings, but will instead be filed soon after, when the Debtor's staff and attorneys can pivot from the filing of the case itself, to the tasks that the Debtor intends to carry out once it has filed for bankruptcy.

59.     It is my belief given the conditions leading up to this bankruptcy filing, that the liquidation of all of the Debtor's assets is required to maximize the return to the creditors in this case, without limitation completing such sales so that the Debtor does not incur administrative rent beyond March 20, 2022.  Pursuant to that goal, I believe that the Court should approve, once this motion is filed, to expedite the sale of all of the Debtor's assets, which sale will in turn require the Debtor to hire auctioneers to actually carry out this task quickly and efficiently.

## **INFORMATION REQUIRED BY LOCAL BANKRUPTCY RULE 1007-2**

60.     To the best of my knowledge, and upon information and belief, I provide the following information related to the Debtor, as required by Local Bankruptcy Rule 1007-2(a) and (b):

i.      The nature of the Debtor's business and the circumstances leading to the Chapter 11 Case is discussed above.

ii.     The Chapter 11 Case was not originally commenced under Chapter 7 or Chapter 13.

iii.    No committee was organized prior to the Petition Date.

iv.     Information regarding the Debtor's' twenty largest unsecured creditors has been filed contemporaneously herewith.

v.      The Debtor is not aware of any secured creditors.

vi.     A summary of each of the Debtor's assets and liabilities has been filed contemporaneously herewith.

vii.    The Debtor does not have any publicly held securities.

viii.   None of the Debtor's property is in the possession of a custodian.

ix.     The Debtor does not own the premises from which it operated, and information regarding the premises leased by the Debtor from which the Debtor's operated its business is set forth above.

x.      The Debtor's substantial assets are located at the premises discussed above, the Debtor's books and records are electronically stored and controlled and maintained by the Debtor's remaining key personnel.  The Debtor does not hold any assets outside the United States.

xi.  The Debtor is aware of two pending actions: (i) *Perez* (21-cv-11168) – a Fair Labor Standards Act complaint filed in the SDNY on December 30, 2021 with a status conference set for March 23, 2022, for which an advice of bankruptcy has been filed on March 17, 2022; and (ii) Illinois Department of Insurance Worker's Compensation Compliance Division filed an amended emergency motion for work-stop order filed on January 27, 2022, for which a suggestion of bankruptcy on March 17, 2022.

xii.  I, along with Alexandr "Alex" Agaian, the Corporate Secretary, and Olga Beliakova, the Chief Financial Officer, comprise the Debtor's senior management.

xiii.  The estimated amount of the weekly payroll to employees (exclusive of officers, directors, stockholders, and partners) for the thirty days following the Petition Date is $0.

xiv.  The estimated amount to be paid to officers in the thirty days following the Petition Date is $153,203.

xv.  The Debtor's projected cash receipts or disbursements, net cash gain or loss, or obligations and receivables in the 30-day period following the petition date is annexed hereto as **Exhibit A**.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Dated:  March 17, 2022

James Walker
CEO

Sworn to before me this 17th day of March, 2022.

# EXHIBIT A

# BUDGET

Exhibit B

**Buvk Corp.**
**DIP Budget**

| kUSD | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ended[1] | 3.11.2022 | 3/20/2022 | 3/27/2022 | 4/3/2022 | 4/10/2022 | 4/17/2022 | 4/24/2022 | 5/1/2022 | 5/8/2022 | 5/15/2022 | 5/22/2022 | 5/29/2022 | 6/5/2022 | 6/12/2022 | 6/19/2022 | 6/26/2022 | 7/3/2022 | 7/10/2022 | 7/17/2022 | 7/24/2022 | 7/31/2022 | 8/7/2022 | 8/14/2022 | 8/21/2022 | 8/28/2022 |
| Initial cash balance | 800 | | | | | | | | | | | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | | | | | | | | | | | | |
| DIP Financing | 4,000 | 500 | - | (500) | (500) | (400) | - | - | (3,100) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Assets liquidation | - | - | 312 | 312 | 187 | 187 | 218 | 4,463 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Deposits refund | - | - | - | 880 | 150 | - | - | | | | | | | | | | | | | | | | | | |
| Total Receipts | 4,000 | 500 | 312 | 692 | (163) | (213) | 218 | 4,463 | (3,100) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Disbursements:** | | | | | | | | | | | | | | | | | | | | | | | | | |
| Employee Expenses | 2,379 | - | 67 | - | 67 | - | 67 | - | 67 | - | 34 | - | 34 | - | 34 | - | 34 | - | 34 | - | 34 | - | 30 | - | 330 |
| Employee Reimbursement | 104 | 10 | 10 | 10 | 10 | 5 | 5 | - | 5 | - | 5 | - | 5 | - | 5 | - | 5 | - | 5 | - | 2 | - | 2 | - | 2 |
| Outstaffed couriers, consultants, temp hires | 1,379 | 152 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Insurance | 45 | 45 | - | - | - | - | 35 | - | - | - | - | 5 | - | - | - | 5 | - | - | - | 5 | - | - | - | - | 5 |
| Professional fees | - | 20 | 10 | 10 | 10 | 5 | 5 | 10 | - | - | - | - | 10 | - | - | - | - | - | - | - | - | - | - | - | - |
| Attorney fees | 75 | 40 | 25 | 40 | 25 | 40 | 25 | 25 | 25 | - | - | - | - | - | 50 | - | - | - | - | - | - | - | - | 25 | 30 |
| Rent & Utilities | - | 608 | - | 404 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Taxes & fees | - | 30 | 36 | - | - | - | 36 | - | - | - | - | 1 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Disbursements | 3,982 | 905 | 148 | 464 | 112 | 50 | 173 | 35 | 97 | - | 39 | 6 | 49 | - | 89 | 5 | 39 | - | 39 | - | 41 | - | 32 | 25 | 367 |
| Total Operating Receipts / (Disbursements) | 18 | (405) | 164 | 228 | (275) | (263) | 46 | 4,428 | (3,197) | - | (39) | (6) | (49) | - | (89) | (5) | (39) | - | (39) | - | (41) | - | (32) | (25) | (367) |
| DIP Facility Interest & Fees | - | - | 1 | - | 7 | - | - | - | 352 | 7 | - | - | - | - | - | 15 | - | - | - | - | - | - | - | - | - |
| Net Receipts / (Disbursements) | 18 | (405) | 163 | 228 | (282) | (263) | 46 | 4,428 | (3,550) | (7) | (39) | (6) | (49) | - | (89) | (20) | (39) | - | (39) | - | (41) | - | (32) | (25) | (367) |
| Cash balance | 818 | 412 | 575 | 804 | 521 | 258 | 304 | 4,731 | 1,182 | 1,174 | 1,136 | 1,130 | 1,081 | 1,081 | 993 | 973 | 934 | 934 | 895 | 895 | 855 | 855 | 823 | 798 | 431 |

# EXHIBIT B

# DEBTOR'S ORGANIZATIONAL CHART

## ORGANIZATIONAL CHART

| Shareholders | Address | Stock | Percentage |
|---|---|---|---|
| Viacheslav Bocharov | 9/2 Pokrovka str, Apt 1, Moscow, Russia 105062 | 4,189,347 | 46.55% |
| Rodion Shishkov | Groveside, Herons Ghyll, East Sussex, TN22 4BY United Kingdom | 4,189,347 | 46.55% |
| Kirill Shishkov | Via Giacomo Ca1·issimi 28/C, 00198 Roma, ltaly | 621,306 | 6.90% |
| Total | | 9,000,000 | 100.00% |