Mark S. Lichtenstein
AKERMAN LLP
1251 Avenue of The Americas, 37th Floor
New York, New York 10020
Tel. No. (212) 880-3800
Fax No. (212) 880-8965

John H. Thompson
AKERMAN LLP
750 Ninth Street, N.W., Suite 750
Washington D.C. 20001
Tel.: (202) 393-6222
Fax: (202) 393-5959

*Proposed Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BUYK CORP.[1] | ) | Case No. 22-10328 (MEW) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF ORDER**
**(I) AUTHORIZING, BUT NOT DIRECTING, DEBTOR TO (A) MAINTAIN EXISTING**
**INSURANCE PROGRAMS AND EXISTING PREMIUM FINANCING AGREEMENT,**
**AND (B) FUND ALL OBLIGATIONS IN RESPECT THEREOF,**
**AND (II) GRANTING RELATED RELIEF**

Buyk Corp. (the "Debtor") in the above-captioned Chapter 11 case (the "Chapter 11 Case"), by and through its undersigned counsel, hereby files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), pursuant to sections 105(a), 363(b), and 503(b) of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing, but not directing, the Debtor to (a) maintain the Debtor's existing insurance programs and premium financing agreement on an uninterrupted basis in accordance with its historical practices and (b) fund all premiums, deductibles, fees, and other obligations in respect thereof, whether relating to the prepetition or post-petition period, and (ii) granting such other and further relief as is requested herein or as the Court (as defined herein)

---

[1] The Debtor in this case, along with the last four digits of its federal tax identification number is Buyk Corp. (1477). The principal place of business for the Debtor is 360 West 31st Street, Floor 6, New York, NY 10001.

62573224;5

otherwise deems necessary or appropriate.  In support of this Motion, the Debtor submits the *Affidavit of James Walker Pursuant to Local Bankruptcy Rule 1007-2 And In Support of First Day Motions and Applications* (the "First Day Declaration"), which is being filed contemporaneously herewith and is incorporated herein by reference.  In further support of this Motion, the Debtor respectfully states as follows:

## JURISDICTION

1.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.      Venue in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 363(b), and 503(b) of the Bankruptcy Code, as supplemented by Bankruptcy Rules 6003 and 6004.

## BACKGROUND

4.      On March 17, 2022, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, initiating this Chapter 11 Case.

5.      The Debtor continues to operate its business and manage its property as debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Case.

7.      Additional details regarding the Debtor's business and the circumstances leading to the filing of the Chapter 11 Case are set forth in detail in the First Day Declaration.

## BUSINESS BACKGROUND

8.      The Debtor intends to proceed as expeditiously as permitted through its Chapter 11 case for the purposes of effecting a sale of substantially all of its assets subject to higher and better offers in an auction process approved by the Court.

62573224;5

9.      Prior to this bankruptcy filing, the Debtor operated an ultra-high speed grocery business with 39 locations, 31 in the New York metropolitan area and 8 in the Chicago metropolitan area. The Debtor commenced operations in April of 2021. After an initial seed round of investment by Russian-based investors in the amount of approximately $63.5 million in convertible notes and $11 million in unsecured loans, in or about January 2022, the Debtor was in the process of a seeking additional equity investment of approximately $250,000,000. Due to the mounting indicia of a potential Russian dispute with Ukraine, the Debtor determined in January 2022 to pivot to a United States-based equity raise and actively sought series A funding from numerous institutional investors. The United States fund raising was going reasonably well when Russia commenced its invasion of Ukraine. At that juncture, the Debtor was confronted with an existential and, ultimately, fatal crisis. First, any chance of obtaining equity or debt investment from the prominent institutional investors which had been interested in funding the Debtor was now lost. Second, although the Debtor was operating and earning revenue, it was in the beginning stages of its growth and was relying, in part, on cash infusions by the founders to continue its operations and expansion. Unfortunately, although the founders were not, and are not, subject to any sanctions, restrictions on the ability to transfer any funds out of Russia made it impossible for the founders to provide any further funding to the Debtor.

10.     Since February 28, 2022, working together with its management team, the Debtor pursued an asset or stock sale to a variety of entities in a similar or adjacent business as the Debtor or a rescue loan /equity investment. In light of the monthly deficiency between income and expenses, an impending payroll due on March 11, 2022, and other pressing obligations to creditors, plus the negative impact of the Russia/Ukraine crisis on investor interest, the Debtor began seeking a loan from several potential debtor-in-possession ("DIP") lenders in order to fund final payroll to

Debtor's employees and independent contractors in the amount of approximately 800 and an orderly liquidation in the context of bankruptcy. In the exercise of its fiduciary duties to all stakeholders it became apparent that the only viable and realistic strategic alternative for the Debtor was to obtain a short term bridge loan secured by all of the Debtor's assets, including unencumbered brand new (and almost new) refrigeration and other food storage equipment with a book value of approximately $11 million, grocery items (including 20% perishable items) with a book value of $1.7 million, and cash of approximately $700,000, in a sufficient amount to fund all outstanding payroll expense and an expedited sale process in bankruptcy. The goal, of course, is to maximize the value of these assets in bankruptcy in order to repay the DIP Lender, administrative and priority claims and to, if possible, provide some level of distribution to unsecured creditors.

11.    After having discussions with over thirty (30) potential funding sources, including multiple potential DIP lenders, on March 10, 2022, the Debtor entered into a Term Sheet with Legalist for a debtor-in-possession loan commitment of $6.5 million (the "DIP Loan").

12.    On March 4, 2022, the Debtor furloughed approximately 98% of all employees. On March 11, 2022, the Debtor terminated the employment of all of its employees, except for six staff members who the Debtor proposes to continue to employ post-petition to assist in the orderly winddown in this liquidating Chapter 11.[2] On March 11, 2022, Legalist and the Debtor executed that certain Pre-Petition Term Loan Credit Agreement in the maximum amount of $6.5 million (the "Credit Agreement")[3] which provided for two separate draws: (i) $4 million on March 11, 2022 for the sole purpose of satisfying all payroll obligations for the Debtor's terminated

---

[2] On March 11, 2022, the Debtor provided WARN Notices to all terminated employees.

[3] The Pre-Petition Term Loan Credit Agreement was superseded by the Amended and Restated DIP Agreement executed on March 17, 2022.

employees and, (ii) up to $2.5 million to be drawn post-petition pursuant to a budget approved by the Court as part of Court approval of the DIP Loan and the funds borrowed both pre and post-petition.

