| | |
|---|---|
| Mark S. Lichtenstein<br>AKERMAN LLP<br>1251 Avenue of The Americas, 37th Floor<br>New York, New York 10020<br>Tel. No. (212) 880-3800<br>Fax No. (212) 880-8965 | John H. Thompson<br>AKERMAN LLP<br>750 Ninth Street, N.W., Suite 750<br>Washington D.C. 20001<br>Tel.: (202) 393-6222<br>Fax: (202) 393-5959 |

*Proposed Counsel to the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BUYK CORP.[1] | ) | Case No. 22-10328 (MEW) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DEBTOR'S MOTION FOR AN ORDER (I) APPROVING TERMS AND AUTHORIZING IMPLEMENTATION OF KEY EMPLOYEE RETENTION PROGRAM AND KEY EMPLOYEE INCENTIVE PLAN; AND (II) GRANTING RELATED RELIEF**

Buyk Corp. (the "Debtor" or "Buyk"), the debtor and debtor-in-possession in the above captioned Chapter 11 Case (the "Chapter 11 Case"), by and through its undersigned counsel, hereby submits this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A,** approving terms and authorizing implementation of key employee retention program and key employee incentive plan and granting related relief. In support of the Motion, the Debtor respectfully states as follows:

**PRELIMINARY STATEMENT**

1.     Preservation and maximization of the value of the Debtor's businesses for its orderly liquidation depends on the performance and productivity of the Debtor's key employees to oversee and handle the liquidation of its assets. As described below, the Debtor has already terminated, on a pre-petition basis, all but six (6) key employees who each have critically

---

[1] The Debtor in this case, along with the last four digits of its federal tax identification number is Buyk Corp. (1477). The principal place of business for the Debtor is 360 West 31st Street, Floor 6, New York, NY 10001.

important and distinct skill sets and responsibilities. These 6 employees are, in the Debtor's estimation, critical to the winddown process. Replacing these employees would be difficult, time-consuming and expensive, if they could be replaced at all. Losing these employees at this early and critical stage of the Chapter 11 Case will be highly disruptive to the Debtor's orderly liquidation process, prejudicing the Debtor's bankruptcy estate and creditors.

2.      To reduce the risk of potential departures of certain key employees as a consequence of the liquidation process, the Debtor has developed a key employee retention program (the "KERP") and a key employee incentive program (the "KEIP") to motivate six of the Debtor's employees representing approximately .075 of the Debtor's total pre-petition employee headcount (the "KERP/KEIP Participants"), to remain employed with the Debtor and to maximize the value of the Debtor's remaining assets during Chapter 11.

3.      Further, the funds necessary to satisfy the obligations under the KERP and KEIP are included in the Budget the Debtor proposes in its *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain a Senior Secured Superpriority Post-petition Financing, (II) Granting Liens and Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [ECF No. 13, Exh. B]

## BACKGROUND

4.      The Debtor intends to proceed as expeditiously as permitted through its Chapter 11 case for the purposes of effecting a sale of substantially all of its assets subject to higher and better offers in an auction process approved by the Court.

5.      Prior to this bankruptcy filing, the Debtor operated an ultra-high speed grocery business with 39 locations, 31 in the New York metropolitan area and 8 in the Chicago

metropolitan area. The Debtor commenced operations in April of 2021. After an initial seed round of investment by Russian-based investors in the amount of approximately $63.5 million in convertible notes and $11 million in unsecured loans, in or about January 2022, the Debtor was in the process of a seeking additional equity investment of approximately $250,000,000. Due to the mounting indicia of a potential Russian dispute with Ukraine, the Debtor determined in January 2022 to pivot to a United States-based equity raise and actively sought series A funding from numerous institutional investors. The United States fund raising was going reasonably well when Russia commenced its invasion of Ukraine. At that juncture, the Debtor was confronted with an existential and, ultimately, fatal crisis. First, any chance of obtaining equity or debt investment from the prominent institutional investors which had been interested in funding the Debtor was now lost. Second, although the Debtor was operating and earning revenue, it was in the beginning stages of its growth and was relying, in part, on cash infusions by the founders to continue its operations and expansion. Unfortunately, although the founders were not, and are not, subject to any sanctions, restrictions on the ability to transfer any funds out of Russia made it impossible for the founders to provide any further funding to the Debtor.

