| | |
|---|---|
| WINDELS MARX LANE & MITTENDORF, LLP<br>*Attorneys for Buyk Corp.*<br>156 West 56th Street<br>New York, New York 10019<br>Telephone (212) 237-1000<br>Attorneys Appearing:<br>James M. Sullivan<br>(jsullivan@windelsmarx.com) | Hearing Date: October 6, 2022 at 2:00 p.m. |
| | Objections Due: September 29, 2022 at 5:00 p.m. |
| | Interim Fees and Expenses Previously Sought $ 0.00 |
| | Interim Fees Incurred $813,570.00 |
| | Less Voluntary 20% Holdback $162,714.00 |
| | Interim Fees Sought for Payment $650,856.00 |
| | Interim Unpaid Expenses Sought For Payment $1,430.44 |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>BUYK CORP.,<br><br>Debtor. | Chapter 11<br><br>Case No. 22-10328-mew |

**APPLICATION PURSUANT TO BANKRUPTCY CODE §§ 328, 330 AND 331 AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 2016(a) OF WINDELS MARX LANE & MITTENDORF, LLP, ATTORNEYS FOR THE CHAPTER 11 DEBTOR BUYK CORP. FOR FIRST INTERIM ALLOWANCE AND PAYMENT OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED FOR THE PERIOD OF APRIL 4, 2022 THROUGH JUNE 30, 2022**

| Professionals | Year Admitted | Hours Engaged | 2022 Hourly Rate | Total | Time Records Submitted |
|---|---|---|---|---|---|
| Leslie S. Barr (c) | 1985 | 28.1 | $615 | $17,281.50 | Yes |
| Brian W. Kreutter (c) | 2003 | 265 | $615 | $162,975 | Yes |
| Ben Kusmin (a) | 2006 | 130.7 | $595 | $77,766.50 | Yes |
| James Sullivan (p) | 1995 | 459.4 | $615 | $282,531 | Yes |
| Edmund B. Troya (a) | 2003 | 376 | $595 | $223,720 | Yes |
| **Paraprofessionals** | | | | | |
| Matthew L. Corwin | | 114.8 | $395 | $45,346.00 | Yes |
| Tracy Heston | | 1.1 | $395 | $434.50 | Yes |
| Colin Michael Shea | | 6 | $395 | 2,370.00 | Yes |
| Joel L. Solomon | | 1.1 | $395 | $434.50 | Yes |
| Francisco J. Velez | | 1.8 | $395 | $711 | Yes |
| | Total | 1384 | | $813,570 | |
| | Blended Hourly Rate | | $587.83 | | |

Time spent in preparing Fee Application: $1,142.50, including review of other Fee Applications filed in this case 2.3 Hours
Is the time spent in preparing the Fee Application(s) included in the total hours described in this Application? X Yes ___ No
Dollar value of the time spent in preparing the Fee Application if compensation is therefore sought: $1,142.50.

(p) Partner (c) Of Counsel (a) Associate

WINDELS MARX LANE & MITTENDORF, LLP
*Attorneys for Buyk Corp.*
156 West 56th Street
New York, New York 10019
Tel. (212) 237-1000 / Fax. (212) 262-1215
Attorneys Appearing: James M. Sullivan (jsullivan@windelsmarx.com)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>BUYK CORP.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 22-10328-mew |

**APPLICATION PURSUANT TO BANKRUPTCY CODE §§ 328, 330 AND 331 AND
FEDERAL RULE OF BANKRUPTCY PROCEDURE 2016(a) OF WINDELS MARX
LANE & MITTENDORF, LLP, ATTORNEYS FOR THE CHAPTER 11 DEBTOR BUYK
CORP., FOR FIRST INTERIM ALLOWANCE AND PAYMENT OF COMPENSATION
FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED
FOR THE PERIOD OF APRIL 4, 2022 THROUGH JUNE 30, 2022**

_____

**TO THE HONORABLE MICHAEL E. WILES,**
**UNITED STATES BANKRUPTCY JUDGE:**

Windels Marx Lane & Mittendorf, LLP ("**Windels Marx**" or the "**Firm**"), attorneys for

Buyk Corp. (the "**Debtor**" or "**Buyk**"), makes this application (the "**Application**") pursuant to

§§ 328 and 330 of title 11, United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy

Code**") and Rule 2016(a) of the Federal Rules Bankruptcy Procedure (the "**Bankruptcy Rule**"

or the "**Bankruptcy Rules**") for a first interim allowance and payment of compensation for

services rendered and reimbursement of expenses incurred for the period of April 4, 2022

through June 30, 2022 (the "**Application Period**"), and respectfully represents as follows:

**I.        Jurisdiction; Venue; Statutory Bases**

1.        The Court has jurisdiction over this Application under 28 U.S.C. §§ 157 and 1334

and the *Amended Standing Order of Reference* of the United States District Court for the

---

[1] The Debtor in this case, along with the last four digits of its federal tax identification number is Buyk Corp. (1477). The principal place of business for the Debtor is 245 East 93rd Street, Ste. 22E, New York, NY 10128.

