RIKER DANZIG LLP
James B. Daniels, Esq.
Tod S. Chasin, Esq.
500 Fifth Avenue, 49th Floor
New York, New York 10110
Telephone: (212) 302-6574
Facsimile: (212) 302-6628
*Counsel to National Property Solutions, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                      :

In re:                        :   Chapter 11
                      :

BUYK CORP.,           :
                      :   Case No. 22-10328 (MEW)
          Debtor.     :
                      :
                      :
------------------------------------------------------------- x

## FIRST AND FINAL APPLICATION OF
## NATIONAL PROPERTY SOLUTIONS, INC. FOR AN ORDER (I) AWARDING
## COMPENSATION AS COURT-APPOINTED AUCTIONEER PURSUANT TO 11 U.S.C.
## §§ 327(a) AND 330 AND LOCAL BANKRUPTCY RULE 6005-1, AND
## (II) GRANTING RELATED RELIEF

National Property Solutions, Inc. ("NPS" or the "Auctioneer"), as auctioneer appointed

under the Order Approving Debtor's Application to Retain National Property Solutions, Inc. as

Auctioneer for the Debtor Pursuant to 11 U.S.C. §§ 327 and 328, entered March 25, 2022 (the

"Retention Order;" DE 50), as and for its first and final application for an Order (I) awarding

compensation pursuant to 11 U.S.C. §§ 327(a) and 330 and Local Bankruptcy Rule 6005-1 and

(II) granting related relief,  respectfully states as follows:

## PRELIMINARY STATEMENT

On March 25, 2022, the Court entered an Order approving the execution of an Exclusive

Auction Agreement ("Auction Agreement") by and between debtor in possession Buyk Corp.

("Buyk" or the "Debtor") and NPS. NPS immediately embarked on an aggressive and focused marketing campaign to sell Buyk's assets and inventory. During that process, Buyk and NPS exchanged literally hundreds of emails, texts and phone calls seven days a week at all hours of the day and night, addressing all aspects of the auctions. As a result, and contrary to the Debtor's claims to this Court, Buyk was intimately involved in the entire marketing and auction process regarding the Chicago and New York retail stores. More specifically, Buyk knew:

- The exact dates of the 2 Chicago auctions, which included 8 Retail Locations;

- The exact dates of the 6 New York auctions, which included 19 Retail Locations;

- The exact addresses and corresponding store numbers of the Retail Locations in New York that were being auctioned;

- The exact dates and locations where inventory was to be picked up;

- The results of those auctions; and

- The inventory that was sold and unsold, and the location of the unsold inventory.

The true facts are that NPS completed its first Chicago auction on April 5, 2022, 11 days following its retention, and completed its second Chicago auction of the remaining four locations on April 7, 2022, 13 days following its retention. With the Debtor's full knowledge, NPS scheduled the 6 New York auctions on consecutive days between April 11 and April 16. Suddenly, after the initial auctions in Chicago and New York, Buyk then unilaterally and wrongfully suspended the remaining scheduled auctions. As a result, all of the remaining New York auctions were rescheduled. Notwithstanding this disruption, NPS was able to successfully reschedule and

close those auctions between April 13 and 21, 2022. This was one of the first, but not the last, times that the Debtor materially breached the parties' Exclusive Auction Agreement ("Auction Agreement"), which expressly provided that "Auctioneer shall have the sole right to determine the means and methods of conducting all aspects of matters relating to the sale or public auction" of the Debtor's Assets. Auction Agreement, Sec. III.G.

All of the auctions organized by NPS were conducted on the internet, and the Debtor's chosen personnel were not only aware of these auctions but were able to log in to each auction to monitor the proceedings on behalf of the Debtor. Moreover – and contrary to the Debtor's representations to this Court – NPS provided the Debtor with preliminary reports for the Chicago auctions on April 6 and April 9, 2022 and the New York auctions on May 3, 2022. *See* Exhibits C and E hereto. Those reports were provided well before NPS was wrongfully terminated on June 15, 2022. Further, as the Debtor is well aware, any delay in completing NPS' auction reports was the result of events beyond NPS' control, including most significantly Buyk's decision to lock out its own Auctioneer and deny both NPS and successful bidders access to pickup locations; the post-auction default by major bidders in both cities, necessitating weeks of additional time to resell that inventory; and the Debtor's decision to deal directly with defaulting bidders, cutting NPS out of the process altogether. Again, it was the Debtor and not NPS that materially breached the Auction Agreement in connection with the conduct of these auctions.

Throughout the course of NPS' services under the Auction Agreement, the Debtor and certain of its key employees and agents actively impeded and interfered with the Auctioneer's efforts to sell the Assets. With regard to the retail locations, NPS was never given control of these locations which resulted in inventory being stolen and sold goods disappearing. Post auction NPS and successful bidders were locked out of and denied access to pick up locations. And on multiple

occasions, Buyk insisted that NPS stop all sales and pickups only to be told later that it could proceed with certain sales and pickups approved by BuyK.

