WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, New York 10019
Telephone (212) 237-1000
Attorney Appearing: James M. Sullivan (jsullivan@windelsmarx.com)
*Counsel to Buyk Corp.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BUYK CORP.,[1] | ) | Case No. 22-10328 (MEW) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DEBTOR'S EMERGENCY MOTION PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE FOR AN ORDER AUTHORIZING AND APPROVING DEBTOR'S USE OF CASH COLLATERAL FOR PAYMENT OF NECESSARY ADMINISTRATIVE EXPENSES OR ALTERNATIVELY TO SURCHARGE COLLATERAL PURSUANT TO SECTION 506(c) OF THE BANKRUPTCY CODE**

**TO THE HONORABLE MICHAEL E. WILES,**
**UNITED STATES BANKRUPTCY JUDGE:**

Buyk Corp., the above-captioned debtor and debtor in possession ("***Buyk***" or the "***Debtor***"), by and through its undersigned counsel, respectfully requests through this motion (the "***Motion***") the entry of an Order on an expedited basis, pursuant to sections 105(a) and 363 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*. (the "***Bankruptcy Code***"), authorizing and approving its use of cash collateral to pay necessary administrative expenses as they become due on an interim basis through the date of the final hearing on the Motion, and on a final basis through November 30, 2022, without prejudice to a further extension upon application to the

---

[1] The Debtor in this case, along with the last four digits of its federal tax identification number is Buyk Corp. (1477). The Debtor's principal place of business is 245 East 93rd Street, Ste. 22E, New York, NY 10128.

Court or alternatively to surcharge collateral pursuant to Section 506(c) of the Bankruptcy Code. In further support of the Motion, the Debtor submits herewith the Declaration of Debtor's CEO James Walker (the "***Walker Declaration***") attached hereto as **Exhibit A**, and the Declaration of Debtor's counsel James Sullivan (the "***Sullivan Declaration***") attached hereto as **Exhibit B**. The Debtor respectfully sets forth as follows:

## PRELIMINARY STATEMENT

1. The Debtor is compelled to file this Motion seeking immediate access to cash collateral after its secured creditor Legalist has taken steps to prevent the Debtor from making immediate and necessary payments for administrative expenses.

2. In order for the Debtor to remain in Chapter 11, it needs to be in a position to use the cash collateral of its secured creditor, Legalist, to pay necessary administrative expenses in the ordinary course, including employee salaries, rent, insurance, and professional fees. Although the Debtor believes it has the authority to pay administrative expenses in accordance with the Debtor's Final Cash Collateral Order and a revised budget approved by Legalist in August 2022, Legalist recently filed papers in which it has taken the position that the Debtor is not authorized to use cash collateral and that it has been paying administrative claims in violation of the Final Cash Collateral Order. Given the seriousness of the allegation, the Debtor does not feel comfortable continuing to make payments of administrative expenses without the comfort of an order from the Court. Absent use of cash collateral, the Debtor would be forced to exit Chapter 11 and fire the remaining employees. Further, the chances for a successful liquidation and the ability to realize maximum value for the benefit of creditors would effectively be eradicated.

3. The Debtor holds approximately $1 million in its bank accounts. The Debtor must use cash collateral to pay the following necessary administrative expenses, some of which are overdue, within the next fourteen days:

- warehouse rent to Nationwide Industrial Supply for October 2022: $75,000 (overdue);

- employee salaries and expenses, and health insurance: up to $50,000 (scheduled payment due October 7th); and

- payments to retained professional Sherwood Partners, Inc. ("**Sherwood**"): $15,000 (overdue).

4. Failure to make these payments will cause immediate and irreparable harm to the Debtor. Conversely, the relief sought herein is necessary to protect the value of the Debtor's assets and the adequate protection liens and the superpriority administrative expense claim granted to Debtor's secured creditor Legalist, Inc. (together with its relevant underlying funds, "**Legalist**") provides adequate protection of Legalist's interests in such assets.