13.     The purpose of the post-petition availability under the DIP Loan is to fund an expedited and efficient sale process of the Debtor's assets.  In light of the existence of perishable inventory and the desperate need to avoid administrative rents starting in April 2022[4], the Debtor retained certain auctioneers pre-petition with the intent to seek Court approval of the retention of such auctioneers and the sale process.

14.     The Debtor's goal is to complete the sale process within sixty (60) days of the Petition Date and to then seek confirmation of a plan of liquidation to distribute the remaining sale proceeds after satisfaction of the DIP Loan.  The Debtor has sufficient funds and anticipated revenues from prospective asset sales to operate in liquidation mode through, at least, the first 13 weeks of these Chapter 11 cases, as reflected in the budget (the "Budget").

15.     The Debtor's entry into the DIP Loan and the sale of all assets is the best result for all stakeholders under incredibly difficult and unforeseeable circumstances.  For the Debtor's former employees, the DIP Loan allowed them to be paid their wages in full.  For the rest of the Debtor's stakeholders, the DIP Loan, commencement of this case, and the contemplated sale process will enable the Debtor to maximize the value of its assets in the hope of satisfying creditor claims in order of priority.

## BUSINESS OF THE DEBTOR

16.     In April 2021, the Debtor made its debut with the launch of a 15-minute grocery delivery service in New York City. In November 2021, the Debtor expanded into the Chicago

---

[4] Many of the Debtor's leases are current through March 2022.

market.

17.    The Debtor offered grocery items, along with household essentials, personal care and pet supplies, relying on couriers on bicycles to deliver the orders.

18.    The Debtor, which was backed by $63.5 million in seed funding, was the latest entrant to the competitive field of ultrafast delivery firms cropping up in major metropolitan areas including New York.  One of the Debtor's differentiating factors from its competitors was its real-time, in-house technology.  For example, the Debtor, which had an order weight maximum of 26 pounds for each courier, had the ability to split larger orders up between multiple couriers if needed. Its technology allowed the Debtor to fulfill orders within two minutes and then deliver them in between five and 10 minutes.

19.    The Debtor relied on a mix of contractors and its own workforce and had more than 600 couriers and over 100 office workers.   In addition to leveraging efficiencies from its technologies, the Debtor attempted to earn revenue from the margins on its products and used the money saved by renting small locations not needed to be in prime spots for foot traffic to invest in employee costs. The Debtor's business plan also included an initiative to launch private label offerings with more than 100 SKUs in categories, such as meat and pasta.

20.    As of February 24, 2022, the Debtor had 39 stores that serve the New York and the Chicago metropolitan areas (31 in New York and 8 in Chicago), each with 2,000 to 3,000 SKUs.

21.    As noted above, the Debtor had been relying upon cash infusions by its original investors to continue to operate and expand while simultaneously seeking a new round of equity financing.  Prior to closing its business, the Debtor's plan was to open another 100 stores in 2022. Due to the invasion of Ukraine, the Debtor was unable to execute on its planned equity raise, despite its intensive efforts to raise rescue capital.  With relatively little cash on hand in February

2022 and payroll coming due, the Debtor's Board of Directors, in consultation with its managers and retained advisors, determined to ultimately terminate virtually all of its employees and obtain a relatively small DIP Loan to fund a liquidating Chapter 11 case.

22.    On March 4, 2022, the Debtor furloughed 98% of its work force.  On March 11, 2022, the Debtor enter into the Credit Agreement to borrow up to $6.5 million from Legalist with $4 million of such commitment already distributed by the Debtor on account of the wages due to all employees[5] whose employment was terminated on March 11, 2022.

23.    As previously stated, Legalist and the Debtor agreed in the Credit Agreement that the Debtor was required to file a bankruptcy case on March 15, 2022 (with a two-business day grace period).

## CHAPTER 11

24.    On March 17, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  As a result of the Ukrainian crisis and the Debtor's attendant inability to receive funding from its initial investors and/or any other parties in a sufficient amount to continue to operate as a going concern while seeking a comprehensive capital raise or a merger or sale transaction, the Debtor's fiduciaries determined to cause the Debtor to commence this Chapter 11 case in order to effectuate an orderly sale of its assets.

## CORPORATE STRUCTURE

25.    As set forth in the Declaration of James Walker in Support Of First Day Motions which has been filed contemporaneously herewith Rodion Shishkov and Viacheslav Bocharov, each own 46.55% of the Debtor.  The remaining 6.9% of the Debtor is owned by Kirill Shishkov. Prior to the financial distress described above, the Debtor formed a German wholly-owned

---

[5] Note the exception of 6 employees retained to assist with the bankruptcy.

62573224;5

subsidiary named BUYK GmBH.  That entity has no assets, liabilities and operations and has little

if any value.  In the Debtor's estimation it is highly unlikely that any part of the funds realized

from the sales of the Debtor's assets will be distributed to equity holders under a liquidating plan

or otherwise.

## CAPITAL STRUCTURE AND PREPETITION INDEBTEDNESS

26.     The Debtor's principal pre-petition secured lender is Legalist whose secured debt

against the Debtor is in the amount of $4,000,000 as of the Petition Date.  Legalist has a blanket

lien on all of the Debtor's assets.  Legalist has committed to funding up to an additional $2.5

million to fund the Chapter 11 case.  The Debtor has no other secured creditors.

27.     The Debtor is also a borrower under certain unsecured convertible notes in the

aggregate amount of $63.5 million during the period from June-December 2021 (the "Convertible

Notes").  In addition to the secured debt to Legalist and the Convertible Note debt, the Debtor has

approximately $18 million in unsecured debt.  Finally, the Debtor anticipates significant claims

arising from the rejection of its leases (although as part of the sale process).

## INSURANCE PROGRAMS AND RELATED OBLIGATIONS

28.     In connection with the operation of the Debtor's business, the Debtor maintains

comprehensive insurance programs (collectively, the "Insurance Programs") that include a variety

of policies through several different insurance carriers (collectively, the "Insurance Carriers").  A

detailed list of the Insurance Programs is annexed hereto as **Exhibit B**.[6]

29.     The premiums with respect to certain of the Insurance Programs are financed

pursuant to a premium financing agreement between First Insurance Funding and the Debtor (the

---

[6] Insurance programs as used in this Motion is intended to include all of the Debtor's insurance policies and programs whether listed on Exhibit B or not.  While the Debtor believes Exhibit B is all inclusive, given the multitude of policies, it is possible that one or more policies were inadvertently omitted from Exhibit B.

"Premium Financing Agreement"), a true and correct copy of which is attached hereto as **Exhibit C**.

## A.    Insurance Programs

30.    The Insurance Programs protect the Debtor and its personnel against various risks that may arise in the course of the Debtor's business.