6.     Since February 28, 2022, working together with its management team, the Debtor pursued an asset or stock sale to a variety of entities in a similar or adjacent business as the Debtor or a rescue loan /equity investment. In light of the monthly deficiency between income and expenses, an impending payroll due on March 11, 2022, and other pressing obligations to creditors, plus the negative impact of the Russia/Ukraine crisis on investor interest, the Debtor began seeking a loan from several potential debtor-in-possession ("DIP") lenders in order to fund final payroll to Debtor's employees and independent contractors in the amount of approximately 800 and an orderly liquidation in the context of bankruptcy. In the exercise of its

fiduciary duties to all stakeholders it became apparent that the only viable and realistic strategic alternative for the Debtor was to obtain a short term bridge loan secured by all of the Debtor's assets, including unencumbered brand new (and almost new) refrigeration and other food storage equipment with a book value of approximately $11 million, grocery items (including 20% perishable items) with a book value of $1.7 million, and cash of approximately $700,000, in a sufficient amount to fund all outstanding payroll expense and an expedited sale process in bankruptcy. The goal, of course, is to maximize the value of these assets in bankruptcy in order to repay the DIP Lender, administrative and priority claims and to, if possible, provide some level of distribution to unsecured creditors.

7. After having discussions with over thirty (30) potential funding sources, including multiple potential DIP lenders, on March 10, 2022, the Debtor entered into a Term Sheet with Legalist for a debtor-in-possession loan commitment of $6.5 million (the "DIP Loan").

8. On March 4, 2022, the Debtor furloughed approximately 98% of all employees. On March 11, 2022, the Debtor terminated the employment of all of its employees, except for six staff members who the Debtor proposes to continue to employ post-petition to assist in the orderly winddown in this liquidating Chapter 11.[2] On March 11, 2022, Legalist and the Debtor executed that certain Pre-Petition Term Loan Credit Agreement in the maximum amount of $6.5 million (the "Credit Agreement")[3] which provided for two separate draws: (i) $4 million on March 11, 2022 for the sole purpose of satisfying all payroll obligations for the Debtor's terminated employees and, (ii) up to $2.5 million to be drawn post-petition pursuant to a budget

---

[2] On March 11, 2022, the Debtor provided WARN Notices to all terminated employees.

[3] The Pre-Petition Term Loan Credit Agreement was superseded by the Amended and Restated DIP Agreement executed on March 17, 2022.

4

approved by the Court as part of Court approval of the DIP Loan and the funds borrowed both pre and post-petition.

9. The purpose of the post-petition availability under the DIP Loan is to fund an expedited and efficient sale process of the Debtor's assets. In light of the existence of perishable inventory and the desperate need to avoid administrative rents starting in April 2022[4], the Debtor retained certain auctioneers pre-petition with the intent to seek Court approval of the retention of such auctioneers and the sale process.

10. The Debtor's goal is to complete the sale process within sixty (60) days of the Petition Date and to then seek confirmation of a plan of liquidation to distribute the remaining sale proceeds after satisfaction of the DIP Loan. The Debtor has sufficient funds and anticipated revenues from prospective asset sales to operate in liquidation mode through, at least, the first 13 weeks of these Chapter 11 cases, as reflected in the budget (the "Budget").