Southern District of New York dated January 31, 2012 (Preska, C.J.).  Venue of this case and of this Application in this District is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 328, 330 and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a).  The subject matter of this Application is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## II.    Summary of Application

2.    The Debtor operated an ultra-high speed grocery business with 39 locations, 31 in the New York metropolitan area and 8 in the Chicago metropolitan area.  The Debtor has continued to operate as a debtor in possession under Chapter 11 of the Bankruptcy Code.

3.    Upon its retention in the Debtor's bankruptcy case, the Firm has, among other things, (i) reviewed and analyzed the Debtor's books and records; (ii) liquidated assets of the Debtor's estate (the "**Estate**"); (iii) significantly reduced administrative claims and expenses; and (iv) resolved litigations or potential litigations.

4.    By this Application, Windels Marx seeks the first interim allowance of $813,570 (the "**Proposed Allowed Fees**") representing the fees the Firm incurred during the Application Period.  The Firm voluntarily reduced the amount of the Proposed Allowed Fees by approximately $25,000.

5.    The Firm further requests a first interim fee award of $650,856 (the "**Requested Fees**") representing the Proposed Allowed Fees less a voluntary holdback of 20 percent equaling $162,714 (the "**Holdback**").

6.    In addition, Windels Marx seeks the first interim allowance and reimbursement of its unpaid expenses in the amount of $1,430.44.

### III.    Background[2]

7.     Beginning in April 2021, the Debtor operated an ultra-high speed grocery business that grew to include 39 locations, 31 in the New York metropolitan area and 8 in the Chicago metropolitan area.

8.     The Debtor was the latest entrant to the competitive field of ultrafast delivery firms cropping up in major metropolitan areas, including New York.

9.     One of the Debtor's differentiating factors from its competitors was its real-time, in-house technology.  For example, the Debtor, which had an order weight maximum of 26 pounds for each courier, had the ability to split larger orders between multiple couriers if needed.  Its technology allowed the Debtor to fulfill orders within two minutes and then deliver them between five and 10 minutes.

10.     The Debtor relied on a mix of contractors and its own workforce and had more than 600 couriers and over 100 office workers.  In addition to leveraging efficiencies from its technologies, the Debtor attempted to earn revenue from the margins on its products and used the money saved by renting small locations not needed to be in prime spots for foot traffic to invest in employee costs.  The Debtor's business plan also included an initiative to launch private label offerings with more than 100 SKUs in categories, such as meat and pasta.

11.     After an initial seed round of investment by Russian-based investors in the amount of approximately $63.5 million in convertible notes and $11 million in unsecured loans, in or about January 2022, the Debtor was in the process of a seeking additional equity investment of approximately $250,000,000.  Due to the mounting indicia of a potential Russian dispute with Ukraine, the Debtor determined in January 2022 to pivot to a United States-based

---

[2] A detailed background of the Debtor's business operations is set forth in the *Affidavit Pursuant to LR 1007-2 of James Walker Pursuant to Local Bankruptcy Rule 1007-2 and in Support of First Day Motions and Applications.* (Doc. No. 9)

equity raise and actively sought Series A funding from numerous institutional investors. The United States fund raising was going reasonably well when Russia commenced its invasion of Ukraine in February 2022.

12.     Although the founders were not, and are not, subject to any sanctions, restrictions on the ability to transfer any funds out of Russia made it impossible for the founders to provide any further funding to the Debtor.

13.     Since February 28, 2022, the Debtor pursued an asset or stock sale to a variety of entities in a similar or adjacent business as the Debtor or a rescue loan/equity investment.

14.     As noted above, the Debtor had been relying upon cash infusions by its original investors to continue to operate and expand while simultaneously seeking a new round of equity financing. Prior to closing its business, the Debtor's plan was to open another 100 stores in 2022. Due to the invasion of Ukraine, the Debtor was unable to execute on its planned equity raise, despite its intensive efforts to raise rescue capital.

15.     As a result of the Ukrainian crisis and the Debtor's attendant inability to receive funding from its initial investors and/or any other parties in a sufficient amount to continue to operate as a going concern while seeking a comprehensive capital raise or a merger or sale transaction, the Debtor's fiduciaries determined to cause the Debtor to commence this Chapter 11 case in order to effectuate an orderly sale of its assets.

16.     On March 4, 2022, the Debtor furloughed approximately 98% of all employees.

17.     In light of the monthly deficiency between income and expenses, an impending payroll due on March 11, 2022, and other pressing obligations to creditors, plus the negative impact of the Russia/Ukraine crisis on investor interest, the Debtor began seeking a loan from several potential debtor in possession ("**DIP**") lenders in order to fund final payroll to Debtor's

employees and independent contractors in the amount of approximately 800 and an orderly liquidation in the context of bankruptcy.

18.     After having discussions with over thirty (30) potential funding sources, including multiple potential DIP lenders, on March 10, 2022, the Debtor entered into a term sheet with Legalist Inc. ("**Legalist**") for a debtor in possession loan commitment of $6.5 million (the "**DIP Loan**").