With regard to the warehouses, the Debtor overtly solicited independent offers from potential purchasers of the warehouse Assets, while Dmitry Vilbaum, the Debtor's Vice President, Global Head of Real Estate Development, and its senior officer and point person coordinating all Asset sales with NPS ("Vilbaum"), failed and refused to return urgent communications from NPS to finalize purchases from buyers properly procured by NPS under the Auction Agreement. The Debtor also refused to provide NPS with keys to the warehouses and repeatedly denied NPS access to the Warehouses where the critical Assets for sale – brand new, still crated refrigeration and related equipment the Debtor had planned to use in its now-failed business -- were stored. Ignoring its many defaults and breaches of the Auction Agreement, the Debtor then improperly terminated the agreement by letter dated June 15, 2022.

The Auction Agreement granted NPS the exclusive right to sell all assets of the Debtor located at specified Retail and Warehouse Locations (the "Assets"). It specified the Commissions and the Buyer's Premium Fees ("Buyer's Premium") to which NPS would be entitled upon the sale of any Assets. Critically, the Exclusive Auction Agreement further provided that "[i]f any Assets are removed from the Auction or Sale by Seller, compensation under the terms of this Agreement is due Auctioneer."

During the course of its retention, NPS provided Buyk with the preliminary sales reports for the 8 auctions in Chicago and New York and thereafter provided Buyk with numerous reports updating Buyk on the status of its efforts to resell the inventory that defaulting bidders refused to pay for and the location of the unsold inventory. NPS also made payments to the Debtor representing auction proceeds, in amounts totaling $300,000.00 – additional facts which the Debtor

flatly misrepresented to this Court. "Debtor's Motion Pursuant to 11 U.S.C. §§ 105(a) and 542(a) and Local Bankruptcy Rules 6004 and 6005 for an Order (I) Directing Debtor's Three Court-Appointed Auctioneers to Immediately (A) Turnover to Debtor All Proceeds of the Auction Sales of the Debtor's Assets and All Unsold Assets in Their Possession, Custody, or Control, (B) File Reports of Sale, and (C) File Applications for Compensation, and (II) Granting Related Relief, filed 07/19/22 ("Turnover Motion;" DE 297), ¶ 15 ["NPS provided only one partial incomplete report about these sales, and failed to deliver the proceeds of such sales to the Debtor."].

By "Order Directing National Property Solutions, Inc. to (A) Provide Accounting of and Turn Over to Debtor All Proceeds of the Auction Sales of the Debtor's Assets, and (B) File Applications for Compensation," dated August 29, 2022 ("Turnover Order;" DE 394), the Court directed that NPS (i) provide to the Debtor a final accounting of all sales and all funds representing receipt from any Buyer(s) of payment of Bid Price, sales taxes, Buyer's Premium or any other funds received in respect of any sale of Assets, and (ii) turn over to the Debtor all funds representing payment by any Buyers of Bid Price, sales taxes, or any other funds except for Buyer's Premium payments. NPS fully complied with the Turnover Order. On September 2, 2022, NPS provided the Debtor with a final accounting of all sales and all funds received, and also turned over to the Debtor the additional sum of $185,817.54. As provided in its Auctioneer Agreement, NPS has also received payments of Buyer's Premium totaling $79,871.60, which the parties negotiated in lieu of recovery of auction-related expenses which NPS waived under the Auction Agreement.

The Debtor's improper termination of the Auction Agreement in no way relieved the Debtor's estate from its liability for the Commissions or Buyer's Premium due and owing to NPS. NPS is entitled to recover, as an allowed administrative expense, payment of all Commissions and

Buyer's Premium as to all of the Assets sold by NPS, and all of the remaining Assets identified under the Auction Agreement, including those Assets to be sold in the future by Hilco pursuant to the order entered by this Court dated August 18, 2022 (DE 369), on the grounds that the Debtor wrongfully breached the Auction Agreement and removed those Assets from sale under that agreement.

## BACKGROUND

### A.   NPS is a Nationally Respected Auctioneer

1.      Renee Y. Jones, CAI, AARE, BAS, CES ("Jones") has been known worldwide in the auction and appraisal industry for more than 40 years. Ms. Jones is lauded for her business development, operations management, professional auctioneering, and appraisal accomplishments. She has managed and sold over $6 billion of real estate and tangible assets. Jones has wide-ranging expertise in an extraordinary variety of asset classifications including retail inventory, food / pharmaceutical production equipment, grocery store / food distribution assets, highly technical video production equipment, commercial industrial production equipment, real estate, intellectual property and general personal property.

2.      Jones has managed auction events and appraisal assignments on behalf of governmental agencies including the RTC, FDIC, US Customs Service, US Marshal's Office, federal, state courts, and municipalities. She has called auctions and completed appraisal assignments for the public and private sectors for Fortune 50 corporations to private individuals both in the United States, Canada, the United Kingdom, South America, and Mexico.