5. The value of the Debtor's remaining assets, all of which are subject to the adequate protection liens, have not materially changed since the time that Legalist agreed to extend debtor in possession financing of up to $6.5 million to the Debtor immediately prior to the filing of the Debtor's bankruptcy case.

6. Accordingly, the Debtor respectfully requests that the Court authorize and approve the Debtor's use of cash collateral to complete payments for necessary administrative expenses as they become due on an interim basis through the date of the final hearing on the Motion, and on a final basis through November 30, 2022, without prejudice to a further extension upon application to the Court or alternatively to surcharge collateral pursuant to Section 506(c) of the Bankruptcy Code.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction of this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* of the United States District Court for the Southern District of New York dated January 31, 2012 (Preska, C.J.). This matter is a core proceeding

under 28 U.S.C. § 157(b). Venue of this case and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND[2]

8. On March 10, 2022, the Debtor entered into a term sheet with Legalist for a debtor-in-possession loan commitment of $6.5 million (the "***Proposed DIP Loan***").

9. On March 11, 2022, Legalist and the Debtor executed that certain Pre-Petition Term Loan Credit Agreement in the maximum amount of $6.5 million (the "***Credit Agreement***"), which provided for two separate draws: (i) $4 million on March 11, 2022 for the sole purpose of satisfying all payroll obligations for the Debtor's terminated employees and (ii) up to $2.5 million to be drawn post-petition subject to Court approval of the Proposed DIP Loan.

10. The Credit Agreement set forth a total interest rate of 15.75 percent and included commitment, management and monitoring fees totaling an additional 6.25 percent.

11. As to the underdrawn portion of the $6.5 million commitment, the Credit Agreement authorized an additional underdrawn line fee of 4.75 percent.

12. At the time of the Credit Agreement and Proposed DIP Loan, the Debtor's assets included unencumbered brand new (and almost new) refrigeration and other food storage equipment with a book value of approximately $11 million, grocery items (including 20% perishable items) with a book value of $1.7 million, and cash of approximately $700,000, in a sufficient amount to fund all outstanding payroll expenses and an expedited sale process in bankruptcy.

13. At the time it executed the Credit Agreement and agreed to make the Proposed DIP Loan, Legalist knew that the Debtor was not an operating company and the only way the Debtor would be able to repay the loan, along with its generous interest rate and fees, was to

---

[2] Additional information regarding the Debtor's business, capital structure, and the circumstances leading to the commencement of the bankruptcy case is set forth in the Declaration of James Walker pursuant to Local Bankruptcy Rule 1007-2 and in support of First Day Motions and Applications (Doc. No. 9) filed on March 17, 2022.

{12097281:8}  4

await the liquidation of the Debtor's assets under a Chapter 11 liquidation process. In addition, Legalist understood that as a condition of the liquidation of the Debtor's assets under Chapter 11, Legalist would need to agree to permit the payment of necessary administrative expenses.

14. On March 17, 2022 (the "***Petition Date***"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.

15. The Debtor continues to operate its business and manage its properties as debtor-in-possession pursuant to section 1184 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in this Bankruptcy Case.

16. On March 18, 2022, the Debtor filed a motion for authority to enter into the DIP Loan and for authority to use cash collateral (the "***Financing Motion***"). (Doc. No. 13).

17. On March 30, 2022, the Court entered an interim cash collateral order authorizing the Debtor to pay administrative expenses in accordance with an approved budget. (Doc. No. 66).

18. As a result of concerns raised by the UST and the Court at the initial hearing on the Financing Motion, the Debtor determined that it did not require the Proposed DIP Loan at that time and therefore the request for approval of the Proposed DIP Loan was withdrawn without prejudice with the understanding that the request could be renewed should the need arise.

19. On April 22, 2022, the Court entered the final cash collateral order (the "***Final Cash Collateral Order***", Doc. No. 151), which, among other things:

- references an undefined "Termination Date" based on "Termination Events", which include "July 21, 2022 or such later date as may be agreed to in writing by [Legalist] or as provided for by further order of the Court[.]" (*Id.* at ¶ 5). The Court has the discretion, therefore, to extend the Final Cash Collateral Order to any future date should Legalist not agree to extend the term of this Order.