31.    In order to protect the Debtor against such risks, the Insurance Programs include the following types of coverage:

(a)    <u>General Liability and Property Policies.</u> These policies, including related excess policies, provide coverage for claims relating to, among other things, accidents and damage to property used by the Debtor in its operations.

(b)    <u>Workers Compensation Policies.</u> These policies, including related excess policies, provide coverage for injuries suffered by the Debtor's employees in the course of their employment.

(c)    <u>Management Liability Policy.</u> These policies, including related excess liability policies, covers the Debtor, directors, officers, managers and business entities from claims arising out of their governance, finance, benefits, employment and management activities on behalf of the Debtor.

(d)    <u>Crime.</u> This policy protects the Debtor against losses caused by crime against the Debtor.

(e)    <u>Employment Practices Liability.</u> This policy protects the Debtor against losses caused by lawsuits arising out of issues relating to wage and hour laws, immigration laws, and workplace violence laws.

(f)    <u>Cyber Liability.</u> This policy protects the Debtor against losses caused by cyber-attacks, data compromises, identity theft, and other computer-based attacks.

(g)    <u>Terrorism.</u> This policy covers the Debtor against losses caused by certified acts of terrorism.

32.    The Debtor seeks from the Court authorization, but not direction, to maintain the Insurance Programs on an uninterrupted basis in accordance with their historical practices.

B.    **Insurance Obligations**

33.    The Debtor has indirectly incurred and continues to incur certain obligations relating to the Insurance Programs (such obligations, including those which accrued prior to the Petition Date, are the "Insurance Obligations").  Absent payments by the Debtor for the purpose of funding the Insurance Obligations, the Insurance Programs and the Premium Financing Agreement will not be funded and the Debtor's coverage under the Insurance Programs may be voided.  Disruption of the Debtor's insurance coverage will expose the Debtor to serious risks, including possibly (a) incurring direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers under the Insurance Programs, (b) incurring material costs and other losses that otherwise would have been reimbursed by the Insurance Carriers under the Insurance Programs, (c) losing good-standing certification to conduct business inasmuch as the jurisdiction in which they operate requires the Debtor to maintain certain levels of insurance coverage, (d) being unable to obtain similar types of insurance coverage, and (e) incurring higher costs for re-establishing lapsed policies or obtaining new equivalent coverage.

34.    The different categories of Insurance Obligations include (a) fixed-rate premiums based on a rate established by each Insurance Carrier, which are generally payable on an annual basis, (b) deductibles and other fees related to the Insurance Programs, (c) payments to insurance agents and brokers who assist with the procurement and negotiation of the Insurance Programs, and (d) a claims administrator who manages worker's compensation and general litigation claims.

35.    The Debtor is obligated to make monthly payments to First Insurance Funding in the amount of $28,370.67 under the Premium Financing Agreement.  The Debtor previously funded $49,452.56 toward the down payment of the Premium Financing Agreement.

36.    In the aggregate, for the 12 month period beginning June 19, 2021, the Debtor will or has paid in the aggregate approximately $1,061,755.00[7] to facilitate the payment of Insurance Obligations.

37.    Accordingly, the Debtor seeks this Court's authorization, but not direction, to pay any such outstanding amounts and other amounts as may come due in order to maintain their insurance coverage.

## **RELIEF REQUESTED**

38.    By this Motion, the Debtor respectfully requests the entry of an Order substantially in the form annexed hereto as **Exhibit A**, pursuant to sections 105(a), 363(b), and 503(b) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (a) authorizing, but not directing, the Debtor to (i) maintain the Insurance Programs and the Premium Financing Agreement on an uninterrupted basis in accordance with its historical practices, (ii) fund all Insurance Obligations, and (b) granting such other and further relief as is requested herein or as the Court otherwise deems necessary or appropriate.

## **BASIS FOR RELIEF**

### A.    **Ample Authority Exists to Continue to Maintain Insurance Coverage**

39.    The Debtor submits that appropriate circumstances exist to justify the continuation of the Insurance Programs in the ordinary course of business, as contemplated by this Motion. The relief requested in this Motion will help minimize any disruption in the Debtor's business operations during the period between the Petition Date and confirmation of a Chapter 11 plan,

---

[7] This amount is intended to include all of the costs the Debtor incurs resulting from the Debtor's insurance policies and programs, regardless of whether such policies and programs are listed in Exhibit B. The Debtor believes Exhibit B is all inclusive; however, given the multitude of policies and varying amounts, this number is an estimation, and may not precisely reflect all costs incurred by the Debtor due to its insurance policies and programs. It is possible that one or more policies or costs associated therewith were inadvertently omitted from Exhibit B.

62573224;5

thereby preserving the value of the Debtor's estate. Moreover, this relief is necessary to avoid immediate and irreparable harm to the Debtor and its estate.

### (a)    Bankruptcy Code Sections 1107(a) and 1108

40.    The Court may authorize the requested relief as being necessary for the Debtor to carry out its fiduciary duties pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtor, operating its businesses as debtor in possession under Bankruptcy Code sections 1107(a) and 1108, is a fiduciary "holding the bankruptcy estates and operating the businesses for the benefit of their creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *see also In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (stating section 1107(a) contains an implied duty of the debtor-in-possession to act as a fiduciary to preserve the estate and the business's going concern value). Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id*.

41.    Courts have noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id*.; *see also In re Mirant Corp*., 296 B.R. 427, 429-30 (Bankr. N.D. Tex 2003) (allowing debtors to pay claims "reasonably believe[d]" to be authorized under the *CoServ* test or whose payment was necessary "in the exercise of their business judgment … in order for [the d]ebtors to continue their respective businesses"). The *CoServ* court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," and also when the payment was to "sole suppliers of a given product." *CoServ,* 274 B.R. at 498.[8] Payment of the prepetition amounts associated

---

[8] The court in *CoServe* provided a three pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty: (i) First, it must be critical that the debtor deal with

with the Insurance Programs meets each element of the *CoServ* court's standard.  Insurance

coverage is required by the United States Trustee's Guidelines.  Moreover, as a fiduciary for the

bankruptcy estates, the Debtor would be violating its duty if it in any way jeopardizes the coverage

provided under the Insurance Programs.