11. The Debtor's entry into the DIP Loan and the sale of all assets is the best result for all stakeholders under incredibly difficult and unforeseeable circumstances. For the Debtor's former employees, the DIP Loan allowed them to be paid their wages in full. For the rest of the Debtor's stakeholders, the DIP Loan, commencement of this case, and the contemplated sale process will enable the Debtor to maximize the value of its assets in the hope of satisfying creditor claims in order of priority.

## BUSINESS OF THE DEBTOR

12. In April 2021, the Debtor made its debut with the launch of a 15-minute grocery delivery service in New York City. In November 2021, the Debtor expanded into the Chicago market.

---

[4] Many of the Debtor's leases are current through March 2022.

13. The Debtor offered grocery items, along with household essentials, personal care and pet supplies, relying on couriers on bicycles to deliver the orders.

14. The Debtor, which was backed by $63.5 million in seed funding, was the latest entrant to the competitive field of ultrafast delivery firms cropping up in major metropolitan areas including New York. One of the Debtor's differentiating factors from its competitors was its real-time, in-house technology. For example, the Debtor, which had an order weight maximum of 26 pounds for each courier, had the ability to split larger orders up between multiple couriers if needed. Its technology allowed the Debtor to fulfill orders within two minutes and then deliver them in between five and 10 minutes.

15. The Debtor relied on a mix of contractors and its own workforce and had more than 600 couriers and over 100 office workers. In addition to leveraging efficiencies from its technologies, the Debtor attempted to earn revenue from the margins on its products and used the money saved by renting small locations not needed to be in prime spots for foot traffic to invest in employee costs. The Debtor's business plan also included an initiative to launch private label offerings with more than 100 SKUs in categories, such as meat and pasta.

16. As of February 24, 2022, the Debtor had 39 stores that serve the New York and the Chicago metropolitan areas (31 in New York and 8 in Chicago), each with 2,000 to 3,000 SKUs.

17. As noted above, the Debtor had been relying upon cash infusions by its original investors to continue to operate and expand while simultaneously seeking a new round of equity financing. Prior to closing its business, the Debtor's plan was to open another 100 stores in 2022. Due to the invasion of Ukraine, the Debtor was unable to execute on its planned equity raise, despite its intensive efforts to raise rescue capital. With relatively little cash on hand in

February 2022 and payroll coming due, the Debtor's Board of Directors, in consultation with its managers and retained advisors, determined to ultimately terminate virtually all of its employees and obtain a relatively small DIP Loan to fund a liquidating Chapter 11 case.

18. On March 11, 2022, the Debtor enter into the Credit Agreement to borrow up to $6.5 million from Legalist with $4 million of such commitment already distributed by the Debtor on account of the wages due to all employees[5] whose employment was terminated on March 11, 2022.

19. As previously stated, Legalist and the Debtor agreed in the Credit Agreement that the Debtor was required to file a bankruptcy case on March 15, 2022 (with a two-business day grace period).

## CHAPTER 11

20. On March 17, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. As a result of the Ukrainian crisis and the Debtor's attendant inability to receive funding from its initial investors and/or any other parties in a sufficient amount to continue to operate as a going concern while seeking a comprehensive capital raise or a merger or sale transaction, the Debtor's fiduciaries determined to cause the Debtor to commence this Chapter 11 case in order to effectuate an orderly sale of its assets.

## CORPORATE STRUCTURE

21. As set forth in the Declaration of James Walker in Support Of First Day Motions which has been filed contemporaneously herewith Rodion Shishkov and Viacheslav Bocharov, each own 46.55% of the Debtor. The remaining 6.9% of the Debtor is owned by Kirill Shishkov. Prior to the financial distress described above, the Debtor formed a German wholly-owned subsidiary named BUYK GmBH. That entity has no assets, liabilities and operations and

---

[5] Note the exception of 6 employees retained to assist with the bankruptcy.

7

has little if any value. In the Debtor's estimation it is highly unlikely that any part of the funds realized from the sales of the Debtor's assets will be distributed to equity holders under a liquidating plan or otherwise.