19.     On March 11, 2022, Legalist and the Debtor executed that certain Pre-Petition Term Loan Credit Agreement in the maximum amount of $6.5 million which provided for two separate draws: (i) $4 million on March 11, 2022 for the sole purpose of satisfying all payroll obligations for the Debtor's terminated employees and independent contractors and, (ii) up to $2.5 million to be drawn post-petition pursuant to a budget approved by the Court as part of Court approval of the DIP Loan and the funds borrowed both pre and post-petition.

## IV.     Procedural Background and Case Status

20.     On March 17, 2022 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and continued in possession of its property and the management of its business affairs as a debtor in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

21.     No Trustee or Examiner has been appointed and no Official Committee of Unsecured Creditors has been formed in this case.

22.     On April 18, 2022, the Office of the United States Trustee (the "**UST**") examined James Walker, the Debtor's Chief Executive Officer, at the initial Bankruptcy Code § 341(a) meeting of creditors.

23.     To date, all quarterly fees have been paid to the UST and all monthly operating reports have been filed.

24.     As of September 4, 2022, the cash balance held by the Debtor is $1,009,469.58.

25.     The Debtor is currently drafting a plan and disclosure statement and hopes to be filing these documents within the next few weeks.

## V.     The Retention of Windels Marx

26.     The Debtor retained and employed Akerman LLP ("**Akerman**") as its attorneys from the Petition Date through April 6, 2022 and for transitional services through April 29, 2022. (*see* Doc. No. 174).

27.     On April 22, 2022, the Debtor filed an application to retain and employ Windels Marx as its attorneys effective as of April 4, 2022 (the "**Retention Application**", Doc. No. 147) pursuant to the terms set forth in a retainer letter entered into by the parties and in the affidavit of James M. Sullivan (the "**Sullivan Affidavit**") in support of the Retention Application.

28.     Pursuant to the Sullivan Affidavit, the Debtor has agreed to pay Windels Marx attorneys and paraprofessionals as follows: (i) partners and of counsel at $615 per hour; (ii) associates at $595 per hour; and (iii) paraprofessionals at $395 per hour.

29.     Mr. Sullivan, the partner in charge of this matter, discounted his hourly rate from $810 to $615 per hour, which serves as a cap for attorney rates.

30.     The blended rate structure for this matter is significantly below the fee structure that would be otherwise charged to the Debtor using the attorneys' and paraprofessionals' standard hourly rates.

31.     This Court authorized the Debtor to retain and employ Windels Marx as its attorneys effective as of April 4, 2022.  (Doc. No. 172).  A copy of the April 29, 2022 Order is attached as **Exhibit A**.

32.    All services performed and expenses incurred by Windels Marx for which compensation or reimbursement is now requested were performed or incurred on behalf of the Debtor, and not for any other person or entity.

33.    Windels Marx has not shared or agreed to share compensation or reimbursement of expenses awarded in this case with any other person or entity.

34.    Windels Marx received no retainer in this case and, aside from the agreed upon rates identified in the Retention Application, has made no agreements with the Debtor for compensation or reimbursement.

**VI.    <u>Highlights of the Firm's Efforts During the Application Period</u>**

35.    Windels Marx, on behalf of the Debtor, performed a myriad of tasks in the first three months of its retention.  Highlights of the Firm's efforts are set forth below:

**A.    Vacatur of Debtor's Premises and the Debtor's Leases**

36.    One of the Firm's first priorities was to eliminate or substantially reduce the incurrence of administrative expenses.  As of the date of the Firm's retention, rent subject to an administrative expense priority had accrued and continued to accrue.

37.    During the Application Period, Windels Marx worked with the Debtor to vacate dozens of locations located in New York and Illinois and reject the Debtor's leases relating to such properties.

38.    Prior to the Firm's retention, on March 22, 2022, the Debtor filed an omnibus motion to reject certain unexpired leases (the "**Lease Rejection Motion**").  (Doc. No. 37).

39.    After analyzing multiple objections to the Lease Rejection Motion, Windels Marx worked with lessors' counsel and the Debtor to establish a procedure to address the Debtor's proposed lease rejections.

40.	On May 25, 2022, following extensive negotiations, the Court entered an order approving the Lease Rejection Motion.  (Doc. No. 226).

41.	During the Application Period and beyond, Windels Marx has drafted and negotiated numerous court-approved agreements with landlords addressing the rejection of their leases, which in many cases also resolved the landlords' entitlement to pre-petition security deposits and/or their pre-petition and post-petition rent claims.  (*see e.g.* Doc. Nos. 260 and 261).

42.	As of the date of this Motion, the Debtor has rejected all but two of its leases.

43.	The legal services rendered by Windels Marx with respect to the leases efficiently and effectively resulted in significant administrative claim savings, and achieved a critical step in furtherance of the Debtor's wind down of operations.