3.      Jones' assignments have included entire television networks, manufacturing, industrial, commercial equipment and residential real estate. Jones managed the entire bankruptcy liquidation process for the disposition of assets on behalf of the United States Trustee in one of the highest profile bankruptcy cases in U.S. history – <u>In re: Enron Corporation</u>, a full

time, three years assignment. For the Enron bankruptcy, Jones' responsibilities included monthly court appearances before the Hon. Arthur J. Gonzalez in the Bankruptcy Court.

4.      Jones founded NPS in 1985, and is its Chief Executive Officer.

5.      Michael Fine is known nationally as a real estate auction specialist with thirty-three years of industry experience.  Throughout his career he has advised and assisted with the monetization of personal property, inventory, industrial goods, and agricultural assets in conjunction with monetizing real property.  Fine has personally participated in auction programs for a spectacular array of companies including *Pritzker Realty, Exxon Mobil, Weatherford International, Hartz Mountain Industries, Alcoa, Intrawest, American Skiing Company* and financial institutions including The *Northern Trust Company, Wells Fargo, Citicorp, Bank of America-LaSalle, Chicago Title Land Trust Company, Trust Company* and many others.  Fine has worked as an independent contractor for NPS since 2009.

6.      Jones and Fine each have over thirty-five (35) years of experience in planning, organizing, and conducting commercial asset sales by auction and private sale, including extensive experience in bankruptcy-related sales by debtors in possession.

7.      In planning and organizing the sale of Buyk's Assets under the Auctioneer Agreement, Jones determined that she would be responsible for the sale of Assets located in the Chicago Retail locations, and in the Warehouse locations.  Fine would oversee the auctions to be conducted in the New York Retail locations.

**B.      <u>NPS' Auction Plan</u>**

8.      In planning the sales of the Debtor's Assets so as to realize the highest possible returns, NPS determined that the sales of assets from the Retail store locations in New York and Chicago would be conducted by way of auction sales, which had to be organized and completed

before the planned private sale of the brand new, still crated machinery and equipment stored at the Warehouse sites. There were a number of reasons why NPS scheduled the auctions for the Retail Locations first. First and foremost, it was a cost saving measure. Once the 27 Retail Locations were emptied, those leases could be rejected. Second, the assets stored at the Retail Locations included perishable foodstuffs and other inventory. If those perishable goods were not sold promptly, they could not be sold at all. Third, the inventory stored at the Retail Locations also included machinery and equipment (chiefly refrigeration equipment) that had been used at those locations. Meanwhile, the most valuable assets to be sold under the Auctioneer Agreement consisted of new, unused refrigeration equipment in the Warehouse Locations. If NPS had proceeded immediately with the sale of the new machinery and equipment stored at the Warehouse locations, those Assets would have significantly diminished the value of the used units stored at the Retail Locations, and those still-valuable assets of the Debtor would have gone begging.

9.      As with any complex commercial auction sale program, the auction sale of the Debtor's assets required NPS to plan, organize, and conduct six (6) major operations for each location:  pre-sale inspection and inventorying of the assets in both the Retail and Warehouse locations by NPS, which included creating written descriptions of and then photographing the Assets; marketing of the Assets; pre-sale inspections by prospective buyers; conducting the auctions themselves; collecting payments; and coordinating the pickup of those Assets by prevailing bidders.

10.      The Assets of the Debtor to be sold by NPS were spread across 8 Retail Locations in Chicago, 19 Retail Locations in New York City, and 4 Warehouse Locations in New Jersey. In order to accomplish each of the required pre-sale inspection and inventorying; marketing,

buyer inspection, auction, collection, and pickup operations efficiently and effectively, at each of the Debtor's Retail and Warehouse Locations, it was critical that NPS be allowed complete control over each of the sites, and all of the operations to be performed at each of those sites, as it had been provided at literally every auction ever conducted by NPS. Complete control over the sites is essential to secure the valuable assets of the Estate and to ensure that potential bidders could inspect the Assets pre-auction and that successful bidders could easily access and pick up their goods post-auction. Moreover, each of those operations are interconnected, and NPS needed to arrange for appropriate staffing to conduct each stage of operations at each site. Critically, any arbitrary rescheduling of any auction at any site would disrupt NPS's staffing arrangements for **all** of the operations required at the affected site.

11. With regard to marketing the valuable Warehouse Assets, there was a particular and specialized, three-stage marketing strategy. The three-stage approach was as follows: In Stage One, NPS contacted over 175 manufacturers, their distributors throughout North America, and national and regional retailers who are known to sell or use refrigeration equipment, to attempt large quantity sales. In Stage Two, NPS devoted over 200 hours to the creation of a Virtual Pop-Up Store where inventory could be purchased at stated prices with quantity discounts. Finally, Stage Three would involve a nationally promoted on-line auction for the remaining inventory.

### C. **The Auction Agreement**

12. On March 17, 2022 (the "Petition Date"), Buyk Corp. ("Buyk" or the "Debtor") filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"). Since the Petition Date, the Debtor has continued in

possession of its assets and control of its operations as a debtor-in-possession pursuant to Section 1107 of the Bankruptcy Code.