- grants Adequate Protection Liens (as defined therein) to Legalist to the extent of any diminution in the value of its collateral. (*Id.* at ¶ 8(a)). To the extent the Adequate Protection Liens are inadequate to protect against a diminution in value of the collateral, Paragraph 8(b) of the Final Cash Collateral Order also provides Legalist with an Adequate Protection Superpriority Claim "ahead of and senior to any and all other administrative expense claims and all other claims asserted against the Debtor other than the Carve-Out …including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections ... 506(c) (subject to entry of the Final DIP Order)..."

- permits the Debtor to pay administrative expenses as part of the Carveout (as defined therein) "unless and until the Carveout Trigger Date", which is the date of delivery of a Carveout Termination Notice by Legalist to counsel to the Debtor and the UST. (*Id.* at ¶ 9).

- allows the Debtor to satisfy administrative expenses reflected in an approved budget that were incurred but unpaid prior to a Carveout Trigger Date upon Court approval. (*Id.* at ¶ 10).

- attaches, as Exhibit B, the Credit Agreement. As set forth in the Recitals of the Credit Agreement, Legalist was "willing to extend [l]oans" to the Debtor in the aggregate of $6.5 million.

- attaches, as Exhibit C, the Debtor's proposed budget approved by Legalist and the Court.

## **DEBTOR'S LIQUIDATION EFFORTS**

20. Since the Petition Date, the Debtor's primary aim has been to liquidate its assets for the benefit of secured creditor Legalist and its other creditors.

21. Through its counsel, the Debtor has negotiated numerous court-approved agreements with landlords addressing the rejection and disposition of their leases, which in many cases has resulted in landlords agreeing to return a portion of their prepaid rent/security deposits and/or waiving all or some of their post-petition and pre-petition claims. (*see e.g.* Doc. Nos. 260 and 261). The Debtor's efforts have effectively eliminated the majority of what were expected to be very large administrative rent claims in this bankruptcy case.[3]

---

[3] The Debtor has recovered more than $200,000 of prepaid rent and security deposits, and has relatedly secured waivers of post-petition administrative rent claims for many hundreds of thousands more.

22. The Debtor has also eliminated virtually all administrative claims associated with the hundreds of rejected contracts. Such efforts have substantially benefited Legalist because they reduced the amount of administrative expenses included in the Carveout under the Final Cash Collateral Order, which would be paid ahead of Legalist's claim following service of a Carveout Trigger Notice[4].

23. Although the Debtor has already undertaken extensive efforts to liquidate its assets, several millions of dollars of equipment, inventory, and IP Assets, which are subject to Legalist's adequate protection liens, remain to be sold. Debtor's management is working with retained professionals, including Hilco Fixed Asset Recovery, LLC ("*Hilco*"), Sherwood and Debtor's counsel Windels Marx Lane and Mittendorf, LLP ("*Windels Marx*") to efficiently and expeditiously sell these assets.

24. In addition, there are very substantial claims that remain to be liquidated. The Debtor continues to pursue its affirmative claims and favorably resolve those whenever possible.

25. The Debtor has also brought a turnover motion against previously retained auctioneers, which has resulted in the Court entering orders directing the auctioneers to, among other things, turnover all auction sale proceeds. (Doc. Nos. 394 and 395). The Debtor intends to pursue all available legal remedies against its prior auctioneers.

26. For the reasons set forth below, the Debtor should be allowed to continue to access cash collateral so that it may finish the liquidation process that it started with Legalist's full knowledge and approval.

---

[4] To date, Legalist has not yet served the Debtor with a Carveout Trigger Notice.

## LEGALIST'S PARTICIPATION IN, AND APPROVAL OF, THE DEBTOR'S LIQUIDATION EFFORTS

27. At the time of the Credit Agreement and Proposed DIP Loan, Legalist was aware of the amount and nature of the Debtor's assets, which, for the most part, remain the same as of the date of this Motion.