      **(b)**       **The Doctrine of Necessity and Bankruptcy Code Section 105**

      42.      Additionally, the Court may authorize the continuation of the Insurance Programs

and the payment of the Insurance Obligations pursuant to its equitable powers, either under section

105(a) of the Bankruptcy Code or through the "doctrine of necessity" or the "necessity of payment"

doctrine, which allow a bankruptcy court to exercise its equitable power, allow payment of critical

prepetition claims not explicitly authorized by the Bankruptcy Code, and further support the relief

requested herein.  *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (noting

that in order to justify payment under "doctrine of necessity," such payment must be essential to

continued operation of debtor).  Section 105(a) of the Bankruptcy Code further empowers the

Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a) of the Bankruptcy Code, courts

may permit payments on account of prepetition obligations outside the context of a Chapter 11

plan when such obligations are essential to the continued operation of a debtor's business.  *See In*

*re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996); *see also In re Fin. News*

*Network Inc.*, 134 B.R. 732, 735-36 (Bankr. S.D.N.Y. 1991) (holding that the "doctrine of

necessity" stands for the principle that a bankruptcy court may allow preplan payment so of

prepetition obligations where such payments are critical to the debtor's organization") *see, e.g., In*

---

the claimant. (2) Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. (3) Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim. *Id.*

*re Just For Feet, Inc.*, 242 B.R. 821, 824 (Bankr. D. Del. 1999) (acknowledging that "[c]ertain

pre-petition claims . . . may need to be paid to facilitate a successful reorganization" and that

"[s]ection 105(a) of the [Bankruptcy] Code provides a statutory basis for the payment of pre-

petition claims"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994)

(explaining that doctrine of necessity is standard in Third Circuit for enabling court to authorize

payment of prepetition claims prior to confirmation of reorganization plan); *In re Boston & Maine

Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (stating that court has power to authorize payments of

claims for goods and services that are necessary to debtor's continued operation as going concern);

*In re Ionosphere Clubs*, 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989) (stating that section 105(a) of

Bankruptcy Code permits payment of prepetition claims where necessary to rehabilitate debtor).

43.     As set forth above, the Debtor believes that payment of the various prepetition

obligations sought to be paid under this Motion is necessary to ensure the continued functioning

of the Insurance Programs, avoid litigation, prevent damage to business reputation, and/or, in

certain instances, to avoid running afoul of state laws.   Accordingly, such payments are

appropriately authorized under the "doctrine of necessity."

    **(c)**     **Bankruptcy Code Section 363(b)**

44.     To the extent that payment of any of the prepetition obligations sought to be paid

under this Motion would be deemed to constitute a use of property outside the ordinary course of

business, a basis for authorizing payment of the prepetition amounts associated with the Insurance

Programs is found under Bankruptcy Code section 363(b)(1).   Bankruptcy Code section 363(b)(1)

permits a debtor in possession to use property of the estate "other than in the ordinary course of

business" after notice and a hearing.   11 U.S.C. § 363(b)(1).   Courts in this and other circuits have

indicated that the use of property of the estate outside of the ordinary course of business is proper

where the debtor in possession has articulated a good business reason for such use. *See Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (holding that section 363(b) requires that "there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"); *United States Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, No. 02 Civ. 2854 (MBM), 2003 WL 21738964, at *12 (S.D.N.Y. July 28, 2003) ("To approve a transaction under § 363(b), the bankruptcy court must find that there is a good business reason to allow the transaction"); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) (applying Continental to require "articulated business justification" for section 363 transaction); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) ("[A] § 363 application requires a showing that there is a 'good business reason to grant such an application.'") (quoting *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)).

45.    Where a debtor has articulated a valid business justification for a proposed transaction, courts generally apply the business judgment rule in evaluating such transaction.[9] *Lange v. Schropp (In re Brook Valley VII, Joint Venture)*, 496 F.3d 892, 900 (8th Cir. 2007) ("In general, courts do not second-guess business decisions made in good faith."); *Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that

---

[9] The business judgment rule has vitality in chapter 11 cases. See *Lange*, 496 F.3d at 900; *Integrated Res.*, 147 B.R. at 656; *see also Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a Debtor's management decisions.").

the action was in the best interests of the company.'") (quoting *Smith v. Van Gorkom*, 488 A.2d

858, 872 (Del. 1985)).

46.     The relief requested in this Motion is necessary for the Debtor to continue its

operations during the pendency of the Chapter 11 Case.  If the Insurance Programs lapse, the

Debtor will be required to obtain replacement insurance, likely at a cost greater than the cost of

the current Insurance Programs.  Furthermore, replacing the Insurance Programs would divert the

time and resources of the Debtor's officers and/or managers away from the liquidation process.

Thus, the Debtor submits that it has articulated sound business reasons for the prepetition payments

sought hereunder.  Moreover, a loss of Management Liability Insurance could prompt officers to

resign.  Also, if accidents occur without liability insurance in place, the Debtor's estate could be

exposed to substantial administrative claims.

47.     Courts in this and other districts have granted relief similar to the relief requested

herein.  *See, e.g.*, *BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y.

Mar. 29, 2017) (authorizing debtors to pay prepetition premiums and enter into new insurance

policies pursuant to sections 105(a) and 363(b) of the Bankruptcy Code); *In re Int'l Shipholding*

*Corp.*, No. 16-12220 (SMB) (Bankr. S.D.N.Y. Aug. 23, 2016) (same); *In re Aéropostale, Inc.*, No.

16-11275 (SHL) (Bankr. S.D.N.Y. June 3, 2016) (same); *In re Fairway Grp. Holdings Corp.*, No.

16-11241 (MEW) (Bankr. S.D.N.Y. June 1, 2016) (same); *In re Republic Airways Holdings Inc.*,

No. 16-10429 (SHL) (Bankr. S.D.N.Y. Mar. 23, 2016) (same); *see also In re: Advanced Living*

*Technologies, Inc.,* No. 13-10313 (HCM) (Bankr. W.D. Tex. March 7, 2013) Docket 72

(authorizing debtors to pay prepetition insurance premiums under Bankruptcy Code sections

105(a), 362, 363, 1107 and 1108 and Bankruptcy Rule 6003); *In re Idearc Inc. f/k/a Verizon*

*Directories Disposition Corporation.*, No. 09-31828 (BJH) (Bankr. N.D. Tex. April 5, 2009) Docket 69 (same).

48.    In this case, the continuation of the Insurance Programs and payment of the Insurance Obligations are imperative to the Debtor's continued operations, ability to restructure, and preservation of value of its estate.  It is essential for the Debtor to carry insurance in its day-to-day operations, or it runs the risk of, among other harms, incurring financial responsibility and legal liability for potential occurrences not covered by insurance.  Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtor's commercial activities.