## CAPITAL STRUCTURE AND PREPETITION INDEBTEDNESS

22. The Debtor's principal pre-petition secured lender is Legalist whose secured debt against the Debtor is in the amount of $4,000,000 as of the Petition Date. Legalist has a blanket lien on all of the Debtor's assets. Legalist has committed to funding up to an additional $2.5 million to fund the Chapter 11 case. The Debtor has no other secured creditors.

23. The Debtor is also a borrower under certain unsecured convertible notes in the aggregate amount of $63.5 million during the period from June-December 2021(the "Convertible Notes"). In addition to the secured debt to Legalist and the Convertible Note debt, the Debtor has approximately $18 million in unsecured debt. Finally, the Debtor anticipates significant claims arising from the rejection of its leases (although as part of the sale process).

## JURISDICTION

24. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

25. By this Motion, the Debtor seeks entry of an order approving and authorizing the KERP and KEIP, authorizing the Debtor to make payments under the KERP and KEIP, and granting certain related relief.

26. A proposed form of order granting the relief requested herein is annexed hereto as Exhibit A (the "Proposed Order").

## DESCRIPTION OF THE KERP

27. The KERP is designed to ensure that six (6) key employees remain with the Debtor during this Chapter 11 Case and the liquidation of the Debtor's assets. The total aggregate KERP payments is $153,203.10 per month including benefits (the "KERP Payments") consistent with the chart below:

|  | Current Salary per Year | Discount | New Salary per Year |
|---|---|---|---|
| James Walker | $ 750,000 | 35% | $ 487,500 |
| Alexandre Agaian | $ 222,000 | 0.0% | $ 222,000 |
| Olga Beliakova | $ 178,500 | 0.0% | $ 178,500 |
| Dmitry Vilbaum | $ 300,000 | 10.0% | $ 270,000 |
| Ramon Guzman | $ 120,000 | 0.0% | $ 120,000 |
| Oleg Lungu | $ 180,000 | 0.0% | $ 180,000 |

## DESCRIPTION OF THE KEIP

28. The Debtor's KEIP covers all six employees, with an aggregate total payout of approximately $300,000 (the "KEIP Payments"). The KEIP is based on the following metrics being met: (i) a sale of assets for an aggregate net value of $8 million or more; or (ii) a distribution to unsecured creditors of 10% or more, through the confirmation of a plan of liquidation. The distribution of the KEIP Payments among the KERP/KEIP Participants shall be based on and proportionate to the amount of salary received by each KERP/KEIP Participant while the Debtor is in bankruptcy. Upon the completion of the required metrics, each KERP/KEIP Participant shall receive a percentage of the $300,000 equal to the percentage amount of the salary received by that KERP/KEIP Participant, after all salary to all of the KERP/KEIP Participants has been calculated.

**BASIS FOR RELIEF**

**I. The KERP Satisfies Section 503(c)(3)**

29.  Section 503(c)(3) of the Bankruptcy Code permits payments to a debtor's employees outside the ordinary course of business if such payments are justified by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). In this and other districts, courts have concluded that whether payments to employees are justified by the "facts and circumstances" of a case is to be determined by application of the business judgment rule. *In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2011) (describing six factors that courts may consider when determining whether the structure of a compensation proposal meets the "sound business judgment test" in accordance with section 503(c)(3) of the Bankruptcy Code). Accordingly, the determination of whether a retention plan is justified by the facts and circumstances of the case and the analysis of whether the approval of such plan is a sound exercise of the debtor's business judgment are the same.

30.  In *Dana*, the bankruptcy court set forth the following factors for evaluating whether a debtor satisfied the "sound business judgment" test for purposes of the approval of a compensation plan under section 503(c)(3) of the Bankruptcy Code:

- Is there a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

- Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

- Is the plan or proposal consistent with industry standards?

10

- What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*Dana*, 358 B.R. at 576-77. As set forth below, to the extent applicable, all of these factors are satisfied as to the KERP.