**B.	Claims against Third Parties**

*Claims against Roger & Son's*

44.	Windels Marx pursued claims against Roger and Son's Inc. ("**R&S**") based on payments made by Buyk for undelivered equipment.

45.	The Firm (i) reviewed detailed information from the Debtor and R&S, (ii) analyzed complex tax issues, (iii) conducted legal research and (iv) participated in extensive settlement negotiations regarding the Debtor's claims.

*Turnover Claims against Previously Retained Auctioneers*

46.	In light of the existence of perishable inventory and the desperate need to avoid administrative rents starting in April 2022, Akerman retained three auctioneers, Michael Amodeo & Co., Inc. ("**Amodeo**"), BESTBUYAUCTIONEERS.COM ("**Bestbuy**") and National Property Solutions, Inc. ("**NPS**") (each, an "**Auctioneer**", and together, the "**Auctioneers**"). (Doc. Nos. 47, 49 and 50, respectively).

47.     The Auctioneers each failed or refused to deliver to the Debtor some or all of the cash proceeds of their respective auction sales of the Debtor's properties or to fully account for them by submitting reports of sale, despite the specific terms of their retention orders and the Court's Local Bankruptcy Rules respectively directing and requiring them to do so.

48.     On June 15, 2022, the Debtor terminated its agreement with NPS for cause.

49.     On July 19, 2022, the Debtor filed a motion seeking the entry of an order directing the Auctioneers to (i) turnover to the Debtor all proceeds of their respective auction sales of the Debtor's assets, and any unsold assets in their possession, custody, or control, (ii) submit to the Debtor their respective reports of sale to be filed with the Court, and (iii) file applications for final awards of compensation (the "**Turnover Motion**", Doc. No. 297).

50.     On August 16, 2022, NPS filed an objection to the Turnover Motion. (Doc. No. 364).

51.     On August 29, 2022, the Court entered orders directing the Auctioneers to, among other things, turnover all auction sale proceeds. (Doc. Nos. 394 (for NPS) and 395 (for Bestbuy and Amodeo)).

**C.      Liquidation of Debtor's Assets**

*Liquidation of Debtor's Warehouse Equipment*

52.     On November 1, 2021, the Debtor entered into an Operating Services Agreement (the "**OSA**") with Nationwide Industrial Supply, LLC ("**NIS**") for NIS to receive and store new equipment (the "**Equipment**") owned by Buyk at four warehouses (the "**Warehouses**"). The Equipment has an aggregate value of at least $5,000,000.

53.     After the Petition Date, the Parties entered into negotiations to resolve issues with respect to (i) the logistics of removing the Equipment from the Warehouses, (ii) the settlement

and orderly termination of the OSA, (iii) the release of a warehouseman's lien held by NIS, and (iv) the parties' obligations.

54. Following their good faith negotiations, the parties successfully resolved these issues and entered into a settlement agreement, which was approved by the Court on August 24, 2022. (Doc. No. 386).

55. Following the termination of NPS on June 15, 2022, the Debtor began searching for consultants to assist it in selling the Equipment. The Debtor interviewed three consultants before selecting Hilco Fixed Asset Recovery, LLC, who was retained by order dated August 18, 2022. (Doc. No. 369).

56. On or about August 28, 2022, the Debtor consolidated the Equipment by vacating one of the Warehouses in order to reduce administrative expenses.

*Liquidation of Debtor's Intellectual Property*

57. Windels Marx endeavored to retain a sales agent that would identify a buyer of Debtor's valuable intellectual property assets, including, but not limited to, trademarks, domain names and the proprietary software the Debtor used to operate its business (collectively, the "**Intellectual Property**").

58. After the Firm concluded its search, the Debtor selected Sherwood Partners, Inc. ("**Sherwood**") as sales agent.

59. The Firm drafted an engagement letter and participated in extensive negotiations with Sherwood and the UST regarding the terms of the retention and the duties to be performed by Sherwood.

60. On June 22, 2022, the Debtor and Sherwood entered into an Engagement Agreement Letter.

61.     Windels Marx prepared the Sherwood retention application (Doc. No. 271), which was approved by Order dated July 13, 2022.  (Doc. No. 284).

**D.      Motions Concerning the Administration of the Estate**

62.     Immediately after being retained, Windels Marx sought the final approval of several pending motions filed by Akerman seeking critical relief on behalf of the Debtor.