13.     On March 22, 2022, the Debtor filed its Application for an Order Authorizing the Retention of National Property Solutions, Inc. as Auctioneer for the Debtor Pursuant to 11 U.S.C. §§ 327 and 328 (the "Retention App.;" DE 38).

14.     On  March 25, 2022, the Court entered its Order Approving Debtor's Application for an Order Authorizing the Retention of National Property Solutions, Inc. as Auctioneer for the Debtor Pursuant to 11 U.S.C. §§ 327 and 328 (the "Retention Order;" DE 50).

15.     The  Retention Order authorized the Debtor to enter into an Exclusive Auction Agreement with NPS, in the form annexed to the Retention Application.  On the date of entry of the Retention Order, Buyk and NPS executed the Exclusive Auction Agreement ("Auction Agreement").  Retention App., Exh. C (DE 38, p. 23 ff.).  A true copy of the Auction Agreement is annexed hereto as **Exhibit A.**

16.     The Auction Agreement afforded NPS the "**<u>EXCLUSIVE RIGHT TO SELL</u>**" (emphases in original) "all personal property owned by Seller" (the "Assets") located on the Retail Locations and the Warehouse Locations listed in Section I of the agreement (collectively, the "Premises").  Auction Agreement, Sec. I.A; *see also* Sec. III.A. ["The Auctioneer shall have the exclusive right to procure Buyers for the Assets."].  NPS was permitted to sell the Assets by either public auction or private sale.  <u>Id</u>., Sec. II.B.

17.     The Auction Agreement afforded NPS sole discretion and control as to all matters involving the manner and conduct of the sale(s) of the Assets, whether by auction of by private sale.  Auction Agreement, Sec. II.B. ["Auctioneer shall have the authority to conduct the sale in the manner and utilizing the methods, auctioneer deems, in its professional judgement, to be

appropriate."]; Sec. III.G. ["Auctioneer shall have the sole right to determine the means and methods of conducting all aspects of matters relating to the sale or public auction subject to the terms of this Agreement."].

18.     For all of the reasons detailed above, the Auction Agreement expressly provided that NPS was to be afforded full and unfettered access to all of the Premises where the Assets were stored, and from where they were to be sold:

> E. Use of Premises: Seller shall provide Auctioneer keys, access cards and alarm codes or other access devices and hereby grants Auctioneer the right and authority to enter upon and use the Premises to prepare for and conduct the sale of the Assets, exhibiting the Assets to prospective Buyers, conduct the auction or sale and for such other purposes of accomplishing any of Auctioneer's duties under this Agreement. Seller acknowledges and agrees that Auctioneer shall not be responsible for damage or injury to the Premises resulting from or arising in connection with the sale or removal of the Assets, except to the extent that such damage or injury is caused by Auctioneer's willful misconduct or gross negligence.

Auction Agreement, Sec. I.E.

19.     The Auction Agreement further provided for compensation to NPS in the form of Commissions and Buyer's Premium.  Commissions were set in the amount of 15% of gross sale price for any Assets located in Retail Locations (Auction Ag., Sec. IV.C.(i)), and in a "sliding scale" amount between 4% and 10% of gross sale price for any Assets located in any Warehouse Location.  Id., Sec. IV.C.(ii).  In lieu of being reimbursed for actual expenses incurred by NPS in organizing and orchestrating the auctions, the Debtor and NPS agreed that NPS would be entitled to Buyer's Premium fees in an additional amount of 15% of the Bid Price for any Assets at any Store Location.  Id., Sec. IV.D.

20.     In consideration of the considerable efforts to be made by the Auctioneer in advertising, marketing, and selling the Assets, as identified in the Auction Agreement, the Debtor

and NPS expressly agreed that "[i]f any Assets are removed from the Auction or Sale by Seller, compensation under the terms of this Agreement is due Auctioneer." Auction Agreement, Sec. IV.G. Moreover, "if the sale fails to occur because of Seller's default . . . Auctioneer's fees shall become immediately due and payable by Seller." Id., Sec. IV.F.

**D.** **NPS Fully Complied with the Auction Agreement**

21.     NPS fully complied with its obligations under the Auction Agreement, as to both Retail and Warehouse sales.

22.     NPS began its advertising and marketing of the Assets immediately upon the Debtor's filing of the Retention Application. NPS' decision to conduct Retail Location auctions first was made in consultation with Buyk at the outset. On March 31, 2022, NPS sent Buyk a letter laying out in detail the inspection, marketing, bidding and auction process for the Chicago and New York auctions. The letter also included the specific dates of the Chicago auctions. A true copy of the March 31, 2022 letter from NPS to Buyk is annexed hereto as **Exhibit B.**

23.     In addition to fully complying with the terms of the Auction Agreement, NPS' conduct throughout the process was open and transparent. All auctions scheduled by NPS were conducted online. Representatives of the Debtor were able to observe each and every auction of Assets available at both the New York and Chicago Retail Locations. Upon the completion of each auction, NPS provided detailed sale reports.