*Legalist Approved the Debtor's Actions*

28. The Debtor has consistently communicated with Legalist regarding its liquidation efforts and, until recently, Legalist was extremely supportive of such efforts, including the Debtor's retention of Hilco to liquidate the Debtor's warehouse inventory and Sherwood to sell the Debtor's intellectual property assets ("***IP Assets***").

29. In fact, on August 10, 2022, Legalist sent an email to counsel for the Debtor stating "Legalist, Inc. expresses its support of Buyk Corp.'s motion for an order (A) Authorizing debtor to enter the service agreement with Hilco Fixed Asset Recovery, LLC, (B) Approving the sale of certain fixtures, furniture, and equipment free and clear of all liens, claims, encumbrances, and interests, and (C) Approving certain other relief related to such sales." *See* Exhibit 1 to Sullivan Declaration.

30. Prior to an August 23, 2022 hearing in the bankruptcy case (the "***August Hearing***"), the Debtor requested approval of a proposed revised budget ("***Revised Budget***")[5] projecting assets and expenditures through October 23, 2022 so that the Debtor could be in a position to tell the Court and creditors that an approved budget was in place.

31. In addition, the Debtor requested an extension of the termination date of the Final Cash Collateral Order through November 30, 2022 rather than the October 23, 2022 end date reflected in the Revised Budget. *See* Exhibit 2 to the Sullivan Declaration.

---

[5] The Revised Budget is attached to the Debtor's Conversion Opposition (defined below) (Doc. No. 445).

32. In an email dated August 15, 2022, Legalist approved the Revised Budget subject to a minor change that was requested by Legalist and agreed to by the Debtor. Debtor incorporated the requested change as per an email dated August 22nd.

33. Follow up email exchanges on August 22 and August 23 confirmed that Legalist had approved the Revised Budget but was still considering the Debtor's request to extend the termination date of the Final Cash Collateral Order through November 30, 2022 (as opposed to the October 23 dated reflected in the Revised Budget).

34. Legalist knew that the Debtor intended to communicate the approval to the Court at the August Hearing and that the Debtor, creditors and the Court would rely on Legalist's representation of its approval of the Revised Budget at the hearing and going forward in the Debtor's case.

35. In reliance on Legalist's approval of the Revised Budget, Debtor's counsel communicated to the Court at the August Hearing that the Debtor and Legalist had an approved budget that would allow for payment in full of administrative claims.

36. Legalist also encouraged the Debtor to oppose the UST's motion to convert the bankruptcy case (the "***Conversion Motion***", Doc. No. 347) and to secure an extension of time to respond to this motion.

*Legalist Changes Course*

37. Legalist's position regarding the bankruptcy case changed dramatically after the August 23 Hearing. Instead of supporting the Debtor's liquidation efforts, Legalist began taking hyper-aggressive actions to thwart such efforts. Upon information and belief, the drastic change in attitude was the product of internal pressure from Legalist's investors.

38. For example, despite asking the Debtor to secure an extension of time to respond to the Conversion Motion, Legalist secretly attempted to convince counsel for the UST to renege on his promise to adjourn the Conversion Motion for 30 days in an effort to exert maximum pressure on the Debtor to ignore its fiduciary duties to all creditors and turn over full control over the case to Legalist. Such attempts ultimately resulted in a smaller extension than what was originally promised.

39. Legalist also began demanding that the Debtor not pay critical administrative expenses, but rather turn over all of the cash in the estate to Legalist regardless of the potential harm to the Debtor's estate such action would cause.

40. In an effort to appease Legalist, the Debtor attempted to discuss changes in the Revised Budget, including the uses of cash collateral on a going forward basis and a new termination date for the Final Cash Collateral Order.

41. As part of their discussions, the Debtor offered to grant Legalist relief from the automatic stay to liquidate the Debtor's warehouse equipment to repay its loan. Legalist refused this and other proposals by the Debtor.

42. Legalist previously informed the Debtor that it does not want the bankruptcy case to be converted to Chapter 7, but it also does not want to pay the reasonable and necessary costs required to administer a Chapter 11 case.