49.    The Debtor needs to minimize the risks associated with winding down its business. Even a brief delay or suspension in the Debtor's ability to pay the Insurance Obligations could create significant risk that the Debtor would void or otherwise lose the benefits of the Insurance Programs.  Disruption of the Debtor's insurance coverage would expose the Debtor to serious risks, including possibly (a) incurring direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers under the Insurance Programs, (b) incurring material costs and other losses that otherwise would have been reimbursed by the Insurance Carriers under the Insurance Programs, (c) losing good-standing certification to conduct business in jurisdictions requiring the Debtor to maintain certain levels of insurance coverage, (d) being unable to obtain similar types of insurance coverage, and (e) incurring higher costs for re-establishing lapsed policies or obtaining new equivalent coverage.

50.    Accordingly, the Court should grant the relief requested herein because maintenance of the Insurance Programs and payment of all Insurance Obligations are warranted and are in the best interests of the Debtor's estate, creditors, and all other parties-in-interest.

51.     In light of the foregoing, the Debtor respectfully submits that the relief requested herein is necessary and appropriate, is in the best interests of its estates and creditors, and should be granted in all respects.

## RESERVATION OF RIGHTS

52.     To the extent that any contract or agreement in connection with any of the Insurance Programs is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtor does not at this time intend to assume or reject such contract or agreement.  As such, the Court's authorization of payment shall not be deemed to constitute an assumption of such contract or agreement pursuant to section 365 of the Bankruptcy Code.  The Debtor is currently in the process of reviewing all of its contracts and agreements and reserves all of their rights with respect thereto.  Nothing herein shall acknowledge, grant, or otherwise permit any right of offset or recoupment by a non-debtor with respect to any claim asserted against the Debtor.  If the Court grants the relief sought herein, any payments made pursuant to the Court's order are not intended and should not be construed as an admission to the validity of any claim or a waiver of the rights of the Debtor to dispute such claim subsequently.

53.     Additionally, except as expressly stated herein, nothing contained herein is intended or should be construed as (a) an agreement or admission by the Debtor as to the validity of any claim against its estate, (b) a waiver or impairment of the Debtor's right to dispute any claim on any grounds, (c) a promise by the Debtor to pay any claim, or (d) an implication or admission by the Debtor that such claim is payable pursuant to an Order granting the relief requested in this Motion.

## DEBTOR SATISFIES BANKRUPTCY RULE 6003

54.     Bankruptcy Rule 6003 provides that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the

petition, grant relief regarding ... a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate . . . ." Fed. R. Bankr. P. 6003(b). The Debtor submits that, because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

### WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

55.    To implement successfully the foregoing requested relief, the Debtor respectfully requests a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, the payments proposed herein are essential to prevent potentially irreparable damage to the Debtor's operations, value, and ability to reorganize. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

### NOTICE

56.    The Debtor will provide notice of this Motion to: (a) the Office of the U.S. Trustee; (b) the holders of the 20 largest unsecured claims against the Debtor; (c) the United States Attorney's Office for the Southern District of New York; (d) the Internal Revenue Service; (e) each of the Insurance Carriers; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtor will serve copies of this Motion and any order entered with respect to this Motion as required by the Local Rules. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## <u>CONCLUSION</u>

WHEREFORE, for the reasons set forth above and in the First Day Declaration, the Debtor respectfully requests that the Court enter the Order substantially in the form annexed hereto as **Exhibit A** (i) authorizing, but not directing, the Debtor to (a) maintain the Insurance Programs and the Premium Financing Agreement on an uninterrupted basis in accordance with its historical practices and (b) fund all Insurance Obligations, whether relating to the prepetition or post-petition period, and (ii) granting such other and further relief as is requested herein or as the Court otherwise deems necessary or appropriate.

Dated: New York, New York
     March 17, 2022

    AKERMAN LLP

    By:   */s/Mark Lichtenstein*
        Mark S. Lichtenstein
        1251 Avenue of The Americas, 37th Floor
        New York, New York 10020
        Tel. No. (212) 880-3800
        Fax No. (212) 880-8965
        E-Mail: mark.lichtenstein@akerman.com

        -and-

        John H. Thompson
        AKERMAN LLP
        750 Ninth Street, N.W., Suite 750
        Washington D.C. 20001
        Tel.: (202) 393-6222
        Fax: (202) 393-5959
        E-Mail: john.thompson@akerman.com

        *Proposed Counsel for Debtor and Debtor-in-Possession*

# EXHIBIT A

# PROPOSED ORDER

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BUYK CORP.[1] | ) | Case No. 22-10328 (MEW) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**ORDER (I) AUTHORIZING, BUT NOT DIRECTING, DEBTOR TO
(A) MAINTAIN EXISTING INSURANCE PROGRAMS AND EXISTING INSURANCE
PREMIUM FINANCING AGREEMENT, AND (B) FUND ALL OBLIGATIONS IN
RESPECT THEREOF, AND (II) GRANTING RELATED RELIEF**

Upon the Motion (the "Motion")[2] [ECF No. ___] of Buyk Corp., as debtor in possession

in the above-captioned Chapter 11 Case (the "Debtor"), for entry of an order (the "Order"),

pursuant to sections 105(a), 363(b), and 503(b) of the Bankruptcy Code and Bankruptcy Rules

6003 and 6004, (i) authorizing, but not directing, the Debtor to (a) maintain the Insurance

Programs[3] and Premium Financing Agreement on an uninterrupted basis in accordance with its

historical practices and (b) fund all Insurance Obligations, whether relating to the prepetition or

post-petition period, and (ii) granting such other and further relief as is requested in the Motion or

as the Court otherwise deems necessary or appropriate; and the Court having jurisdiction over this

matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this

proceeding and the Motion in the Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the

---

[1] The Debtor in this case, along with the last four digits of its federal tax identification number is Buyk Corp. (1477). The principal place of business for the Debtor is 360 West 31st Street, Floor 6, New York, NY 10001.

[2] Capitalized terms used but not otherwise defined herein have the meanings set forth in the Motion or the First Day Declaration, as applicable.

[3] Insurance Programs as used in the Motion and this Order is intended to include all of the Debtor's insurance policies, programs and agreements related thereto whether listed on Exhibit B to the Motion or not and whether expired or current. While the Debtor believes Exhibit B is all inclusive, given the multitude of policies, it is possible that one or more policies were inadvertently omitted from Exhibit B.

62650661;1

Court having found that the relief requested in the Motion is in the best interests of the Debtor's

estate, creditors, and other parties-in-interest; and the Court having found that the Debtor's notice

of the Motion and opportunity for a hearing on the Motion were appropriate under the

circumstances and no other notice need be provided; and the Court having reviewed and considered

the Motion and the First Day Declaration; and the Court having heard the statements in support of

the relief requested in the Motion at a hearing before the Court (the "Hearing"); and the Court

having determined that the legal and factual bases set forth in the Motion and at the Hearing

establish just cause for the relief granted herein; and upon all of the proceedings had before the

Court; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED

that:

1.    The Motion is granted as set forth herein.

2.    The Debtor is authorized, but not directed, in its sole discretion, to maintain,

continue, and renew the Insurance Programs and maintain the Premium Financing Agreement on

an uninterrupted basis and in accordance with the same practices and procedures as were in effect

prior to the Petition Date.