31.     The Debtor believes that the KERP is critical to maintaining its work force and will preserve the value of the estate during the liquidation process. The Debtor believes that requiring each of the 6 remaining employees to waive their substantial rights to severance payments and for two of them to materially discount their pre-petition salaries, is in the sound exercise of the Debtor's business judgment and the best interest of the estate.  Due to the unique operations of the business, the KERP is reasonable, acceptable within the industry standards and the size of this case, and  well within the Debtor's sound business judgment to maximize value and promote a successful and orderly liquidation process.  It may very well be that several of the 6 remaining employees will leave on their own volition prior to the conclusion of the Bankruptcy Case.  Additionally, after the initial flurry of activity in commencing the Case and initiating and implementing the sale process, the utility of some of the six remaining employees will diminish. Thus, it is likely that the CEO, working together with the Board, will determine that services of certain employees retained on a post-petition basis are no longer necessary and such employees will be terminated prior to the conclusion of the Case. Further none of the KERP/KEIP Participants are insiders so as to run afoul of Section 503(c)(1)

32.     Accordingly, the Debtor respectfully submits that the KERP is justified by the facts and circumstances of the Cases and satisfies section 503(c)(3) of the Bankruptcy Code and should be approved.

**II. The KEIP Should Be Approved Under Sections 363(b) and 503(c) of the Bankruptcy Code and the Business Judgment Standard**

33.     For the same reasons as set forth above with respect to the KERP, the KEIP should be approved pursuant to section 363(b) of the Bankruptcy Code.  As more fully described above, section 363(b)(1) of the Bankruptcy Code provides that debtor "may use, sell or lease, other than in the ordinary course of business, property of the estate, if the debtor demonstrates a "sound business purpose." Moreover, once a debtor articulates a valid business justification for the proposed use of estate property, the bankruptcy court should give great deference to that judgment.  *Global Crossing Ltd.* at 744 (*citing In re Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A. 2d 34, 45 n. 17 (Del. 1994)).

34.     In this case, the implementation of the KEIP is a proper exercise of the Debtor's business judgment and is in the best interests of the Debtor's estates.  The KEIP has been specifically designed to incentivize the KERP/KEIP Participants to maximize the value of the Debtor's assets.  Properly incenting the KERP/KEIP Participants is critical to maximizing value for the estates.

35.     Finally, and most importantly, the KERP/KEIP Participants earn benefits if and only if the Debtor meets certain financial metrics.  The KEIP thus ensures that the KERP/KEIP Participants are incented to maximize the Debtor's performance, which is consistent with the myriad of debtors that have used similar programs approved in other cases in this District. *See In re BearingPoint, Inc.*, Case No. 09-10691 (REG) (Bankr. S.D.N.Y. July 24, 2009) [Docket No. 1128] (incentives based on (i) the sale of business units, (employees working on estate transition and wind-down activities, and (iii) percentage of creditor recoveries); *In re Calpine Corp.*, Case No. 05-60200 (BRL)(Bankr. S.D.N.Y. May 15, 2006) [Docket No. 1580] (size of incentive pool tied to the debtor's market adjusted enterprise value and plan adjusted enterprise

value); *In re Nortel Networks, Inc.*, Case No. 09-10138 (KG) (Bankr. D. Del. Mar 5 and 20, 2009) [Docket Nos. 436 and 511] (incentive plan based on the achievement of separate milestones, including a cost reduction plan, "certain parameters…that will result in a leaner and more focused organization" and plan confirmation).

36. To the extent the Court finds that the KEIP is outside the ordinary course of the Debtor's business, it must also be approved under section 503(c)(3) of the Bankruptcy Code. For the same reasons articulated above that justify the approval of the KERP, the KEIP should be meets each Dana factor.