63.     These motions included:

(a) Debtor's Motion for an Order Approving Terms and Authorizing Implementation of Key Employee Retention Program and Key Employee Incentive Plan (the "**KERP Motion**") (Doc. No. 17);

(b) Motion to Pay Taxes for Sales, Franchise, and Annual Reporting Taxes and Fees (Doc. No. 4);

(c) Emergency Motion to Authorize the Debtor to, in the Ordinary Course of Business, Use of Cash Management System and Bank Accounts; and (ii) Authorizing Banks and Financial Institutions to Honor and Process All Related Checks and Electronic Payments Requests (Doc. No. 7);

(d) Emergency Motion to Authorize, but not Direct, Debtor to (a) Maintain Existing Insurance Programs and Existing Premium Financing Agreement, and (b) Fund all Obligations in Respect Thereof (Doc. No. 10);

(e) Motion to Authorize (i) Debtor to Pay Pre-Petition Wages and (ii) Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests (Doc. No. 12);

(f) Motion to Approve (i) Debtor in Possession Financing, (ii) Granting Liens and Administrative Expense Claims, (iii) Authorizing the Use of Cash Collateral, (iv) Granting Adequate Protection, (v) Modifying the Automatic Stay and (vi) Scheduling a Final Hearing (the "**Cash Collateral Motion**", Doc. No. 13); and

(g) Emergency Motion for Approval of Adequate Assurance of Payment to Utility Services and Continuation of Service and Determining that the Debtor is not Required to Provide an Additional Assurance (Doc. No. 14).

64.     On behalf of the Debtor, the Firm responded to the UST's objection to the KERP Motion (Doc. Nos. 173 (Response) and 125 (Objection)) and worked with the UST and the Court to secure final approval of the above-referenced motions.

65.     Apart from the motions above, Windels Marx drafted and filed a motion to establish certain notice, case management and administrative procedures after engaging in comprehensive conversations with the UST as to the proposed procedures.  (Doc. No. 159).  By order dated May 20, 2022, the Court approved this motion.  (Doc. No. 211).

**E.     Claims Analysis**

66.     On April 6, 2022, Akerman filed a motion (the "**PACA/PASA Motion**") seeking authority for the Debtor to pay pre-bankruptcy claims if validly covered by the Perishable Agricultural Commodities Act of 1930, as amended, and the Packers and Stockyards Act of 1921, as amended ("**PACA**" and "**PASA**", respectively).  (Doc. No. 87).

67.     Baldor Specialty Foods, Inc. ("**Baldor**") objected to the PACA/PASA Motion (Doc. No. 160) and additionally sought payment of its claim (the "**Baldor Claim**") under PACA.

68.     The Firm subsequently revised the proposed order approving the PACA/PASA Motion and Baldor withdrew its objection.  (Doc. No. 176).

69.     On May 10, 2022, the Court entered an order approving the PACA/PASA Motion.  (Doc. No. 187).

70.     Windels Marx thereafter reviewed potential PACA/PASA claims and communicated with claimants regarding the treatment of their claims.

71.     The Firm determined that most of the claims were not eligible for PACA/PASA classification and several claims were withdrawn for PACA/PASA consideration as a result of the Firm's efforts.

72.     Windels Marx objected to the classification of one claim (Doc. No. 294) and, by failing to file a response, the claimant discontinued its pursuit for PACA/PASA classification on its claim.

73.     Following a comprehensive review, the Firm approved the Baldor Claim and paid this claim pursuant to a notice of intent to pay filed in the bankruptcy case.  (Doc. No. 213).

74.     In addition, Windels Marx prepared an application seeking the retention of Kurtzman Carson Consultants LLC ("**KCC**") as Claims and Noticing Agent.  (Doc. No. 227).  The Firm worked extensively with the UST to obtain its consent to the application and by order dated June 2, 2022, the Court approved KCC's retention.  (Doc. No. 240).

75.     The Firm has worked with KCC to provide notice on various motions and other filings in the bankruptcy case.

76.     Windels Marx also drafted the Debtor's application for an order establishing claims bar dates (Doc. No. 296) and secured approval of this application by order dated July 26, 2022.  (Doc. No. 304).

**F.      Communications with Legalist and Budgeting Issues**

77.     Substantially all of Buyk's assets and property were pledged as collateral and serve as security in connection with the $4 million pre-petition secured loan from Legalist.

78.     Windels Marx negotiated with Legalist on the final order for the Cash Collateral Motion and the parties regularly communicated on, among other things, the status of the Firm's efforts to liquidate the Debtor's assets and budgeting issues.

79.     During its preparation of the budgets, Windels Marx worked closely with the Debtor in composing and revising budget variance reports that were served upon Legalist concerning the use of cash collateral, and responded to Legalist's inquiries regarding the same.

**G.**   **The Debtor's Schedules, Statement of Financial Affairs and Operating Reports**

80.    Windels Marx worked diligently with the Debtor to obtain and compile the necessary information to prepare, complete and file required schedules and statements in the bankruptcy case.

81.    As part of this process, the Firm analyzed significant amounts of data relating to the Debtor's leases, contracts, employees, creditors and inventory.

82.    On April 15, 2002, the Firm filed the Debtor's Statement of Financial Affairs (Doc. No. 132) and schedules (Doc. No. 133).

83.    Windels Marx has also assisted and conferred with the Debtor to prepare and file monthly operating reports in this case.  (Doc. Nos. 189, 255, 256, 267, 293 and 371).

**H.**   **Communications with Governmental Agencies**

84.    Windels Marx responded to several requests from governmental entities.  One such agency was the New York State Department of Labor (the "**NY DOL**"), who asked for information regarding the Debtor's compliance with the WARN Act.