24.     Specifically, on April 5, 2022, NPS completed its first Chicago auction, only 11 days following its retention. NPS then completed its second Chicago auction on April 7, 2022, 13 days following its retention.

25.     NPS provided the Debtor with preliminary reports for the Chicago auctions on April 6 and 9, 2022.  True copies of the e-mails sent to Buyk, which included the preliminary reports provided by NPS for the Chicago auctions, are annexed hereto collectively as **Exhibit C.**

26.     Following the completion of the Chicago Retail Location auctions, NPS then scheduled and conducted six (6) auctions of Assets at New York Retail Locations.  On April 8, 2022, NPS sent Buyk a detailed auction schedule for the New York Retail Locations that identified each of the Retail Locations by address, and the dates on which the auctions were scheduled for each address.  Those auctions were originally scheduled on consecutive dates from April 11-16, 2022.  After Buyk caused NPS to reschedule those auctions, they took place between  April 13 and April 21. A true copy of NPS' e-mail to Buyk, detailing the schedule for the New York auctions, is annexed hereto as **Exhibit D.**

27.     On May 3, 2022, NPS provided Buyk with preliminary reports for the New York Retail Location auctions.  A true copy of NPS's May 3, 2022 e-mail to Buyk, together with the preliminary reports provided by NPS for the New York auctions, are annexed hereto collectively as **Exhibit E.**

28.     NPS provided Buyk with preliminary reports for the New York and Chicago Retail Location auctions well within the time frames prevailing in commercial auction practice. Indeed, any delay in completing NPS' auction reports was the result of events beyond NPS' control, including most significantly the post-auction default by three (3) major bidders in the New York auctions, which caused further delays and necessitated the resale of close to $100,000 of inventory.  Moreover, Buyk's failure to provide NPS with control over the Retail Locations resulted in inventory being stolen, sold assets disappearing and successful  bidders being denied access to the pickup locations to retrieve their goods.  Any delays in completing NPS' reports

were exacerbated by the Debtor's decision to conduct private sale negotiations with those defaulting bidders, cutting NPS out of the process altogether.

29.     After providing Buyk with the preliminary sales reports, NPS continued to provide BuyK with updated reports on a regular basis regarding the status of the auction process and the remaining inventory to be sold.   For example, on May 10, NPS provided Buyk with Current Sold Reports for all of the New York Retail Locations.   Thereafter, on May 11, May 16, May 17 and May 19, 2022, when NPS was directed to cease all sales and pickup activities, NPS provided updates and status reports to Buyk regarding pickups and the remaining inventory. True copies of a representative sample of the Current Sold Reports and other updates and status reports provided by NPS to Buyk are annexed hereto collectively as **Exhibit F.**

**E.     The Debtor Breached the Auction Agreement By its Continual Interference with NPS' Efforts to Sell the Assets**

**1.     The Debtor Interfered with the Retail Location Auctions**

30.     Literally from the inception of the Auction Agreement BuyK breached that Agreement and interfered with NPS' ability to conduct these auctions in a successful and efficient manner.

31.     In mid-May of 2022, in breach of the Auction Agreement, Vilbaum unilaterally suspended and caused NPS to reschedule the remaining New York auctions.  The Debtor's interference by suspending the auctions and requiring NPS to reschedule and re-notice them, caused substantial confusion and almost certainly cost bidders who ultimately did not bid at the rescheduled auctions, causing a loss of sale proceeds from those auctions.  This problem cascaded into changing the already published pick up schedule, causing more confusion and logistical difficulties with buyers, and ultimately resulting in considerable additional expense for NPS for staff and travel expenses associated with pick ups.

32.     The Debtor's unilateral suspension of auctions scheduled by NPS materially breached Section III.G. of the Auction Agreement, which expressly provided that "Auctioneer shall have the sole right to determine the means and methods of conducting all aspects of matters relating to the sale or public auction" of the Debtor's Assets.  Auction Agreement, Sec. III.G.

33.     Immediately following the suspension of the auctions decreed by the Debtor, NPS conducted three (3) further auctions in New York from April 13 through 21, 2022.

34.     At the New York auctions, three (3) major bidders (including RDS, which had bid approximately $100,000 to purchase Assets) defaulted on their bids.  This caused substantial post-auction resales, which necessarily delayed the preparation of auction reports.

35.     Despite these circumstances, NPS provided the Debtor with a preliminary sales report for the six (6) New York auctions on May 3, 2022.  *See* Exh. E.

36.     It is also noteworthy that the Debtor failed to cooperate with and assist NPS in filing auction reports with this Court, as it did with other auctioneers.  For example, on April 4, 2022, the Debtor's counsel executed and filed an Auctioneer's Report of Sale by Michael Amodeo & Co., which attaches sale information in the same general format and content as that provided by NPS to the Debtor in its own preliminary sale reports.  No similar assistance was offered or given to NPS.