*Legalist Supports the Conversion Motion*

43. On September 30, 2022, the Debtor's discussions with Legalist with regard to the changes to the Revised Budget broke down and Legalist filed a joinder to the Conversion Motion (the "**Conversion Joinder**", Doc. No. 441).

44. Hours after Legalist filed the Conversion Joinder, the Debtor filed its opposition to the Conversion Motion (the "**Conversion Opposition**", Doc. No. 445).

45. The Debtor thereafter filed its response to the Conversion Joinder (Doc. No. 450).

46. Among other things, the Conversion Joinder incorrectly asserts that the Debtor's ability to use cash collateral terminated per the Final Cash Collateral Order on July 21, 2022. *See* Final Cash Collateral Order at ¶ 5.

47. Moreover, the Conversion Joinder also improperly asserts that the Debtor incurred debt outside the budget beyond this date and the end of the budgeted period occurring in August 2022.

48. As set forth above, Paragraphs 9 and 10 of the Final Cash Collateral Order permit the Debtor to use cash collateral to pay administrative expenses "unless and until the Carveout Trigger Date", which is the date of delivery of a Carveout Termination Notice by Legalist to counsel to the Debtor and the UST. (*Id.* at ¶ 9).

49. Because Legalist has not delivered a Carveout Termination Notice to the Debtor and the UST, the Carveout Trigger Date has not occurred and the Debtor was and is authorized to use cash collateral in accordance with the Revised Budget (which lasts through October 23, 2022) under the Final Cash Collateral Order.

50. Therefore, the Debtor did not breach the Final Cash Collateral Order.

### **THE CONTINUED INVOLVEMENT OF DEBTOR'S MANAGEMENT AND WINDELS MARX IS ESSENTIAL TO THE LIQUIDATION OF THE DEBTOR'S REMAINING ASSETS**

51. The continued involvement of Debtor's management and counsel is crucial to the liquidation of the remaining assets of the estate.

52. Debtor's management and bankruptcy counsel have been and continue to work closely with Hilco and Sherwood to assist in the sale of the Debtor's warehouse equipment and IP Assets.

53. For instance, Mr. Walker, Mr. Sullivan, and other Buyk representatives have participated in several meetings with potential purchasers of the Debtor's IP Assets and have extensive knowledge of these assets.

54. As set forth in the Declaration of Sherwood Senior Managing Director Peter Hartheimer in support of the Conversion Opposition, "the conversion of the bankruptcy case would destroy the continuity of the sales process by removing Windels Marx and Debtor's management … and thus would have … a significant negative impact on the expected sales proceeds for the [IP Assets]". (Doc. No. 445-2 at ¶ 7).

55. Moreover, Mr. Walker, Mr. Sullivan and other Debtor representatives have been in constant communication with Hilco to maximize the sale proceeds of the Debtor's warehouse inventory.

56. Management is also working with Debtor's counsel to prepare and finalize a Chapter 11 Plan, which it hopes to be in a position to file in the next few weeks.

57. Like management, Debtor's counsel Windels Marx continues to provide essential services to allow the Debtor to maximize the proceeds from its liquidation.

58. As set forth in its first interim fee application in this case (Doc. No. 406), Windels Marx has, among other things, (i) negotiated dozens of agreements with landlords to reduce administrative rent claims and recover security deposits, (ii) asserted claims against third parties, (iii) worked with the Debtor, Hilco and Sherwood to liquidate the Debtor's warehouse inventory and IP Assets and (iv) significantly reduced claims.

59. The institutional and detailed knowledge possessed by Debtor's management and Windels Marx as to the remaining assets to be liquidated in this case is irreplaceable. Therefore, the conversion of the case is not in the best interests of the Debtor's creditors.

**RELIEF REQUESTED**

60. By this Motion, Debtor requests that the Court enter an order substantially in the form of the proposed Interim Order attached hereto as **Exhibit C** authorizing and approving the Debtor's use of cash collateral to complete payments for necessary administrative expenses as they become due on an interim basis through the date of the final hearing on the Motion, and on a final basis through November 30, 2022, without prejudice to a further extension upon application to the Court or alternatively to surcharge collateral pursuant to Section 506(c) of the Bankruptcy Code.