3.    The Debtor is authorized, but not directed, in its sole discretion, to fund any

Insurance Obligations.

4.    The Debtor is authorized, in its sole discretion, to revise, extend, supplement, or

change insurance coverage as needed, including entering into new insurance policies (e.g., through

renewal of the Insurance Programs or purchase of new policies).

5.    Nothing in this Order or any action taken by the Debtor in furtherance of the

implementation hereof shall be deemed to constitute an assumption or rejection of any executory

62650661;1

contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, and all of the Debtor's

rights with respect to such matters are expressly reserved.

6.      Nothing in this Order nor the Debtor's payment of claims pursuant to this Order

shall be construed as (a) an agreement or admission by the Debtor as to the validity of any claim

on any grounds, (b) a waiver or impairment of any Debtor's rights to dispute any claim on any

grounds, (c) a promise by the Debtor to pay any claim, or (d) an implication or admission by the

Debtor that such claim is payable pursuant to this Order. Nothing herein shall acknowledge, grant,

or otherwise permit any right of offset or recoupment by a non-debtor with respect to any claim

asserted against the Debtor.

7.      The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

8.      Notwithstanding the possible applicability of Bankruptcy Rules 6004(a) and

6004(h) or otherwise, the terms and conditions of this Order shall be immediately effective and

enforceable upon its entry and the requirements of Bankruptcy Rules 6004(a) and 6004(h) are

hereby waived.

9.      The Debtor is authorized to take all actions necessary to effectuate the relief granted

pursuant to this Order in accordance with the Motion.

10.     The Court retains jurisdiction with respect to all matters arising from or relating to

the implementation, interpretation, and enforcement of this Order.

Dated: New York, New York
       March ___, 2022

**PROPOSED**

_____
**Honorable Michael E. Wiles**
**United States Bankruptcy Judge**

62650661;1

# EXHIBIT B

# LIST OF INSURANCE PROGRAMS

EXHIBIT B
LIST OF INSURANCE PROGRAMS

| INSURANCE | DESCRIPTION | POLICY NO. | POLICY PERIOD | 2022 |
|---|---|---|---|---|
| Cincinnati Insurance Company | Property | ENP 063 20 23 | 10/08/21-10/08/22 | $118,579.00 |
| Colony Insurance Company | Commercial Excess Liability | AR6461526 | 06/24/21-06/19/22 | $95,283.00 |
| Cincinnati Insurance Company | Directors and Officers Liability | EMP 063 23 83 | 10/08/21-10/08/22 | $7,879.00 |
| Cincinnati Insurance Company | Employment Practices Liability | EMP 063 23 83 | 10/08/21-10/08/22 | $1,801.00 |
| Cincinnati Insurance Company | Crime | EMP 063 23 83 | 10/08/21-10/08/22 | $1,819.00 |
| Cincinnati Insurance Company | Cyber Liability | EMP 063 23 83 | 10/08/21-10/08/22 | $9,688.00 |
| Cincinnati Insurance Company | Terrorism | EMP 063 23 83 | 10/08/21-10/08/22 | $91.00 |
| Liberty Surplus Insurance Corporation | Commercial General Liability | 1000489619-01 | 06/19/21-06/19/22 | $219,501.00 |
| Technology Insurance Company, Inc. | Workers' Compensation and Employers Liability | TWC4076536 | 01/14/22-06/23/22 | $607,114.00 |
| | | | | |
| **TOTAL** | | | | **$ 1,061,755.00** |

# EXHIBIT C

# PREMIUM FINANCING AGREEMENT

**PREMIUM FINANCE AGREEMENT**

☐ Personal    ☑ Commercial    ☐ Additional Premium

**FIRST INSURANCE** *FUNDING*
A WINTRUST COMPANY

450 Skokie Blvd, Ste 1000
Northbrook, IL 60062-7917
P:(800) 837-2511 F:(800) 837-3709
www.firstinsurancefunding.com

**Quote #: 30120844**

| INSURED/BORROWER | Customer ID: N/A | AGENT or BROKER |
|---|---|---|
| (Name and Address as shown on Policy)<br>BUYK CORP<br>99 Park Ave Penthouse<br>Attn: Alexandre Agaian<br>New York, NY 10016 | | (Name and Business Address)<br>Alliant Insurance Services, Inc.<br>FINANCIAL SQUARE<br>32 OLD SLIP<br>NEW YORK, NY 10005 |

## LOAN DISCLOSURE

| Total Premiums, Taxes, and Fees | Down Payment | Unpaid Balance | Documentary Stamp Tax (only applicable in Florida) | Amount Financed (amount of credit provided on your behalf) | FINANCE CHARGE (dollar amount the credit will cost you) | Total of Payments (amount paid after making all scheduled payments) | ANNUAL PERCENTAGE RATE (cost of credit as a yearly rate) |
|---|---|---|---|---|---|---|---|
| 326,651.36 | 49,452.56 | 277,198.80 | 0.00 | 277,198.80 | 6,507.90 | 283,706.70 | 5.090 % |

*YOUR PAYMENT SCHEDULE WILL BE:*    *Mail Payments to: FIRST INSURANCE Funding, PO Box 7000, Carol Stream, IL 60197-7000*

| Number of Payments | Amount of Each Payment | First Installment Due | 7/19/2021 |
|---|---|---|---|
| 10 | 28,370.67 | Installment Due Dates | 19th (Monthly) |

**INSURED'S AGREEMENT:**

**1. SECURITY INTEREST.** INSURED/BORROWER ("Insured") grants and assigns FIRST INSURANCE Funding, A Division of Lake Forest Bank & Trust Company, N.A. ("LENDER") a first priority lien on and security interest in the financed policies and any additional premium required under the financed policies listed in the Schedule of Policies, including (a) all returned or unearned premiums, (b) all additional cash contributions or collateral amounts assessed by the insurance companies in relation to the financed policies and financed by LENDER hereunder, (c) any credits generated by the financed policies, (d) dividend payments, and (e) loss payments which reduce unearned premiums (collectively, the "Financed Policies"). If any circumstances exist in which premiums related to any Financed Policy could become fully earned in the event of loss, LENDER shall be named a loss-payee with respect to such policy.
**2. FINANCE CHARGE.** The finance charge begins accruing on the earliest effective date of the Financed Polices. The finance charge is computed using a 365-day calendar year.
**3. LATE PAYMENT.** For commercial loans, a late charge will be assessed on any installment at least 5 days in default, and the late charge will equal 5% of the delinquent installment or the maximum late charge permitted by law, whichever is less. For personal loans, a late charge will be assessed on any installment 10 days in default, and the late charge will be the lesser of $10 or 5% of the delinquent installment.
**4. PREPAYMENT.** If Insured prepays the loan in full, Insured is entitled to a refund of the unearned finance charge computed according to the Rule of 78s.