37. Therefore, given all of these facts, the implementation of the KEIP by the Debtor should be approved by the Court pursuant to section 363(b) of the Bankruptcy Code, and pursuant to 503(c) to the extent applicable, as a sound exercise of the Debtor's business judgment.

## REQUEST FOR WAIVER OF STAY

38. The Debtor seeks a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, the KERP and the KEIP are essential for the Debtor liquidate and to preserve the value for its estate. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## Notice

39. The Debtor has caused a copy of this Motion to be served upon (i) the Top 20 unsecured creditors; (ii) the United States Trustee; (iii) the DIP Lender; (iv) the KERP/KEIP Participants; (v) those persons who have formally appeared in the Chapter 11 Case and requested

13

service pursuant to Bankruptcy Rule 2002; and (vi) all applicable government agencies to the extent required by the Bankruptcy Rules and the Local Rules.  The Debtor submit that no other or further notice need be provided.

WHEREFORE the Debtor respectfully requests entry of the Proposed Order and such other and further relief as the Court may deem just and appropriate.

Dated: New York, New York
       March 18, 2022

                        AKERMAN LLP

                        By: ___/s/Mark Lichtenstein___
                            Mark S. Lichtenstein
                            1251 Avenue of The Americas, 37th Floor
                            New York, New York 10020
                            Tel. No. (212) 880-3800
                            Fax No. (212) 880-8965
                            E-Mail: mark.lichtenstein@akerman.com

                            -and-

                            John H. Thompson
                            AKERMAN LLP
                            750 Ninth Street, N.W., Suite 750
                            Washington D.C. 20001
                            Tel.: (202) 393-6222
                            Fax: (202) 393-5959
                            E-Mail: john.thompson@akerman.com

                        *Proposed Counsel for Debtor and Debtor-in Possession*

# EXHIBIT A

# PROPOSED ORDER

1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| BUYK CORP.[1] ) | Case No. 22-10328 (MEW) |
| ) | |
| Debtor. ) | |
| ) | |

**ORDER GRANTING DEBTORS' MOTION FOR AN ORDER
(I) APPROVING TERMS AND AUTHORIZING IMPLEMENTATION OF
KEY EMPLOYEE RETENTION PROGRAM AND KEY EMPLOYEE
INCENTIVE PLAN; AND (II) GRANTING RELATED RELIEF**

Upon the Debtor's Motion for an Order (I) Approving and Authorizing Implementation of Key Employee Retention Program and Key Employee Incentive Plan; and (II) Granting Related Relief (the "Motion")[2] [ECF No. ___], the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and the Court having held a hearing to consider the relief requested in the Motion (the "Hearing"); and the record of Hearing; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best

---

[1] The Debtor in this case, along with the last four digits of its federal tax identification number is Buyk Corp. (1477). The principal place of business for the Debtor is 360 West 31st Street, Floor 6, New York, NY 10001.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion

62639769;1

interests of the Debtors, their estates, creditors, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, it is

**IT IS HEREBY ORDERED THAT**:

1. The Motion is granted as set forth herein.

2. Pursuant to sections 503(c) and 363(b)(1) of the Bankruptcy Code, the KERP and KEIP are approved.

3. The Debtor is authorized, but not directed, to implement the KERP and KEIP and make the payments contemplated thereunder.

4. Notwithstanding anything to the contrary contained herein, any payment to be made or relief or authorization granted hereunder shall be not be inconsistent with, and shall be subject to, the requirements imposed on the Debtor under the Interim DIP Order and the Budget approved thereunder.

5. To the extent there is any conflict between this Order and the Interim DIP Order, or the Budget, the terms of the Interim DIP Order, as applicable, shall govern.

6. The Debtor is authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order without further order of this Court.

7. Pursuant to Bankruptcy Rule 6004(h), the terms and provisions of this Order shall be immediately effective and enforceable upon its entry.

8. This Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: New York, New York
      March __, 2022

**PROPOSED**

_____

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**