85.    Following an extensive investigation, Windels Marx submitted a detailed response to the NY DOL describing the sudden and unprecedented circumstances that the Debtor encountered in early March 2022 and its compliance with the WARN Act.

**I.**   **Miscellaneous Tasks**

86.    Other services performed by the Firm on behalf of the Debtor include, without limitation:

  i.    Consulted with the Debtor, its creditors and others regarding matters affecting the Estate;

  ii.   Corresponded with former employees and customers of the Debtor;

  iii.  Organized and maintained a docket of pleadings and correspondence filed in this case;

  iv.   Drafted and updated a master service list comprised of all creditors and interested parties;

v.      Prepared correspondence to plaintiff's counsel on the imposition of the automatic stay;

vi.     Counseled the Debtor with respect to and monitored compliance with the payment of UST quarterly fee obligations;

vii.    Conferred with the Debtor on certain accounts receivable and collections;

viii.   Conferred with the Debtor concerning its utility obligations;

ix.     Counseled the Debtor with respect to and appeared at the section 341 meeting of creditors;

x.      Attended all status conferences since its retention in this case;

xi.     Reviewed all case documents;

xii.    Prepared and filed a motion seeking to extend the Debtor's exclusive time periods in which to file its plan and solicit acceptances thereof (Doc. No. 286);

xiii.   Sought approval to sell Debtor's field technology (Doc. No. 162), which was granted by order dated May 6, 2022. (Doc. No. 184); and

xiv.    Drafted, edited, served and filed this Application.

## VII.    Fees and Expenses Incurred By Windels Marx

### A.    Request and Statutory Authority

87.     In this Application, the Firm seeks the first interim allowance of the Proposed Allowed Fees totaling $813,570.

88.     The Firm further requests the first interim payment of the Requested Fees of $650,856 representing the Proposed Allowed Fees less the 20% Holdback of $162,714.

89.     Finally, the Firm seeks the first interim allowance and reimbursement of the Firm's unpaid expenses incurred during the Application Period in the amount of $1,430.44.

90.     Bankruptcy Code § 331(a)(1) provides:

A trustee, an examiner, a debtor's attorney, or any professional person employed under section 327 or 1103 of this title may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered before the date of

such an application or reimbursement for expenses incurred before such date as is provided under section 330 of this title. After notice and a hearing, the court may allow and disburse to such applicant such compensation or reimbursement.

91.     Accordingly, Bankruptcy Code § 331 allows any professional employed under Code § 327 to apply to the court for interim awards and payment of compensation for services and reimbursement of expenses.  Under section 331, after notice and hearing, the court may allow and disburse such compensation and reimbursement to any such professional.  Windels Marx is a professional employed under Bankruptcy Code § 327 and is qualified to apply for and receive interim awards of compensation and reimbursement of expenses in this case.  More than 120 days since the Petition Date have passed without the Firm having applied for an award of fees or reimbursement of expenses.

92.     Bankruptcy Code § 330 allows any professional employed under Bankruptcy Code § 327 to apply to the court for awards and payment of compensation for services rendered and reimbursement of expenses.  Pursuant to Bankruptcy Code § 330, after notice and a hearing a bankruptcy court may award a professional person employed under Bankruptcy Code § 327 "(A) reasonable compensation for actual, necessary services rendered by the . . . attorney and by any paraprofessional person employed by any such [attorney]; and (B) reimbursement for actual, necessary expenses."  11 U.S.C. § 330(a)(1)(A) and (B).  The statute further provides that "[i]n determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent and the value of such services, taking into account all relevant factors, including:

(A)   the time spent on such services;

(B)   the rates charged for such services;

(C)   whether such services were necessary to the administration of, or beneficial at the time at which the service was rendered towards the completion of, a case under this title;

(D)     whether the services were performed within a reasonable amount of time commensurate with the complexity, importance and nature of the problem, issue or task addressed;

(E)     with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy filed; and

(F)     whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title."

11 U.S.C. § 330(a)(3).

93.     To determine whether an allowance of compensation and reimbursement of expenses is warranted under Bankruptcy Code §§ 330 and 331, the court must inquire into the following three general areas: (a) Are the services that are the subject of the [A]pplication properly compensable as legal services? (b) If so, were they necessary and is the performance of necessary tasks adequately documented? (c) If so, how will they be valued? Were the necessary tasks performed within a reasonable amount of time and what is the reasonable value of that time? *In re Navis Realty, Inc.*, 126 B.R. 137, 140 (Bankr. E.D.N.Y. 1991) (citing *In re Wildman*, 72 B.R. 700, 704-05 (Bankr. N.D. Ill. 1987) and *In re Shades of Beauty, Inc.*, 56 B.R. 946 (Bankr. E.D.N.Y. 1986), *aff'd*, 95 B.R. 17 (E.D.N.Y. 1988)). *See also In re Poseidon Pools of America*, 216 B.R. 98, 100 (E.D.N.Y. 1997) (affirming lower court and holding Bankruptcy Judge properly examined time entries to determine "(1) whether the services were adequately documented and (2) whether they were actual and necessary.").