37.     On April 27, 2022, NPS wired $50,000.00 to the Debtor.  On May 2, 2022, NPS sent two separate wires to the Debtor, each in the amount of $50,000.00.  On May 6, 2022, NPS wired the sum of $150,000.00 to the Debtor.  All of these transfers represented proceeds from the auction sales conducted by NPS, and were provided to Buyk within 2 weeks after the final New York auction.  Buyk's suggestion in its Turnover Motion (¶ 17) that NPS turned over these funds only after it received the June 15th termination letter is not true.  True copies of wire transfer

receipts, evidencing NPS' turnover of funds following the Chicago and New York auctions, are collectively annexed hereto as **Exhibit G.**

38.     By its Turnover Motion, the Debtor acknowledged none of these documented facts, and indeed deliberately misled this Court. *See* Motion, ¶ 15 ("Upon information and belief, in or about late April and early May 2022, NPS conducted auction sales of some or all of the personal property located at the retail stores in New York and Chicago . . . NPS provided only one partial incomplete report about these sales, and failed to deliver the proceeds of such sales to the Debtor."), ¶ 17 ("Thereafter [after the June 15th termination letter], NPS belatedly provided sales reports to the Debtor. … NPS has failed to provide any accounting whatsoever with respect to any sale conducted at the Chicago stores…"). As detailed above, all of those allegations are demonstrably false.

39.     The Debtor's suspension of auction sales scheduled by NPS was not its first breach of the Auction Agreement by interfering with the performance of NPS, and certainly was not its last.

40.     More significantly, and literally from Day One, BuyK violated Section I.E. of the Auction Agreement which expressly provides that NPS was to be afforded full and unfettered access to all Retail and Warehouse Locations including providing NPS with keys, access codes and other access devices. NPS was never given full and complete control or unfettered access to the Retail Locations. Locks and codes were changed by Buyk and/or Buyk's landlords making it difficult bordering on impossible for NPS to schedule either pre-auction inspections of the inventory or post-auction pickup by successful bidders. All too often this resulted in inventory being stolen or inaccessible, and sold goods disappearing.

41. These problems were exacerbated by the fact that the Debtor assigned its own employees to control access to the Retail Locations. These employees materially interfered with NPS' supervision of the pickup of sold Assets by successful bidders. By these breaches of the Auction Agreement, Buyk interfered with NPS' access to certain Retail Locations, and NPS was locked out of other locations entirely. Thus, on many occasions NPS lost control over the auction process altogether.

42. Further, Section II.B and III.G of the Auction Agreement provide NPS with sole discretion and control over the entire auction process. Buyk violated this provision in a myriad of ways. In addition to unilaterally suspending and causing NPS to reschedule the closings and pickup schedules for the three remaining New York auctions, post-auction the Debtor's representatives began dealing directly with various bidders including RDS, and directed other bidders and landlords to communicate only with Buyk. Certain buyers were provided with telephone contact information of Buyk's representatives, which made it impossible for NPS to continue communications with these buyers, who naturally preferred to deal directly with Buyk. This interfered with NPS' collection of payments owed by purchasers at the auctions and post-auction sales conducted by NPS in New York. The Debtor concurrently failed and refused to inform NPS of the content of its negotiations with these delinquent buyers, the delivery of any Assets to these Buyers, or of any payments the Debtor may have received from them. The bottom line is that in many instances, NPS was cut off from and denied access to bidders and potential buyers of the Assets.

43. In another example of Buyk's usurpation of NPS' exclusive control over the auction process, during the week of April 10, 2022, while the New York auctions were proceeding, NPS obtained offers from multiple buyers to make private purchases of the entire food inventory at

identified New York Retail Locations. The strongest of these offers was from an owner of multiple Key Foods Grocery Store franchises in New York, to purchase all of the food inventory in all of Debtor's New York stores. However, the Debtor's attorneys at the Windels Marx law firm refused to allow NPS to accept this offer, and instead directed that NPS issue an auction notice for all of the food in all of the stores. Issuing that notice proved to be a waste of both time and money, because there were no bidders other than Key Foods at the ensuing auction.

44.     Additionally, on or around April 28, 2022 and on a number of occasions thereafter, the Debtor's representatives directed Michael Fine of NPS to cease all sales activities, including pickup of goods by prevailing bidders at Retail Location auctions unless or until it approved those sales and pickups, only to be told later that they could proceed with certain sales and pickups that that Buyk had approved. Then, on around May 16, the Debtor instructed NPS to cease all sales and pickup activities altogether. The Debtor advised NPS that all remaining Retail Location inventory would be consolidated to a single location and sold by Michael Amadeo & Co., and that the Debtor would reject its leases on the other Retail Locations. These actions by the Debtor were likewise in breach of its obligation under the Auction Agreement.

### 2.     The Debtor Interfered with Sales of the Warehouse Location Assets

45.     Similar to its breaches of the Auction Agreement with regard to the Retail Store locations, from early March of 2022, Buyk made it impossible for NPS to market and sell the new, still-crated Warehouse inventory which was and still is worth millions of dollars, and in the process denied NPS the commissions on those sales to which it is entitled.