**LEGAL ARGUMENT**

*The Court Can Grant Authority for the Debtor to use Cash Collateral under Section 363 of the Bankruptcy Code*

61. Bankruptcy Code Section 363(c)(2) provides in relevant part that a debtor "may not use, sell, or lease cash collateral … unless: (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

62. Based on Legalist's new position, the Debtor cannot pay the immediate and necessary administrative expenses to continue operations absent a Court order. The Debtor and its professionals relied upon Legalist's support in engaging in the significant efforts described above to liquidate the Debtor's property. Legalist should be estopped from abruptly halting the Debtor's liquidation process that Legalist helped set in motion and approved.

63. Moreover, the Debtor would suffer immediate and irreparable harm from the defaults that would result from its failure to pay necessary and critical administrative expenses. The Debtor would be forced to halt its liquidation efforts, abandon assets, and fire its employees. Further, the chances for a successful liquidation and the ability to realize maximum value for the benefit of creditors would effectively be eradicated. Conversely, the Debtor's use of cash collateral will benefit the estate and all creditors, including Legalist, by minimizing disruption of the Debtor's liquidation efforts.

64. Upon information and belief, the estimated value of the assets remaining to be liquidated exceeds the amount of Legalist's debt and the anticipated allowable expenses in this case. The assets located in the Debtor's dark stores have been auctioned and the proceeds deposited in the Debtor's DIP account. To date, the Debtor has not spent any of the proceeds of the auction sales to which Legalist's liens have attached. The remaining assets are in the process of being auctioned or sold. The net proceeds of such sales will be subject to Legalist's liens.

65. At the beginning of this case, Legalist was willing to lend $6.5 million to the Debtor against these same assets. Given that the Debtor only borrowed $4 million of the amount officially committed, the Debtor submits that Legalist was, is, and will remain adequately protected should the Court grant the relief requested herein. In any case, it is clear that Legalist would not benefit from a conversion of the case to Chapter 7.

66. The Revised Budget is a reasonable assessment of the expenses the Debtor expects to incur as it continues to complete the liquidation of its assets and conclude its business affairs. Legalist's approval of the Revised Budget further belies any assertions that it is not adequately protected by its liens on the Debtor's assets.

67. The requested relief will resolve what is essentially a timing issue, albeit a potentially critical one, and is in the best interests of the Debtor, creditors, and the estate.

68. The Debtor's continued use of cash collateral throughout this case has been authorized by the Court and has been consented to by Legalist. The Second Circuit has held that a debtor may use a secured creditor's collateral to pay administrative expenses where the secured creditor consented to the payment of such expenses. *See In re Blackwood Assocs., L.P.*, 153 F.3d 61, 68 (2d Cir. 1998) ("[I]f a secured party consents to allowing such administrative expenses, that party may be liable for such expenses even in the absence of conferred benefit"); *In re 680 Fifth Ave. Assocs.*, 154 B.R. 38, 43 (Bankr. S.D.N.Y. 1993) (a debtor may collect expenses from encumbered assets if either the secured creditor consents to such expenses, impliedly or expressly).

69. Section 363(e) of the Bankruptcy Code provides that a party with an interest in property proposed to be used, sold or leased by a debtor may receive adequate protection of such interest before a debtor may use, sell or lease such property. 11 U.S.C. § 363(e).

70. Under Bankruptcy Code section 363(e), as long as the secured creditor is adequately protected against the diminution in the value of its collateral, a court may authorize the debtor-in-possession to use cash collateral, including for reimbursement of attorneys' fees, over the objection of the secured creditor. *See In re ProAlert, LLC*, 314 B.R. 436, 443-45 (B.A.P. 9th Cir. 2004) (holding that cash collateral can be used to pay professional fees if creditor is adequately protected); *In re Residential Capital, LLC*, 497 B.R. 403, 419-20 (Bankr. S.D.N.Y. 2013) (finding secured creditor was adequately protected and not entitled to further adequate protection liens); *In re Coventry Commons Assoc.*, 149 B.R. 109, 114 (Bankr. E.D. Mich. 1992) (approving elements of debtor's plan, which included use of collateral for chapter 11 administrative and operational expenses, over secured creditor's objection); *In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 698