## SCHEDULE OF POLICIES

| Policy Number | Full Name of Insurance Company and Name of General Agent or Company Office to Which Premium is Paid | Coverage | Policy Term | Effective Date | Premiums, Taxes and Fees |
|---|---|---|---|---|---|
| 1000489619-01 | C00185-LIBERTY SURPLUS INS CORP | GL | 12 | 6/19/2021 | 219,501.00 |
| | G01628-RLA INSURANCE INTERMEDIARIES | | | ERN TXS/FEES | 373.15 |
| | [ME:25.000 %, CX:0]    [90%PR] | | | FIN TXS/FEES | 7,902.04 |
| AR6461526 | C00082-COLONY INSURANCE COMPANY | EXLB | 12 | 6/24/2021 | 95,283.00 |
| | G01628-RLA INSURANCE INTERMEDIARIES | | | ERN TXS/FEES | 161.98 |
| | [ME:25.000 %, CX:0]    [90%PR] | | | FIN TXS/FEES | 3,430.19 |
| | | | | TOTAL | 326,651.36 |

Q# 30120844, PRN: 062821, CFG: A01733, RT: ALLIANT AMERICAS-30D, DD: 30, BM: Invoice, Qtd For: A01733 Original, Memo 0

**5. PROMISE TO PAY.** In consideration of the premium payment by LENDER to the insurance companies listed in the Schedule of Policies (or their authorized representative) or the Agent or Broker listed above, Insured unconditionally promises to pay LENDER, the Amount Financed plus interest and other charges permitted under this Agreement, including the Down Payment if owed and payable directly to LENDER, subject to all the provisions of this Agreement.
**6. POWER OF ATTORNEY.** INSURED IRREVOCABLY APPOINTS LENDER AS ITS "ATTORNEY-IN-FACT" with full power of substitution and full authority, in the event of default under this Agreement, to (a) cancel the Financed Policies in accordance with the provisions contained herein, (b) receive all sums assigned to LENDER, and (c) execute and deliver on behalf of Insured all documents relating to the Financed Policies in furtherance of this Agreement. This right to cancel will terminate only after all of Insured's indebtedness under this Agreement is paid in full. Insured is responsible for repayment of the Amount Financed plus interest and other charges permitted under this Agreement, including the Down Payment if owed and payable directly to LENDER, irrespective of whether LENDER exercises this right to cancel the Financed Policies.
**7. SIGNATURE & ACKNOWLEDGEMENT.** Insured has received, reviewed, and signed a copy of this Agreement. The undersigned has the requisite authority to (a) enter into this Agreement on behalf of Insured, if Insured is not an individual, and any other insureds named on the Financed Policies, and (b) jointly and severally agree on behalf of all insureds named on the Financed Policies to all provisions set forth in this Agreement. **Insured acknowledges and understands that entry into this financing arrangement is not required as a condition for obtaining insurance coverage.**
**NOTICE TO INSURED: (1) Do not sign this Agreement before you read both pages of it, or if it contains any blank space.  (2) You are entitled to a completely filled-in copy of this Agreement.  (3) You have the right prepay the loan in full and receive a refund of any unearned finance charge. (4) Keep a copy of this Agreement to protect your legal rights. (5) See last page of Agreement for your consent to electronic statement and notice delivery.**

_____    _____    _____    _____
Signature of Insured or Authorized Agent    Date    Signature of Agent    Date

**The undersigned hereby warrants and agrees to the Agent or**
**Broker Representations and Warranties set forth herein.**    **FIF1020NBP**

**8. APPLICATION OF PAYMENTS.** (a) Payments received by LENDER from Insured shall be applied first to installments, then to any unpaid fees. The payment of installments is prioritized over the payment of fees, which means when LENDER receives partial payments or overpayments of any installment(s), amounts previously applied to fees may be reallocated to enable a full installment(s) to be paid. This payment application method may cause fees to reappear as unpaid and owing after the payment period in which the fees were originally assessed and paid, but does not increase or otherwise change the amount of fees that Insured may be required to pay under this Agreement. (b) Any returned premium received by LENDER from the Financed Policies will be applied to reduce the total unpaid balance under this Agreement, which shall not relieve Insured of its obligation to pay any remaining installments due but may reduce the amount of such installments.

**9. EFFECTIVE DATE.** This Agreement will not become effective until it is accepted in writing by LENDER. LENDER will send a Notice of Acceptance to Insured to confirm this Agreement is effective.

**10. DEFAULT/CANCELLATION.** Insured is in default under this Agreement if (a) the Down Payment, if to be collected by LENDER, or any payment is not received by LENDER when it is due, (b) a proceeding in bankruptcy, receivership, insolvency or similar proceeding is instituted by or against Insured, or (c) Insured fails to comply with any of the terms of this Agreement. If Insured is in default, LENDER has no further obligation under this Agreement to pay premiums on Insured's behalf, and LENDER may pursue any of the remedies provided in this Agreement or by law. If a default by Insured results in a cancellation of the Financed Policies, Insured agrees to pay a cancellation charge for commercial loans, which will be the maximum permitted by law. No cancellation charge shall apply to personal loans. If cancellation or default occurs, Insured agrees to pay interest on the unpaid balance due at the contract rate until the balance is paid in full.

**11. LIMITATION OF LIABILITY. Insured understands and agrees that LENDER or its assignee is not liable for any losses or damages to Insured or any person or entity upon the exercise of LENDER's right of cancellation, except in the event of willful or intentional misconduct by LENDER.**

**12. INSUFFICIENT FUNDS CHARGE.** If Insured's payment is dishonored for any reason and if permitted by law, Insured will pay LENDER an insufficient funds charge equal to the maximum fee permitted by law for commercial loans and $10 for personal loans.