**B.**     **Properly Compensable Legal Services**

94.     The services rendered by Windels Marx, as discussed above, are legal services and are properly compensable as such. In making this determination, "the threshold question should be whether the services performed were those which one not licensed to practice law could properly perform for another for compensation." *In re Shades of Beauty*, 56 B.R. at 949 (citing *In re Meade Land & Development Co., Inc.*, 527 F.2d 280, 284-85 (3d Cir. 1975)).

95.     Windels Marx performed legal services only.

## C.     Necessary and Actual Services

96.     The legal services performed by the Firm were also "actual" and "necessary" within the meaning of Bankruptcy Code § 330(a)(1).  *See* 11 U.S.C. 330(a)(1) ("[T]he court may award to a . . . professional person . . . (A) reasonable compensation for actual, necessary services rendered . . . ."); *see also In re Wildman*, 72 B.R. at 707-08 ("The primary objective of any fee petition is to reveal sufficient data to enable the Court to determine whether the services rendered were . . . actual and necessary.").  As the attached detailed time records indicate, the Firm "actually" performed the legal services for which it is now seeking compensation.  *See In re Wildman*, 72 B.R. at 707; *In re Shades of Beauty*, 56 B.R. at 950.

97.     It is incumbent on the attorney seeking compensation to prove the necessity of his or her services by addressing such issues as (1) the cost of the legal services in relation to the size of the estate and maximum probable recovery; (2) the extent the estate will suffer if the services are not rendered; and (3) the extent the estate may benefit if the services are rendered and the likelihood of the disputed issues being resolved successfully. *See In re Wildman*, 72 B.R. at 707; *In re Shades of Beauty*, 56 B.R. at 950.

98.     All of the services performed by the Firm were necessary and beneficial to the Estate and enabled the Debtor to advance the administration of the Estate.  The Firm's services facilitated the Debtor's performance of its duties, including the creation of an estate through the collection and reduction to money of property of the Estate and the examination of and objection to proofs of claim.

99.     Based on the above, as well as in the Firm's detailed time records, the Firm respectfully submits that it has adequately explained "how" and "why" its legal services on behalf of the Debtor were rendered, *In re Shades of Beauty*, 56 B.R. at 950, and that such

services were actual and necessary.  *See also* Fed. R. Bankr. P. 2016.  Attached as **Exhibit B** are

the Firm's time records showing for each attorney or legal assistant the number of hours spent

and the nature of the services performed by type of matter during the Application Period.

**D.     Value of Services/Extent of Compensation**

100.     In addition to the value of the legal services, as set forth above, the Firm provided

the Debtor with effective and competent representation at a reasonable cost.  In determining the

value of legal services and the extent of compensation, this Court should consider whether the

tasks were performed within a reasonable number of hours; whether the requested hourly rate

was reasonable; and the cost of comparable services other than in a case under the Bankruptcy

Code. *See In re Wiedau's, Inc.*, 78 B.R. 904, 909 (Bankr. S.D. Ill. 1987); *In re Shades of Beauty,*

*Inc.*, 56 B.R. at 951; *In re Wildman*, 72 B.R. at 700-01.  Legal services for which a firm seeks

compensation should be judged by a "standard of economy" which rewards attorneys for

"efficiency."  *In re Shades of Beauty, Inc.*, 56 B.R. at 51-52.  The Firm submits that the

requested compensation is based on the customary compensation charged by comparably skilled

practitioners in other than cases under title 11.

101.     Based on all of these factors, the Firm respectfully submits that the compensation

sought is reasonable.  *See In re Wiedau's, Inc.*, 78 B.R. at 909 (holding the "reasonableness" of

the number of hours and the hourly rate requires consideration of such factors as: the time and

labor required; the skill necessary to properly perform the services; the preclusion of other

employment by the attorney due to the case; time limitations imposed by circumstances; and the

experience, reputation and ability of the attorney) (*citing Johnson v. Georgia Highway Express,*

*Inc.*, 488 F.2d 714, 717-719 (5th Cir. 1974) and *In re Wildman*, 72 B.R. at 712). *See also In re*

*Shades of Beauty*, 56 B.R. at 951.

### E.    Reimbursement of Expenses

102.    It is respectfully submitted that the Court should also allow the Firm reimbursement for its unpaid expenses in the amount of $1,430.44 as set forth in the attached **Exhibit B**. *See In re Poseidon Pools*, 216 B.R. at 101 ("Bankruptcy Courts . . . often allow reimbursement of expenses.").  The charges for which the Firm seeks reimbursement are not included in the Firm's overhead and none of the charges for which the Firm seeks reimbursement are being charged above cost to the Firm.  Accordingly, allowing such reimbursement will not result in an "estate [being] unnecessarily burdened, and a law firm undeservedly benefited." *See In re Croton River Club, Inc.*, 162 B.R. 656, 662 (Bankr. S.D.N.Y. 1993).  Rather, the Firm is asking only to be reimbursed for its actual out-of-pocket expenses.  On that basis, reimbursement for the requested expenses is appropriate and should be allowed.