46.     Following the auctions of the Retail Location Assets, NPS spent weeks directly marketing the inventory in the New Jersey Warehouse Locations to a highly qualified list of targeted refrigeration asset buyers.

47.     More specifically, NPS reached out to approximately 175 qualified buyers. Roughly 75 of those potential buyers expressed interest and a number of those buyers made multiple million dollar offers for the Warehouse inventory, all of which were communicated to Buyk, and which were blind offers (based upon spreadsheets only), which would have only increased if those potential buyers had been given the opportunity to physically inspect the Warehouse inventory.  Inexplicably, Buyk's response was radio silence.  Despite repeated efforts, Buyk's point person on these auctions, Vilbaum, did not respond to, let alone counter any of the muti-million dollar offers submitted to the Debtor.

48.     Instead, Buyk and its agents actively sought alternative sales for the Warehouse inventory.  Among other things, the detailed inventory list that Buyk prepared and gave to NPS somehow fell into the hands of potential buyers to whom NPS had not directly marketed these Assets.  A member of senior management of one of Buyk's warehouse managers offered to find buyers, but only if he could receive a commission.  In fact, that same person claimed to have a buyer who was willing to pay $500,000 for all of the warehouse inventory, an offer that NPS rejected out of hand.  And Vilbaum offered  to seek out  "favored" buyers who might afford him future employment after the imminent termination of the Debtor's operations.

49.     All of the New Jersey warehouses were small, single tenant warehouses that contained only Buyk inventory and  all of them were very easily accessible.  Yet, Buyk refused to provide NPS with keys or access codes to these facilities.  Buyk's refusal to provide NPS with access to the New Jersey warehouses was a clear breach of Section I.E. of the Auction Agreement, which expressly provided that "Seller shall provide Auctioneer keys, access cards and alarm codes or other access devices and hereby grants Auctioneer the right and authority to enter upon and use the Premises to prepare for and conduct the sale of the Assets, exhibiting the Assets to prospective

Buyers, conduct the auction or sale and for such other purposes of accomplishing any of Auctioneer's duties under this Agreement."

50.     Similarly, the Debtor initially agreed, but then refused, to allow NPS to set up a temporary office in one of the Warehouse Locations to manage the Warehouse.

51.     Finally, at or around the same time in mid-May when Buyk directed NPS to cease all sales activities as to the Retail Location Assets, Vilbaum informed Renee Jones that Buyk would not engage in any private sales, but that the Debtor instead expected to obtain financing to fund a reorganization, and wished to retain the Warehouse Location Assets for use in continued business operations.

52.     As a result of all of this, the Debtor effectively shut down NPS' ability to sell the Warehouse Assets, and withdrew those Assets from sale under the Auction Agreement.

### 3.     The Debtor's False and Pretextual Allegations in Terminating the Auction Agreement

53.     By letter dated June 15, 2022, the Debtor (by counsel) falsely accused NPS of violating the terms of the Exclusive Auction Agreement and improperly terminated that agreement. A true copy of the Debtor's letter dated June 15, 2022 is annexed hereto as **Exhibit H.**

54.     The Debtor's termination letter contains false and pretextual allegations of defaults by NPS, designed to obscure the Debtor's own material breaches of the Auction Agreement. Contrary to the Debtor's claims in its termination letter, and as shown above, NPS did in fact provide timely and accurate reports of all sales made during the Chicago and New York auctions. Likewise, the Debtor's claims notwithstanding, MPS did promptly turn over net proceeds from the auction sales. More fundamentally, NPS did in fact "utilize best efforts to secure buyers for Buyk's assets," only to have those efforts sabotaged by the Debtor's interference.

55.     While NPS complied with the Debtor's wrongful demands that it cease all sales operations, NPS remains entitled to recover all commissions and Buyer's Premium payments related to the Assets identified in the Auction Agreement.

### C.     NPS' Commissions and Buyer's Premium under the Auction Agreement

56.     NPS is entitled to recover all Commissions and retain all Buyer's Premium earned on account of sales of Assets that NPS was able to close, as well as Commissions for unsold Assets that Buyk effectively withdrew from sale under NPS' Auction Agreement by virtue of its wrongful breach of that agreement as described above.  Auction Agreement, Sec. VII.H.  NPS also intends to seek an award of attorneys' fees and costs.  Id., Sec. VII.G.

57.     As to Commissions earned from actual sales conducted by NPS under the Auction Agreement, NPS has previously submitted to the Debtor its full and final accounting of all such sales.  Based upon that accounting, NPS is entitled to commissions totaling $79,871.60, plus reimbursement of a previous overpayment of $2,005.00, for a final total due from the Debtor in the amount of **$81,876.60.**[1] A true copy of NPS' final accounting as previously submitted to the Debtor, is annexed hereto as **Exhibit I.**

58.     NPS has also collected Buyer's Premium payments from successful bidders at the Chicago and New York auctions, totaling $79,871.60.  Those Buyer's Premium payments were negotiated between the Debtor and NPS, and are provided for in the Auction Agreement, as set forth above.  Auction Agreement, Sec. IV.G.  The compensation terms of the Auction Agreement were expressly described by the Debtor in its Retention Motion, and were duly approved by the Court in its Retention Order.  NPS is entitled to entry of an Order approving its rightful receipt and retention of those funds, as part of its negotiated and earned compensation in this Chapter 11 case.