(Bankr. S.D. Tex. 2009) (authorizing use of cash collateral over the lender's objection to pay certain administrative expenses); *In re Robotic Vision Systems, Inc.*, 367 B.R. 232, 237 (1st Cir. B.A.P. 2007) ("Lenders often agree, or, conditions permitting, bankruptcy courts will authorize over objection, the use of cash collateral to fund … professional services"). Moreover,

> [U]se of [creditor's] cash collateral to pay the debtor's professional fees does not constitute a surcharge. The debtor is not asking [creditor] to pay for the debtor's professional fees. If [creditor's] interest is adequately protected, then by definition there will be no impairment of [creditor's] interest in the nature of a surcharge, or of any other nature.

*In re Coventry Commons*, 149 B.R. at 114 (citations omitted).

71. Because the use of cash collateral will allow the Debtor to continue as a liquidating enterprise, which will preserve and maximize value in connection with the administration of the estate, the Debtor respectfully requests that the Court grant this Motion pursuant to Bankruptcy Code § 363(c)(2).

*The Debtor is Alternatively Entitled to a Surcharge on the Collateral*

72. As long as the secured creditor is adequately protected from potential diminution in value, section 506(c) is not relevant to an analysis of the use of cash collateral. *In re ProAlert*, 314 B.R. at 442-43 (holding that use of cash collateral could be authorized pursuant to section 363(e) of the Bankruptcy Code, subject to adequate protection, without regard for the requirements of a section 506(c) surcharge, and noting that adoption of the creditor's position would improperly "give a secured creditor absolute control over the use of cash collateral in most cases", thereby placing the success of a chapter 11 reorganization "subject to the good will of a debtor's secured creditors"; the court held that "[a]llowing a secured creditor such control would shift the balance carefully struck by Congress and be unduly cumbersome to implement.").

73. Even if Legalist could show that its interest in collateral has been diminished and that is no longer oversecured, the Bankruptcy Code and the Final Cash Collateral Order authorizes the Debtor to surcharge the collateral pursuant to section 506(c) of the Code.

74. As set forth above, the Final Cash Collateral Order preserves the Debtor's 506(c) claims and, because there was never a Final DIP Order entered in the case, such claims supersede Legalist's Adequate Protection Superpriority Claim. *See* Final Cash Collateral Order at ¶ 8.

75. Under Section 506(c) of the Bankruptcy Code, a debtor-in-possession "may recover from property securing an allowed claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." The purpose of the provision is to prevent secured creditors from obtaining a financial windfall at the expense of the estate and unsecured creditors by ensuring that the secured creditors are responsible for the same collateral disposition costs within a bankruptcy case that normally would arise in a foreclosure or similar state law proceeding outside bankruptcy. *See Ford Motor Credit Co. v. Reynolds & Reynolds Co. (In re JKJ Chevrolet, Inc.)*, 26 F.3d 481 (4th Cir. 1994); *Southwest Securities, FSB v. Segner (In re Domistyle, Inc.)*, 811 F.3d 691 (5th Cir. 2015).

76. Three elements must be satisfied in order to surcharge collateral under the terms of section 506(c): (i) the expenditure must be necessary; (ii) the amounts expended must be reasonable; and (iii) the secured creditor must benefit from the expense. *See In re Ceron*, 412 B.R. 41, 48 (Bankr. E.D.N.Y. 2009) (citations omitted).

77. The debtor in possession also must show that its funds were expended primarily for the benefit of the creditor and that the creditor directly benefited from the expenditure. *See id.* (citations omitted).

78. As set forth above, the Debtor has satisfied each of these elements. As Debtor's lone secured creditor, Legalist has benefited substantially from the successful administration of the Debtor's case and its collateral-preserving achievements.

79. The fact that Legalist rejected the Debtor's offer to grant Legalist relief from stay demonstrates Legalist appears to acknowledge that the Debtor can liquidate the warehouse equipment more efficiently than Legalist.