**13. LENDER'S RIGHTS AFTER THE POLICIES ARE CANCELLED.** After any Financed Policy is cancelled by any party or if a credit is otherwise generated, LENDER has the right to receive all unearned premiums and other funds assigned to LENDER as security herein and to apply them to Insured's unpaid balance under this Agreement or any other agreement between Insured and LENDER. Receipt of unearned premiums does not constitute payment of installments to LENDER, in full or in part. Any amounts received by LENDER after cancellation of the Financed Policies will be credited to the balance due with any excess paid to the Insured; the minimum refund is $1.00. Any deficiency shall be immediately paid by Insured to LENDER. Insured agrees that insurance companies may rely exclusively on LENDER's representations about the Financed Policies.

**14. ASSIGNMENT.** Insured may not assign any Financed Policy or this Agreement without LENDER's prior written consent. LENDER may transfer its rights under this Agreement without the consent of Insured.

**15. AGENT OR BROKER.** Insured agrees that the Agent or Broker issuing the Financed Policies or through whom the Financed Policies were issued is not the agent of LENDER, except for any action taken on behalf of LENDER with the express authority of LENDER, and LENDER is not bound by anything the Agent or Broker represents to Insured, orally or in writing, that is not contained in this Agreement. Where permissible by law, LENDER may pay some portion of the finance charge or other form of compensation to the Agent or Broker executing this Agreement for aiding in the administration of this Agreement. In NY, the Agent or Broker may assess a fee to Insured for obtaining and servicing the Financed Policies pursuant to NY CLS Ins § 2119. Any questions regarding this payment should be directed to the Agent or Broker.

**16. COLLECTION COSTS.** Insured agrees to pay reasonable attorney fees, court costs, and other collection costs to LENDER to the extent permitted by law if this Agreement is referred to an attorney or collection agent who is not a salaried employee of LENDER to collect money that Insured owes.

**17. GOVERNING LAW.** The loan terms subject to this Agreement are governed by applicable federal law and Illinois law (to the extent not preempted by federal law), without regard to principles of conflicts of law or choice of law. If any court finds any term herein to be invalid, such finding will not affect the remaining provisions.

**18. WARRANTY OF ACCURACY.** Insured represents and warrants that to the best of its knowledge: (a) the Financed Policies are in full force and effect and that the Insured has not and will not assign any interest in the Financed Policies except for the interest of mortgagees and loss payees, (b) the Down Payment and any past due payments have been paid in full to the Agent or Broker or Lender in cash or other immediately available funds, (c) all information provided herein or in connection with the Agreement is true, correct, and not misleading, (d) Insured is not insolvent nor presently involved in any insolvency proceeding, (e) Insured has no indebtedness to the insurance companies issuing the Financed Policies, (f) there is no provision in the Financed Policies that would require LENDER to notify or obtain consent from any other party to effect cancellation of the Financed Policies, and (g) Insured has not disclosed if he or she is a covered member of the armed forces or a dependent of a covered member as defined in the Military Lending Act.

**19. ADDITIONAL PREMIUMS.** (a) Insured expressly agrees to (i) fully and timely comply with all audits by the insurance companies issuing the Financed Policies, (ii) timely provide complete and accurate payroll information, if applicable, and (iii) pay to the insurance companies any additional amount due in connection with the Financed Policies. The Amount Financed shall be applied to the Financed Policies' premium amounts and Insured shall be responsible for any additional premiums or other sums. (b) Insured, or Agent or Broker, may request that LENDER finance additional policies and/or additional premiums (the "Additional Premiums") for Insured during the term of this Agreement. If LENDER agrees, LENDER will send a Notice of Acceptance to Insured to confirm its approval to finance the Additional Premiums. For commercial loans, this Agreement shall be deemed amended on the date of the Notice of Acceptance to consolidate the Additional Premiums with Financed Policies into a single and indivisible loan transaction subject to this Agreement (with applicable changes to the payment schedule), and the Additional Premiums shall be "Financed Policies" on the date of the Notice of Acceptance. For personal loans, LENDER (or Agent or Broker on LENDER's behalf) will provide a separate Premium Finance Agreement to Insured for any Additional Premiums.

**20. CORRECTIONS.** LENDER may insert the names of insurance companies or policy numbers in the Schedule of Policies, if this information is not known at the time Insured signs this Agreement. LENDER is authorized to correct patent errors or omissions in this Agreement.

**21. NON-WAIVER.** Not Applicable.

**22. ELECTRONIC STATEMENT AND NOTICE DELIVERY. By executing this Agreement, Insured agrees to receive all billing statements, notices, and other communications via electronic delivery in PDF format as permitted by applicable law. It is Insured's responsibility to provide LENDER with true, accurate, and complete e-mail and contact information related to this Agreement and to maintain and update promptly any changes to this information. If Insured wishes to (i) opt out of electronic statement and notice delivery, or (ii) update contact information, Insured can log into Insured's account on www.firstinsurancefunding.com or call (800) 837-2511.**

---

### AGENT OR BROKER REPRESENTATIONS AND WARRANTIES

Unless previously disclosed in writing to LENDER or specified in the Schedule of Policies, the Agent or Broker executing this Agreement expressly represents, warrants, and agrees as follows: (1) Insured has received a copy of this Agreement and has authorized this transaction, Insured's signature is genuine, and the Down Payment has been received from Insured (unless the Down Payment was made to Lender), (2) the information contained in the Schedule of Policies including the premium amount is correct and accurately reflects the necessary coverage, (3) the Financed Policies (a) are in full force and effect, (b) are cancellable by Insured or LENDER (or its successors or assigns), (c) will generate unearned premiums which will be computed on the standard short rate or pro rata basis, and (d) do not contain any provisions which affect the standard short rate or pro rata premium computation, including but not limited to direct company bill, audit, reporting form, retrospective rating, or minimum or fully earned premium, (4) the Agent or Broker is either the insurer's authorized policy issuing agent or the broker placing the coverage directly with the insurer, except where the name of the Issuing Agent or General Agent is listed in the Schedule of Policies, (5) to the best of the Agent or Broker's knowledge, there are no bankruptcy, receivership, or insolvency proceedings affecting Insured, (6) Agent or Broker will  hold harmless and indemnify LENDER and its successors and assigns  against any loss or expense (including attorney's fees, court costs, and other costs) incurred by LENDER and resulting from Agent or Broker's violations of these Representations and Warranties or from Agent or Broker's errors, omissions, or inaccuracies in preparing this Agreement, (7) Agent or Broker will (a) hold in trust for LENDER any payments made or credited to Insured through or to Agent or Broker by the insurance companies or LENDER, and (b) pay these monies and the unearned commissions to LENDER upon demand to satisfy the outstanding indebtedness under this Agreement, and (8) to fully and timely assist with all payroll audits.

FIF1020NBP