## VIII.    Professionals Assigned to the Debtor's Case

### A.    Attorneys

103.    Leslie S. Barr is of counsel to the Firm and received a J.D. degree from Brooklyn Law School in 1984.  Mr. Barr's practice focuses primarily in the field of bankruptcy.  Mr. Barr is admitted to the bar of the State of New York and to the United States District Courts for the Southern and Eastern Districts of New York.

104.    Brian W. Kreutter is of counsel to the Firm who focuses his efforts in the Bankruptcy Department. He is admitted to the bar of the State of New York bar and to practice before the United States District Courts for the Southern, Eastern and Western Districts of New York.  Mr. Kreutter received his law degree from New York University School of Law in 2002 and a bachelor of arts, *magna cum laude*, from American University in 1998.  His practice focuses on business reorganizations, restructurings and bankruptcy litigation.  He represents

debtors, creditors, and trustees in Chapter 7 liquidations and Chapter 11 reorganizations. Mr. Kreutter also has experience in commercial litigation and labor and employment disputes.

105.    Ben Kusmin is an associate with the Firm concentrating in complex business litigation and in the Bankruptcy Department. Mr. Kusmin graduated with a J.D degree from Boston University School of Law in 2006, and B.A. and B.S. degrees from John Hopkins University in 1995. Mr. Kusmin is admitted to the bars of the State of New York, the United States District Courts for the Southern and Eastern Districts of New York, and the United States Supreme Court.

106.    James Sullivan is a member of the Firm. His primary practice focus is corporate restructuring and bankruptcy, distressed situations and complex commercial disputes. He brings a wealth of experience representing creditors' committees, corporate debtors, banks, secured and unsecured creditors, trustees and distressed investors in large Chapter 11 cases. He is a graduate of Georgetown University Law Center and has been practicing law since 1995. He is admitted to the bars of New York, New Jersey and the District of Columbia, the U.S. District Courts for the Southern and Eastern Districts of New York, New Jersey, Connecticut and the Southern District of Indiana, the United States Courts of Appeals for the Second, Third and Federal Circuits, and the United States Supreme Court.

107.    Edmund B. Troya is an associate of the Firm and has been practicing law since 2002. Mr. Troya concentrates his legal practice primarily on Bankruptcy & Creditors Rights. He attended the Northwestern University School of Law where he received a J.D. in 2002 and Dartmouth College where he received a B.A. in 1997. He is admitted to the bar of the State of New York, and the United States District Courts for the Southern and Eastern Districts of New York.

**B.     Paraprofessionals**

108.    Matthew L. Corwin is a legal assistant with the Firm working primarily in the Firm's Bankruptcy and Litigation Departments.

109.    Tracy Heston has been a legal assistant working in the areas of Bankruptcy, Litigation and Real Estate since 1997.

110.    Colin Michael Shea was a Law Clerk at the Firm.  He is currently attending Fordham University School of Law and expects to graduate in 2024.  Mr. Shea earned a B.A. from the University of Virginia in 2019.

111.    Joel L. Solomon has been the Manager of Library Services at Windels Marx since July 1984.  He earned his M.S. in Library Science from the Palmer School of Library & Information Science (C.W. Post Campus of Long Island University) and has been a law librarian since 1978.

112.    Francisco J. Velez is the Firm's Managing Law Clerk.

## IX.     Conclusion

113.    Windels Marx respectfully submits that considering the amount of recorded time, the complex legal issues encountered in this case, the Firm's involvement in the day to day legal issues necessitating resolution to enable the Debtor to maximize and enhance the value of the Estate and the Firm's expertise and professional standing, Windels Marx should be granted a first interim allowance of its Proposed Allowed Fees in this case totaling $813,570.

114.    The Firm further seeks a first interim payment of the Requested Fees in the amount of $650,856, representing the Proposed Allowed Fees of $813,570 less the 20% Holdback of $162,714.

115.    Windels Marx also seeks the first interim allowance and reimbursement of its unpaid expenses in the amount of $1,430.44.

116. No previous request for the relief sought herein has been made to this or to any other Court.

**WHEREFORE**, Windels Marx respectfully requests entry of an Order granting to the Firm:

(a)     A first interim allowance of its Proposed Allowed Fees of $813,570 for services rendered to the Debtor during the Application Period;

(b)     A first interim payment of the Requested Fees in the amount of $650,856, representing the Proposed Allowed Fees of $813,570 less the 20% Holdback of $162,714;

(c)     A first interim allowance and reimbursement of the Firm's unpaid expenses incurred during the Application Period in the amount of $1,430.44; and

(d)     Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
         September 9, 2022

Respectfully submitted,

WINDELS MARX LANE & MITTENDORF, LLP
*Attorneys for Buyk Corp.*

By:     /s/ James Sullivan
         James Sullivan (jsullivan@windelsmarx.com)
         156 West 56th Street
         New York, New York 10019
         Tel. (212) 237-1000 / Fax. (212) 262-1215