---

[1] The dollar figures given for Commission and Buyer's Premium earned by NPS assume collection of receivables.

59. Furthermore, Buyk materially breached the Auction Agreement, almost from its inception, by interfering with NPS' sale of the Assets identified under that Agreement. The Debtor remains liable for the Commissions attributable to future sales of those Assets, whether conducted by Hilco, the Debtor, or otherwise. In this context, the Court should understand that NPS was willing to enter into the Auction Agreement providing for the auction of the Retail Location Assets, only because that agreement also included the valuable Warehouse assets, as to which NPS anticipated earning the bulk of its compensation. NPS is entitled to entry of an Order directing the Debtor, upon any such future sales, to pay over to NPS the Commission amounts which would have been payable to NPS if it had been permitted to complete such sales itself, at the same sales prices, under the Auction Agreement. Auction Agreement, Sec. IV.G., VII.H.

60. The Debtor has previously represented to the Court that it intends to assert an affirmative claim against NPS for allegedly breaching the Auction Agreement, together with a demand for attorneys' fees incurred in connection with its ensuing Turnover Motion. However, apart from the Debtor's own material breach of the Auction Agreement as described above, Section VII.I. of the Auction Agreement bars any such claims, as follows:

> I. **Seller's sole and exclusive remedy for Auctioneer's breach of any obligation under this Agreement which is not cured within thirty days of notice thereof shall be limited to the right to terminate this Agreement** and receive a full refund of any then remaining unexpended balance of the Marketing Fee previously paid by Seller to Auctioneer, plus interest for a period of time that Auctioneer was in possession of such funds at the annual rate of 5%, it being agreed that the payment of such amount shall constitute liquidated damages. Seller acknowledges and agrees that the actual damages which would be incurred by Seller upon such a default would be speculative and incapable of precise determination and that the parties have accordingly stipulated to these liquidated damages as a material inducement to Auctioneer to enter into this Agreement. **In no event shall Auctioneer be liable for consequential or any other damages beyond said liquidated damages and in no event shall such**

**termination adversely affect Auctioneer's right to any commission earned or other amounts due to Auctioneer prior to such termination.**

Auction Ag., Sec. VII.I (emphases supplied). NPS is entitled to entry of an Order, determining that the Debtor possesses no affirmative claim against NPS under the Auction Agreement, and is not entitled to effect any setoff or reduction against Commissions or Buyer's Premium payments due to NPS as aforesaid.

61. Finally, in view of the Debtor's sustained breach of the Auction Agreement, NPS is entitled to an award of attorneys' fees. Section VII.G of the Auction Agreement provides as follows:

> G. The parties retain all rights and remedies available at law, in equity or otherwise based on a breach of this Agreement. The prevailing party in any action commenced under this provision shall be entitled to an award of fees and costs including reasonable attorneys' fees and costs.

Here, as detailed above, Buyk breached the Auction Agreement virtually from its inception, and has compounded that breach by requiring NPS to defend against the Debtor's demonstrably inaccurate claims. NPS respectfully requests that this Court so hold, and enter an Order granting NPS leave to submit an appropriate affidavit of services.

## CONCLUSION

WHEREFORE, for all the foregoing reasons, NPS respectfully requests that the Court enter an Order awarding it compensation due to it in accordance with its Auction Agreement.

Dated:    September 19, 2022            RIKER DANZIG LLP
           New York, NY

                              By: _____*/s/ James B. Daniels*_____
                                   James B. Daniels, Esq.
                                   Tod S. Chasin, Esq.

                              *Counsel to National Property Solutions, Inc.*

DocuSign Envelope ID: FEFBF3DA-B414-4007-8D1B-3A92BB38A7CC

<u>VERIFICATION</u>

MICHAEL FINE, by way of certification in lieu of affidavit, does hereby state:

1.      I am Project Manager at National Property Solutions, Inc., a Court-appointed auctioneer for debtor-in-possession Buys Corp. ("Buyk" or the "Debtor").  As such, I have personal knowledge of the matters set forth herein.

2.      I have read the prefixed "First and Final Application of National Property Solutions, Inc. for an Order (I) Awarding Compensation as Court-Appointed Auctioneer Pursuant to 11 U.S.C. §§ 327(a) and 330 and Local Bankruptcy Rule 6005-1, and (II) Granting Related Relief" ("Application"), and am aware of its contents.  Those allegations of the Application which are made on knowledge are true.  As to those allegations made upon information and belief, I believe them to be true.

3.      Moreover, any and all documents annexed to the Application are certified to be true copies thereof.


I certify under penalty of perjury that the foregoing is true and correct.

*Michael Fine*

853072E8310F499...

MICHAEL FINE


Dated: September 19, 2022