80. In addition, courts recognize a separate test under Section 506(c), which allows a bankruptcy court to surcharge a secured creditor's collateral based on express or implied consent, or when the secured creditor caused expenses to be surcharged. *See In re Tollenaar Holsteins*, 538 B.R. 830 (Bankr. E.D. Cal. 2015). Just as under Section 363(e), Legalist's consent to the use of cash collateral satisfies this separate basis to surcharge its collateral.

81. From the outset of the case, the Debtor's primary focus has been to maximize the value recovered from the sale of its assets, and the work the Debtor and its professionals have performed to this point has supported such efforts. Successful sales have concluded and more are in process; considerable administrative claims based on the rejection of leases and executory contracts have been avoided; and the Debtor's operation and administration of its case have successfully proceeded ahead.

### **IMMEDIATE RELIEF IS WARRANTED**

82. Pursuant to Bankruptcy Rule 4001(b)(2) and Local Bankruptcy Rule 4001-2, the Court may conduct a preliminary, expedited hearing and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

83. The Debtor respectfully submits that an interim order authorizing the Debtor to pay immediate administrative expenses until the final hearing on the Motion is necessary to preserve

and maximize value and avoid immediate and irreparable harm and prejudice to the Debtor's estate and all parties in interest.

84. As set forth above, several necessary administrative expenses are overdue or due in the near future and must be immediately paid in order for the Debtor to continue its successful administration of the estate for the benefit of all creditors.

85. Such items include regularly scheduled salary and benefit payments to the Debtor's employees covering the two week period ending September 30, 2022 and overdue amounts owed to Sherwood, who are instrumental to the sales process of the Debtor's equipment and inventory. Failure to immediately pay these parties could result in them ceasing to work.

86. Moreover, warehouse rent of $75,000 is due to Nationwide Industrial Supply to continue the storage of the Debtor's valuable equipment. As set forth in an October 3, 2022 email from Hilco to Mr. Walker (attached to the Walker Declaration as Exhibit 1), the failure to pay this rent has already impacted the equipment sales process by cancelling potential bidders' plans to inspect the merchandise.

## NOTICE AND NO PRIOR REQUEST

87. The Debtor will provide notice of this Motion to (i) the UST's office, (ii) Legalist (Attn: Brian Rice, Esq.), and (iii) all entities that have requested notice in this Chapter 11 Case and (iv) to the creditors listed in the bankruptcy case pursuant to Bankruptcy Rule 1107(d).

88. The Debtor respectfully submits that such notice constitutes good and sufficient notice and that no other notice need be given.

89. The Debtor submits that this motion cites the relevant statutory authority and rules for the relief requested, does not raise any novel issue of law, and therefore this motion complies

with Local Bankruptcy Rule 9013-1(a). Accordingly, no separate memorandum of law is required in connection with the motion.

90. No previous motion for the relief requested herein has been made to this or any other court.

## CONCLUSION

91. Buyk respectfully requests that the Court enter an order authorizing the Debtor's use of cash collateral to complete payments for necessary administrative expenses as they become due on an interim basis through the date of the final hearing on the Motion, and on a final basis through November 30, 2022, without prejudice to a further extension upon application to the Court or alternatively to surcharge collateral pursuant to Section 506(c) of the Bankruptcy Code and grant such other relief as the Court deems just and proper.

**WHEREFORE** Buyk respectfully requests entry of an Interim Order substantially in the form of **Exhibit C** granting the relief requested in the Motion on an interim basis through the date of the final hearing on the Motion, and a final order in a substantially similar form as the Interim Order granting the relief requested through November 30, 2022.

Dated: New York, New York     WINDELS MARX LANE & MITTENDORF, LLP
October 4, 2022               *Counsel for Buyk Corp.*

By:   */s/ James M. Sullivan*
      James M. Sullivan (jsullivan@windelsmarx.com)
      156 West 56th Street
      New York, New York 10019
      Tel. (212) 237-1000 / Fax. (212) 262-1215